**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Illinois Farmers Insurance Company,
As subrogee of
Paul Krawetz and Pamela Krawetz

Plaintiff,

vs.

Honeywell International Inc.,
A Delaware Corporation,

Defendant.

Court File No. 02-CV-410 JNE/JSM

**HONEYWELL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS AND DISMISSAL OF PLAINTIFF'S CLAIMS**

---

## I. INTRODUCTION

This case involves a fire loss at the home of Paul and Pamela Krawetz (the "Krawetzes") on January 27, 2000. Illinois Farmers Insurance Company ("Illinois Farmers") insured the property and conducted a fire investigation at the scene on February 2, 2000. That same day, Illinois Farmers' expert identified a Honeywell thermostat as the likely cause of the fire. That thermostat was retained as evidence. Eight days later, on February 10, 2000, the Honeywell transformer that had been wired to the thermostat from the Krawetzes' furnace was also removed and retained as evidence.

On March 8, 2001, more than a year later and well after the fire scene had been destroyed and the subject home repaired, Illinois Farmers notified Honeywell of the fire and its intent to pursue a subrogation action against Honeywell for alleged failures of the

thermostat and transformer. This lawsuit followed almost another year later, on January 24, 2002.

To defend itself, Honeywell was left with only photographs of the scene and two pieces of evidence, selectively retained by Illinois Farmers. Honeywell's experts had no opportunity to examine the fire scene or other material evidence from it to develop opinions on other possible causes and origins of the fire, or to refute the opinions of Illinois Farmers' experts.

Illinois Farmers' spoliation of evidence and the resulting prejudice to Honeywell warrants sanctions. Specifically, Honeywell respectfully requests that Illinois Farmers be precluded from offering any evidence or testimony derived from the fire scene or the evidence Illinois Farmers chose to retain. This would include both of Illinois Farmers' retained experts, the St. Paul Fire Department Investigator, and the Honeywell thermostat and transformer.

## II. FACTUAL BACKGROUND

Illinois Farmers commenced this products liability action against Honeywell on January 24, 2002, alleging strict liability, negligence, and breach of warranty. (*Complaint*; attached as Exhibit A to the Affidavit of Scott M. Rusert[1])[2] The claim is based on subrogation from Illinois Farmers having paid $117,988.78 to the Krawetzes as

[1] Hereafter, all exhibits referred to in this Memorandum of Law are attached to the Affidavit of Scott M. Rusert, or in some instances, specifically included as Exhibits to the excerpted depositions provided herewith.

[2] The case was removed to this Court on February 21, 2002.

a result of a fire at the Krawetz residence on January 27, 2000. (*Compl*. ¶¶ III, IV, V)[3] Illinois Farmers alleges that the fire was caused by an overheated thermostat and defective transformer, both manufactured by Honeywell. (*Compl*. ¶ VI)

**A. Illinois Farmers' Investigation**

Richard Rush was an adjuster handling the Krawetz loss for Illinois Farmers. (*Rush Depo*. pp. 4, 20, attached as Exhibit B) Illinois Farmers assigned Mr. Rush to the Krawetz loss on January 28, 2000. (*Id*. pp. 33-34) After viewing the fire scene himself on January 29, 2000, Mr. Rush retained Certified Fire Investigator Robert Whitemore to conduct a cause and origin investigation of the fire scene. (*Id*. pp. 57-58)

On February 2, 2000, Mr. Whitemore investigated the fire scene for Illinois Farmers. (*Id*. p. 59; *Whitemore Depo*. p. 9, attached as Exhibit C). That same day, Mr. Whitemore faxed Mr. Rush informing him that fire appeared to originate with a thermostat "believed to be a Honeywell programmable digital thermostat." (*Rush Depo*. p. 62; *Whitemore Depo*. p. 53 & Ex. 11). Mr. Whitemore went on to advise that the St. Paul Fire Department had retained the thermostat as evidence. (*Whitemore Depo*. Ex. 11)

On March 27, 2000, Mr. Whitemore sent a report to Mr. Rush setting forth his analysis and conclusion about the cause and origin of the fire. (*Rush Depo*., pp. 80-81; *Whitemore Depo.* p. 13; Ex. 4) In it, Mr. Whitemore again referenced the Honeywell programmable thermostat and stated it is "the only identifiable source of ignition within the defined area of origin." (*Whitemore Depo*. Ex. 4, p. 3) Mr. Whitemore also advised

[3] Although the Complaint has not been amended, Paul and Pamela Krawetz claim to have an additional $25,000 in uninsured losses.

that an electrical engineer should examine the thermostat in more detail. (*Id*.) Mr. Rush acknowledged that this report demonstrated the potential for litigation against Honeywell. (*Rush Depo*. p. 82).

**B. Destruction of the Fire Scene and Evidence Preservation**

As stated above, with his initial investigation on February 2, 2000, Mr. Whitemore identified a Honeywell programmable thermostat as the only source of ignition in the area of origin of the fire. (*Whitemore Depo*. Ex. 11) The thermostat was retained as evidence, but Mr. Whitemore made no effort to retain any other evidence from the scene.

Although Mr. Whitemore saw and photographed a wooden chest that had been situated along the wall, six inches from the thermostat, he made no effort to examine the burn patterns on the dresser, place it back in the area of origin, or to preserve it for further examination. (*Whitemore Depo*. pp. 45, 63-66; Ex. 5, photos 44 and 45) In addition, Mr. Whitemore made no effort to examine or preserve electrical wires he saw depicted in Fire Department photographs. After the fire, these wires were hanging down, draped over the wooden chest. (*Id*. pp. 72-76; Ex. 14, photos 16 & 17)

Beyond the evidence from the suspected area of origin, the furnace itself and certain components of it were important to the investigation, but in some instances, not preserved. The thermostat suspected to have started the fire was connected to a furnace in the Krawetzes' basement. (*Id*. pp. 38-40) Mr. Whitemore examined and photographed the furnace and its components, but left it to others to investigate its potential involvement in the fire. (*Id*. pp. 39-40; Ex. 5, photos 38-42). In fact, Mr. Whitemore

photographed and viewed as significant the Honeywell transformer now being blamed for this fire. (*Id*. p. 39; Ex. 5, photo 42).

Soon after the fire, Mr. Krawetz arranged for Hinding Heating & Air, Inc. to work on the furnace in an attempt to get it running. (*Krawetz Depo*. pp. 44-47, attached as Exhibit D) On February 10, 2000, Hinding installed a new thermostat and removed and replaced the transformer on the furnace. (*Id*. Ex. 17) Mr. Krawetz does not know why the transformer was removed, but he recalls saving it for the insurance company or fire department. (*Id.* pp. 48-49) On February 16, 2000, Hinding returned to the Krawetz residence and replaced the main circuit board. (*Id*. p. 51; Ex. 18). The circuit board was not retained. Finally, on either February 16 or 18, 2000, Hinding replaced the entire furnace. (*Id*. p. 52; Ex. 19) The furnace was not retained.

The St. Paul Fire Department collected both the thermostat and the transformer from the fire scene and retained them until May 4, 2000, when Mr. Whitemore's office took possession of them at the direction of Illinois Farmers. (*Whitemore Depo*. p. 60; Exs. 10 & 12) On September 12, 2000, Mr. Whitemore transferred the thermostat and transformer to an electrical engineer – Dan Choudek – for further examination, again at Illinois Farmers' direction. (*Id*. pp. 60-61; Ex. 13)

While the investigation and evidence transfer discussed above was taking place, the Krawetz residence was being repaired – destroying forever the fire scene and the related evidence. Mr. Krawetz either performed or oversaw these repairs following an itemized schedule agreed upon with Mr. Rush. (*Plaintiff's Rule 26(a)(2)(B) Expert Disclosure of Paul Krawetz*, *Krawetz Depo*. Ex. 21) As a result of these repairs, the fire

scene and relevant evidence were destroyed when Mr. Krawetz completed the structural repairs "in the six months after the January 27, 2000, fire." (*Id*. p. 2).

**C. Notice to Honeywell**

On February 2, 2000, Illinois Farmers representatives at the Krawetz fire scene – Richard Rush and Robert Whitemore – were aware that a Honeywell thermostat probably was involved in the fire. (*Rush Depo*. p. 62, *Whitemore Depo*. p. 53) On February 10, 2000, the Honeywell transformer was removed from the furnace, but retained for Illinois Farmers at the direction of Mr. Krawetz. (*Krawetz Depo*. pp. 48-49) By March 27, 2000, Mr. Whitemore concluded the thermostat was the only identifiable ignition source in the area of origin for the fire, and reported that conclusion to Mr. Rush. (*Whitemore Depo*. Ex. 4, p. 3) On September 12, 2000, Mr. Whitemore transferred the thermostat and transformer to Illinois Farmers' electrical engineer (*Id*. pp. 59-61; Ex. 13; *Choudek Depo*. p. 17, attached as Exhibit E) On December 19, 2000, Mr. Choudek issued a report concluding the fire was caused when the Honeywell thermostat overheated because of a failed Honeywell transformer. (*Choudek Depo*. pp. 16-19; Ex. 5)

Finally, after suspecting Honeywell's involvement since February 2, 2000, and having at least four different instances indicating that Honeywell was suspected in the fire, Illinois Farmers' (through counsel) placed Honeywell on notice of the claim giving rise to this lawsuit on March 8, 2001. (*Letter of Kevin J. Kennedy to George Van Kula, Esq*., attached as Exhibit F) By this time, the fire scene had been long-since processed and repairs to the subject house had been complete for nearly eight months.

**D. Illinois Farmers' Expert Opinions**

After a firsthand examination of the fire scene and the various artifacts at the scene, Mr. Whitemore concluded that the fire originated at the Honeywell thermostat located in the northwest corner of the living room. (*Whitemore Depo*. pp. 20-21; Exs. 4, 6, 11) Although he has never encountered a fire started by a thermostat, Mr. Whitemore identifies the thermostat as the only source of ignition within the area of origin. (*Id*. p. 42)

To explain Mr. Whitemore's unique conclusion that the fire originated with the thermostat, Illinois Farmers retained – through Mr. Whitemore – electrical engineer Dan Choudek. (*Choudek Depo*. pp. 3-4) Mr. Choudek opines that the thermostat overheated because the Honeywell transformer to which it was wired on the furnace was defective and sent excess voltage to the thermostat. (*Id*. pp. 26-27, 32-33; Exs. 6, 7) He further opines that the heat generated from this excess voltage caused the body of the transformer to ignite. (*Id*. Exs. 6, 7) To support this theory, Mr. Choudek relies on "exemplar" testing in which he set a piece of the body from a different Honeywell thermostat onto an electric hot-plate and observed it catching fire. (*Id*. pp. 94-96)

**E. Honeywell's Expert Opinions**

Honeywell has retained the services of Certified Fire Investigator Daniel Churchward to assist in the investigation of the cause and origin of the subject fire. (*Defendant's Rule 26(a) Disclosures*, Ex. 1 to the *Churchward Depo*., attached as Exhibit G) Mr. Churchward was retained after Honeywell received notice of this fire, long after the fire scene was destroyed. Mr. Churchward is unable to render an opinion as to the

point of origin and cause of the fire. (*Churchward Report*, contained in *Churchward Depo*. Ex. 1, p. 2, Opinions 2 & 3) While he agrees with Mr. Whitemore's general area of origin, based on an examination of photographs, he questions the involvement of the thermostat because fire patterns in photographs of the scene appear to contradict that conclusion. (*Id*., opinion 1; *Churchward Depo*. pp. 32, 37-41) Moreover, he states that his inability to examine the scene first-hand hindered his investigation, as well as his ability to assess all possible origins and causes – Mr. Whitemore's or other alternatives. (*Churchward Report*, p. 2, Opinion 4, p. 9, "Conclusions") More specifically, his investigation was hindered by the inability to examine burn patterns on the walls and the wooden chest located directly adjacent to the thermostat. (*Churchward Depo*. pp. 44-45, *Churchward Report*, pp. 3-4) Mr. Churchward also criticizes the failure by Illinois Farmers and/or Mr. Whitemore to preserve for inspection, the furnace and its components along with what appears to be electrical wiring seen in the area of origin. (*Churchward Depo*. p. 52, *Churchward Report*, pp. 7-8)

In 1998, Mr. Churchward was the Chairman of the Technical Committee on Fire Investigations for the National Fire Protection Association. (*Churchward C.V*., contained in *Churchward Depo*. Ex. 1, p. 2). This Committee prepared *NFPA 921: Guide for Fire and Explosion Investigations*. (*Id*.) "The guide is intended for use by both pubic sector employees who have statutory responsibility for fire investigation and private sector persons conducting investigations for insurance companies or litigation purposes." (*NFPA 921*, p. 921-1 "Origin and Development of *NFPA 921*", excerpts attached as Exhibit H) Notably, both Mr. Whitemore and Mr. Choudek are members of the NFPA.

(*Whitemore C.V*. included in *Whitemore Depo*. Ex. 6, p. 5; *Choudek C.V*., included in *Choudek Depo*. Ex. 7, p. 3)

Mr. Churchward points out that the fire cause and origin investigation here violated the standards of *NFPA 921* – in particular, the failure to notify Honeywell, as an interested party, of this fire and provide it with an opportunity to examine the scene first-hand. (*Churchward Report*, p. 8 – text & footnote) The version of *NFPA 921* in place at the time of this investigation stated:

> Every attempt should be made to protect and preserve the fire scene, as intact and undisturbed as possible with the structure, contents, fixtures, and furnishings remaining in their pre-fire locations.
>
> (*NFPA 921: Guide for Fire and Explosion Investigations* (1998), § 9-3, p. 921-61)
>
> Potential evidence at the fire scene and surrounding areas can include the physical structure, the contents, artifacts, and any materials ignited or any material on which fire patterns appear.
>
> (*Id*. p. 921-62)
>
> Interested parties should be allowed to participate in the investigation and examine the evidence in its undisturbed condition. *No party should remove evidence or materials without adequate notice to other interested parties*.
>
> (*Id*. § 16-2, p. 921-121) (Emphasis added)

John Forss is an electrical engineer also retained by Honeywell to assist in the investigation of this fire. (*Defendant's Rule 26(A)(2) Disclosures* – previously identified as *Churchward Depo*. Ex. 1) Mr. Forss disagrees with Mr. Choudek's conclusions about the alleged defect in the Honeywell transformer. (*Forss Report*, included in *Churchward Depo*. Ex. 1, p. 2) With respect to the theory about the thermostat overheating, Mr. Forss

questions the role played by the circuit board removed from the furnace, but not retained. He states that the replaced circuit board could have been "an indication of a malfunction in the control circuit [for the furnace] which could create the excessive current evidenced by the thermostat and transformer." (*Id.*) Without the circuit board, that possibility can never be developed fully.

**F. Illinois Farmer's Position on Fire Scene Preservation and Notice to Honeywell**

Whenever Mr. Rush is involved in the investigation of a fire scene, he hopes to determine the potential cause of the fire, while trying to be "keenly aware" of the potential for a subrogation claim. (*Rush Depo*. p. 22) He testified that he is "always aware that the possibility for litigation exists on every claim." (*Id*. p. 87) Mr. Rush is also aware of the need to preserve a fire scene when a subrogation potential exists, so that the involved parties can examine the scene. (*Id*. p. 68)

Notwithstanding the foregoing awareness, Mr. Rush believes he acted properly in waiting more than a year before placing Honeywell on notice of this loss. To justify this belief, he testified that he did not definitively believe Honeywell was involved until after Mr. Choudek issued a report concluding that Honeywell was at fault. (*Id*. pp. 83-86) Furthermore, Mr. Rush believes that he cannot place a potential party on notice of a subrogation claim unless advised to do so by his cause and origin investigator – in this case, Mr. Whitemore. (*Id*. pp. 65, 68-69) Mr. Rush believes it is Mr. Whitemore's responsibility to identify potential responsible parties. (*Id*.)

Mr. Whitemore was Illinois Farmers' retained representative to conduct a cause and origin investigation of this fire. (*Id*. pp. 57-58, *Whitemore Depo*. pp. 6-8) Contrary to Mr. Rush's testimony, Mr. Whitemore does not believe it is his responsibility to identify potential interested parties. (*Whitemore Depo*. pp. 54-56) Instead, he testified that his sole responsibility is to report his findings to Mr. Rush and that it is up to Mr. Rush to identify and notify any potentially interested parties. (*Id*. pp. 55-56)

Notably, both Mr. Rush and Mr. Whitemore acknowledge *NFPA 921* as the guide for fire investigations such as this one. (*Rush Depo*. p. 66; *Whitemore Depo*. p. 94) *NFPA 921* applies to both investigators like Mr. Whitemore and "insurance personnel," like Mr. Rush. (*Whitemore Depo*. p. 94-95; *see also NFPA 921*, p. 921-1) Mr. Whitemore agrees that under *NFPA 921*, Honeywell was an interested party that should have been notified and given the opportunity to investigate the fire scene. (*Whitemore Depo*. p. 99) However, he would find fault with the failure to notify Honeywell in this case only if *NFPA-921* "is the law of the land in the State of Minnesota." (*Id*.)[4]

## III. ARGUMENT

Illinois Farmers failed to preserve vital evidence directly relevant to its claims against Honeywell. Illinois Farmers first advised Honeywell of this fire more than a year after it occurred and well-after the scene and other relevant evidence had been destroyed. With that first notice, Illinois Farmers also advised Honeywell that its products were the

[4] While not finding it "the law of the land", the 8th Circuit recently held that *NFPA 921* is the standard by which a court can assess a fire investigation and the opinions flowing from it. *See Fireman's Fund Ins. Co. v. Canon U.S.A., Inc*., 394 F.3d 1054, 1057-58, 1060 (8th Cir. 2005) (affirming the exclusions of expert opinions on the cause of a fire).

target of a subrogation claim from that fire. Honeywell has been left to defend itself without firsthand access to the vital evidence to which Illinois Farmers had access but failed to retain.

On various occasions under circumstances remarkably similar to this case, courts have been called upon to protect defendants like Honeywell from the unfair prejudice created by spoliation of evidence. In recent years, this Court, the 8th Circuit, and Minnesota state courts have been called upon to address the prejudice that flows from spoliation of evidence. Indeed, every reported case – whether published or unpublished – protects defendants from the prejudice inherent in spoliation by sanctioning parties that fail to preserve evidence – whether intentionally or unintentionally. In each instance, the sanction is exclusion of the selectively-retained evidence, and the expert opinions and testimony that derive from the spoliated evidence.

### A. The Present Case is Virtually Identical to This Court's Decision in *Fischer v. Rheem Mfg. Co.*

On May 13, 2004, this Court ordered sanctions against a subrogating insurance company for spoliation of evidence under circumstances almost identical to those present here. *Fischer v. Rheem Mfg. Co.*, 2004 WL 1088328 (D. Minn. May 13, 2004).[5] *Fischer*, was a subrogation matter in which Western National Insurance Company ("Western National") made claims against a gas supply company and two product manufacturers, one of which was Robertshaw Controls Company ("Robertshaw"). *Id*. at

[5] A copy of *Fischer v. Rheem* is attached as Exhibit I.

*1. The subrogation claim arose from a fire loss at the home of Western National's insureds, Dennis and Judith Fischer. *Id*.

Like Illinois Farmers here, Western National investigated the fire scene within days of the fire; concluded that a product manufacturer was potentially responsible for the loss; and failed to preserve the fire scene before giving notice to the product manufacturer. *Id*. Like Honeywell here, Robertshaw was prejudiced because of its inability to examine the fire scene "firsthand" and to develop and consider theories different from the claimants. *Id*. at *2.

Considering all of the above facts, Judge Magnuson concluded that Western National had spoliated evidence and prejudiced Robertshaw by leaving it unable to "rebut the evidence of causation" being postulated by Western National's experts. *Id*. This prejudice led Judge Magnuson to sanction Western National by precluding it from "relying on evidence obtained from the fire scene, including its experts' opinions and the opinions of the State Fire Marshal." *Id*. According to Judge Magnuson, this was the only sanction that would "truly level the playing field," as necessary. *Id*.

### B. This Court's Ruling in *Regent Ins. Co. v. Candle Corp. of America* is Also Instructive.

In another recent case, *Regent Ins. Co. v. Candle Corp. of America*, 2004 WL 2713251 (D.Minn. Nov. 24, 2004),[6] this Court was again called upon to rule on issues of spoliation of evidence. Although it arose in a different procedural context, the Regent decision is instructive. Regent Insurance Company preemptively moved for summary

[6] A copy of *Regent Ins. Co. v. Candle Corp. of America* is attached as Exhibit J.

judgment seeking to strike Candle Corporation of America's affirmative defense of spoliation. *Id*. at *1. In denying that motion, Judge Kyle reiterated legal principles of spoliation germane to the Honeywell's motion here.

In denying the motion, the Court was not persuaded by Regent's argument that the only destroyed evidence was "irrelevant evidence." *Id*. Instead, the Court said "[i]t is well established that 'a fire scene itself is the best evidence of the origin and the cause of a fire.'" *Id*. (quoting *Hoffman v. Ford Motor Co*., 587 N.W.2d 66, 71 (Minn.Ct.App. 1998)). The Court further pointed out the prejudice inherent in forcing a party to "confront[ ] the challenge of meeting probative and convincing firsthand evidence [of a fire scene investigation] with sketchy, relatively speculative secondhand evidence." *Id*. at *4 (quoting *Hoffman*).

**C. Federal Law or State Law**

While not always addressed in spoliation decisions, it appears that federal law guides a motion for sanctions for spoliation when this Court sits in diversity. In *Fakhro v. Mayo Clinic Rochester*, this Court concluded that federal law applies because the sanction involves procedural/evidentiary matters. *See Fakhro v. Mayo Clinic Rochester*, 2004 WL 909740, at *2-3 (D.Minn. March 31, 2004) *cited by Regent Ins. Co*., 2004 WL 2713251 at *3, n.5.[7] In *Fischer*, Judge Magnuson made no determination on choice of law. Conversely, the 6th Circuit has held that state law applies. *See Nationwide Mutual Fire Ins. Co. v. Ford Motor Co*., 174 F.3d 801, 804 (6th Cir. 1999) (holding that in a

[7] A copy of *Fakhro v. Mayo Clinic Rochester* is attached as Exhibit K.

diversity action "the rules that apply to the spoliation of evidence and the range of appropriate sanctions are defined by state law").

As a practical matter, the choice of federal or state law does not change the analysis here. Decisions from the federal courts and Minnesota state courts establish the same analysis. Both jurisdictions impose a duty on a party to preserve evidence when litigation is foreseeable, and both jurisdictions impose sanctions for the destruction of such evidence. *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993); *Lexis-Nexis v. Beer*, 41 F.Supp.2d 950, 954 (D.Minn. 1999); *Patton v. Newmar Corp.*, 538 N.W.2d 116, 118 (Minn. 1995). Indeed, the Minnesota Supreme Court, in *Patton*, adopted the test set forth in *Dillon*. *Patton* at 119 (citing *Dillon* at 267). While not controlling, the Minnesota state court decisions are instructive on facts similar to the present case.

**D. Courts Apply a Two-Part Test Assessing "Knowledge" and "Prejudice" When Ruling on a Motion for Sanctions Due to Spoliation.**

Spoliation is the "destruction of relevant evidence by a party." *Hoffman,* 587 N.W.2d at 71 *cited by Regent Ins. Co.*, 2004 WL 2713251 at *2. The case law has established a two-part test for deciding whether a party is subject to sanctions for spoliating evidence. First, the court should determine if the party "knew or should have known [the evidence] was relevant to imminent litigation." *Dillon*, 986 F.2d at 267;[8] *Lexis-Nexis*, 41 F.Supp.2d at 954. Second, the court should determine whether another party is prejudiced by the spoliation of the evidence. *Dillon* at 267.

[8] *Dillon* is quoted by both *Regent Ins. Co.*, at *3, and *Fischer*, at *1.

**1. Illinois Farmers Knew or Should Have Known That the Fire Scene and Artifacts from the Scene Were Relevant to Imminent Litigation.**

A showing of "bad faith" is not a prerequisite to a finding that a party spoliated evidence. *See Dillon*, 986 F.2d at 266 (the court did not find bad faith but still excluded evidence as a sanction for spoliation); *see also Patton*, 538 N.W.2d at 116 (specifically holding that *negligent* destruction of evidence is sufficient to impose sanctions for spoliation); *Himes v. Wooding-Verona Tool Works, Inc*., 565 N.W.2d 469, 471 (Minn.Ct.App. 1997) (finding no "wrongdoing on Himes's behalf, but simply recogniz[ing] that he, as plaintiff, should have to bear the consequence of the loss of the [evidence] rather than [defendant]").

A party not only has a duty to preserve items the party believes to have caused the injury, but also to preserve all other possible causes of the injury. *See Dillon*, at 265 (sanctioning a party that only saved a seat belt retractor assembly and a B-pillar, and not the entire automobile); *see also Allstate Ins. Co. v. Sunbeam Corp*., 865 F.Supp. 1267, 1278 (N.D.Ill. 1994) (noting that the rule requiring preservation of evidence rests on "fairness" and stated "there is no reason to limit it to the [claimed defective] product itself"). Specifically with fire investigations, a party must not only preserve the appliances the party believes to have caused the fire, but also (1) the fire scene, itself, and (2) all appliances, fixtures and wiring in the vicinity of the fire's origin. *Hoffman*, 587 N.W.2d at 71. Notably, the fire scene must be preserved because it is "the best evidence of the origin and the cause of a fire." *Id. cited by Fischer*, at *2, *and Regent Ins. Co*., at *3.

In this case, there are two different levels of spoliation that occurred, each with a significant impact on Honeywell's defense of this case. With respect to the origin and cause investigation, the fire scene itself, the wooden chest adjacent to the thermostat, and the electrical wiring in the area of origin are all key pieces of evidence that Illinois Farmers failed to preserve. With respect to the defect theory against Honeywell, and whether the transformer malfunctioned to cause the thermostat to overheat, the furnace itself and the removed circuit board are key pieces of evidence that Illinois Farmers failed to preserve.

Mr. Rush testified that in every fire claim he handles, he is keenly aware of the potential for subrogation action. (*Rush Depo*. p. 22) In addition, both Mr. Rush and Mr. Whitemore testified about their knowledge of *NFPA 921* and its requirement that interested parties, like Honeywell be given timely notice of a fire and provided the opportunity for a first-hand investigation of the scene. (Id.; *Whitemore Depo*. p. 99) Indeed, Mr. Whitemore testified that under *NFPA 921*, Honeywell should have been given notice of this fire. (*Whitemore Depo*. p. 99) However, Mr. Whitemore noted that it is not his duty to provide such notice – that would be the responsibility of Mr. Rush. (*Id*. pp. 54-56) Mr. Rush, while aware of the subrogation potential and *NFPA 921*, testified that he relied on Mr. Whitemore to advise him when to put a party on notice of the fire. (Rush Depo. pp. 65, 68-69)

In effect, an apparent miscommunication about responsibilities and expectations could explain – but not excuse – the failure to notify Honeywell of this fire. However, Mr. Whitemore specifically provided Mr. Rush the information he needed to identify and

notify Honeywell on two separate occasions: on February 2, via fax, and March 27, in a formal report. In both instances Mr. Whitemore informed Mr. Rush that a Honeywell thermostat was the suspected cause of the fire.

As of February 2, 2000, Honeywell clearly was an interested party that should have been given notice of this fire before any evidence war removed. *NFPA 921*, § 16-3. Moreover, knowing of the potential for litigation, there is no valid excuse for Illinois Farmers' failure to put Honeywell on notice of this fire before March 8, 2001.

Mr. Rush's keen awareness of potential subrogation cases bears not only on the failure to timely provide Honeywell with an opportunity to investigate fire scene, but also on the selective retention of the Honeywell artifacts, while ignoring the need to preserve other relevant items: the chest, the wiring from the area of origin, the furnace, and the circuit board removed from the furnace. Admittedly, responsibility for the preservation of these items falls more directly to Mr. Whitemore, than to Mr. Rush. However, Mr. Whitemore, like Mr. Rush, was Illinois Farmers' retained representative at the fire scene. In that capacity, he knew or should have known the potentially relevant items needed to be preserved. Indeed, he made it a point to photograph the chest and the furnace. This fact alone, at a minimum, is an acknowledgment of their potential significance to the investigation and the possibility that Honeywell or any other potential defendant would want to inspect them.

### 2. Honeywell's Defense of the Illinois Farmers' Claim Is Severely Prejudiced by Its Inability to Examine the Fire Scene and the Unpreserved Artifacts.

A party must show that it suffered prejudice by the spoliation of evidence to move a court to impose a sanction for the spoliation. *Dillon*, 986 F.2d at 267-8; *Patton*, 538 N.W.2d at 119, *Himes*, 565 N.W.2d at 470-71. Prejudice in a spoliation case is considered by examining "'the nature of the item lost in the context of the claims asserted and the potential for remediation of the prejudice' caused to the opposing party." *Regent Ins. Co.*, at *2; *Fischer*, at *1 (both quoting *Patton*, 538 N.W.2d at 119). A party is prejudiced by the spoliation of evidence if the party needed or could have used the evidence to independently determine the cause of an injurious event. *Dillon*, at 267-8; *Hoffman*, 587 N.W.2d at 71. Specifically, a defendant is prejudiced when a plaintiff destroys a fire scene, depriving the defendant of an opportunity to conduct a firsthand investigation of the scene and, instead, leaving the defendant limited to examining photographs and selectively preserved evidence. *Hoffman*, at 71.

Within the context of Illinois' Farmers' claims here, Honeywell has been deprived of the most vital piece of evidence – the fire scene itself. "[C]ourts recognize that 'a fire scene itself is the best evidence of the origin and cause of the fire.'" *Regent Ins. Co.*, at *3; *Fischer*, at *2 (both quoting *Hoffman*). This principle is "well-established." *Regent Ins. Co.*, at *3. The *Hoffman* case discussed the importance of the fire scene in great detail, finding that:

> All of the experts agreed that the best evidence of the origin and cause of a fire is the fire scene itself, including the exterior and interior of buildings, the contents of such areas, burn patterns, residuals of combustibles, and fire

> debris. No expert believed that an adequate investigation could be conducted based solely on photographs taken by others. The experts agreed that an investigator relies on multiple senses in fire inspections as he looks at, smells and touches various areas and items . . . . [A] fire investigation is a process of elimination whereby possible specific ignition and heat sources are located, inspected, and ruled in or out.

*Hoffman* at 69-70. Based on this finding, the *Hoffman* court affirmed an exclusion of "all testimony and evidence regarding the cause of the fire that derived from an investigation of [a burned car, the garage it was in, and other contents of the garage]." *Id*. at 70-71. This led to dismissal of the case for a lack of evidence. *Id*. at 71.

Here, Illinois Farmers and its expert had a firsthand opportunity to investigate the subject fire scene. Mr. Whitemore, had the opportunity to use all of his senses to explore and probe the fire scene. Honeywell has been deprived of that same opportunity – instead being left to conduct only a visual examination of photographs of the scene and the selectively preserved artifacts. In essence, Honeywell is confronted with the precise prejudicial dilemma noted by Judge Kyle – rebutting firsthand evidence with secondhand evidence. *Regent Ins. Co*., at *4.

Illinois Farmers will likely argue that Mr. Whitemore did not reach his conclusion alone, but that his conclusion on the origin of the fire is shared by the St. Paul Fire Department. Judge Kyle specifically rejected this excuse to a spoliation defense and pointed out that the investigators in question "are 'not now and never [were] aligned with' Defendants, and Defendants' expert '[was] unable to conduct an independent investigation' of the fire scene." *Regent Ins. Co.*, at *3 (quoting *Himes*, 565 N.W.2d at 471). The relevant inquiry is not whether the St. Paul Fire Investigator was retained by

Illinois Farmers, but rather whether Honeywell had the opportunity for an independent investigation by an investigator of its choosing.

As indicated above, the prejudice to Honeywell extends beyond the mere failure to preserve the fire scene. Illinois Farmers and Mr. Whitemore failed to preserve critical artifacts related to the origin of the fire. The wooden chest and electrical wiring that were located in the general area of origin were not preserved. These are the precise type of items that should have been preserved. *See Hoffmann*, 587 N.W.2d at 71 (holding that a party has a duty to preserve all appliances, fixtures and wiring in the vicinity of the fire's origin); *see also NFPA 921* § 9-3, p. 921-62. Without these items, Honeywell has been deprived of the opportunity to independently investigate other potential points of origin for the fire. (*See Churchward Report*, p. 2, Opinion 4, p. 9, "Conclusions")

The chest was located six inches from the area where Mr. Whitemore concluded the fire began (*Whitemore Depo*. pp. 22, 45) This chest was so significant, that Mr. Whitemore included it as the only item other than the thermostat in his diagram of the fire scene. (*Id*. pp. 22, 64; Ex. 7). Mr. Whitemore also photographed it as it sat in a dumpster at the scene. (*Whitemore Depo*. p. 64; Ex. 5, photos 44 & 45) Despite this attention to the chest, Mr. Whitemore did not preserve it.

Mr. Churchward states that "the chest and the [burn] patterns on it . . . are crucial to a determination of origin." (*Churchward Depo*. p. 57) He considers the detailed examination of this chest a "huge piece of evidence" necessary to validate this fire investigation – either his and Mr. Whitemore's. (*Id*.).

Specifically, Mr. Churchward was deprived of the opportunity to discern burn patterns and measure the depth of char to assess fire movement in the area of origin. (*Churchward Depo*. pp. 48-49) Had he been at the scene, Mr. Churchward also could have done "depth of calcination" measurements on the sheetrock near the chest to determine fire spread and assess Mr. Whitemore's point of origin theory. (*Id*. p. 63)

In addition to the chest and the walls, Mr. Churchward saw photographs depicting what appeared to be electrical wiring draped across the chest and hanging loose within the general area of origin. (*Id*. pp. 79-80) Had he been present at the scene, he would have been able to examine them to determine their potential involvement in the fire. (*Id*.). Since he was not present and they were not preserved, that opportunity was lost.

Like the fire scene and artifacts from the area of origin, the absence of the furnace and removed circuit board creates prejudice to Honeywell. Mr. Churchward noted that these are items he would want to have investigated and would have retained had he been given the opportunity to examine the scene. (*Churchward Report*, pp. 7-8) Similarly, Mr. Forss indicates that the circuit board is an extremely relevant piece of evidence. An examination and testing of it could have revealed an alternative explanation for the alleged excess current on the Honeywell devices that Illinois Farmers blame for this fire. (*Forss Report*, p. 2) Since the circuit board was not retained, that opportunity has been lost.

The potential for remediation of the prejudice to Honeywell from this missing evidence is non-existent. The fire scene, the chest, the wiring, the furnace and the circuit board have been lost forever. With respect to the fire scene and the chest, Honeywell can

at most attempt to discern questionable burn patterns from photographs. Honeywell can do nothing, however, to assess the dept of char in those burn patterns or place them in an overall context of the fire scene. Moreover, Honeywell can do nothing to examine the wiring, the furnace or the circuit board. At best, Honeywell can question whether the replaced circuit board was malfunctioning in such a way to cause malfunctions of the thermostat and transformer.

Ultimately, this case is about what caused the fire. Illinois Farmers, with the benefit of firsthand scene investigation, intends to present expert testimony that the fire was caused by a defective Honeywell transformer that caused a Honeywell thermostat to overheat and ignite. Since Honeywell has not had the benefit of a firsthand investigation of the scene and relevant artifacts that were not retained, Honeywell has been deprived of a level-playing field upon which to rebut those opinions or to present alternative opinions on the cause of the fire. The prejudice is undeniable and beyond remediation.

**D. Illinois Farmers Should Be Sanctioned for Spoliating Evidence.**

A court has broad authority to sanction a party who destroys evidence. *Dillon,* 986 F.2d at 267, *cited by Fakhro* at *3. A spoliation sanction is not necessarily intended to punish a wrongdoer; it is intended to remedy the harm suffered by the party who was not afforded the opportunity to examine the evidence. *Himes*, 565 N.W.2d at 470-71. Therefore, "the propriety of a sanction for the spoliation of evidence is determined by the prejudice resulting to the opposing party." *Hoffman, supra*, 587 N.W.2d at 71.

The *Patton* Court referred to the "need to examine the nature of the item lost in the context of the claims asserted and the potential of remediation of the prejudice." *Patton*

538 N.W.2d at 119. Here, the fire scene is gone forever and cannot be examined. The evidence of any alternative causes including the chest, the wiring, the furnace and the circuit board are also gone forever. There is no substitute for this missing evidence: the scene cannot be recreated and the missing evidence can never be examined. In short, Honeywell is forced to defend this case on terms set by Illinois Farmers. For this reason, Honeywell requests exclusion of all evidence and testimony derived from the fire scene and preserved evidence. In other words, all of Illinois Farmers' expert liability testimony from Mr. Whitemore, Mr. Choudek, and the St. Paul Fire Department Investigator should be excluded, along with Illinois Farmers' selectively preserved evidence – the thermostat and the transformer.

### 1. The Court should exclude all of Illinois Farmers' evidence derived from the fire Scene and the Selected Evidence preserved

Under similar fact patterns, courts have excluded all of a plaintiff's evidence concerning the cause and origin of an accident or fire – including expert testimony from retained experts, State Fire Marshals, selectively preserved evidence and photographs – even though such exclusion resulted in the dismissal of the suit. *See Dillon*, 986 F.2d at 269; *see also Patton,* 538 N.W.2d at 119; *Hoffman,* 587 N.W.2d at 70-71; *Himes*, 565 N.W.2d at 471-72; *Dodd v. Leviton Mfg. Co.*, 2003 WL 21147151 (Minn.Ct.App. May 20, 2003);[9] [10]

[9] A copy of *Dodd v. Leviton Mfg. Co*. is attached as Exhibit L.

[10] Outright dismissal is another, but rarely employed sanction for spoliation. In *Auto-Owners Ins. v. Haggie's House of Pizza, Inc.*, 2003 WL 22293643 (Minn.Ct.App. Oct. 7, 2003) (attached as Exhibit M), the Minnesota Court of Appeals affirmed an outright dismissal on facts similar to the case at bar, citing an inability for the defendant to conduct an independent investigation of a fire scene and plaintiff's "immense evidentiary advantage" derived from destroying the fire scene and saving only the alleged defective products.

The unpublished decision in *Dodd* is instructive on facts almost identical to those in this case. In *Dodd,* a fire originated in the kitchen and destroyed the Dodds' home. *Dodd* at *1. Dodd's insurance company retained a fire cause-and-origin investigator and an electrical engineer to investigate the fire scene. *Id.* The experts determined that the fire originated in an outlet and ruled out as a cause of the fire the remaining appliances in the kitchen. *Id.* at *1-2. The experts extensively photographed the fire scene, preserved some fire debris and saved the outlet and appliances connected to the outlet. *Id.* at *2. The insurance company only notified the defendant after destroying the fire scene and discarding the remaining appliances from the kitchen. *Id.* The trial court sanctioned the insurance company and excluded all of the insurance company's evidence concerning the cause and origin of the fire. *Id*. at *4.

The insurance company appealed on the grounds that the insurance company retained all the relevant evidence concerning the cause and origin of the fire, *i.e.*, the outlet and appliance connected to it, because the experts excluded the other appliances from being a cause of the fire. *Id.* at *5.

The appellate court, however, upheld the lower court because the insurance company severely prejudiced the defendant by limiting defendant's expert investigation concerning the cause and origin of the fire to photographs, evidence that the insurance company selectively preserved and the insurance company's expert testimony. *See id*. at *5. The appeals court also was "troubled" by the insurance company's failure to notify the defendant until eight months after the fire even though the insurance company

believed within a few days of the fire that the defendant's product caused the fire. *Id.* at *3

Illinois Farmers should face the same consequences as the subrogated insurer in *Dodd* on a factual record equally as egregious. Its experts and evidence should be excluded and the court should dismiss this case for a lack of evidence.

**2. Once Illinois Farmers' Expert Testimony and Fire Scene Evidence is Excluded, a Prima Facie Case is Impossible and the Case Should Be Dismissed.**

Under Minnesota law, claims of strict products liability, negligence or breach of warranty require proof of causation. *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060 (8th Cir. 2005). If exclusion of evidence renders a plaintiff unable to prove proximate cause, the case should be dismissed. *See id*. at 1061; s*ee also, Patton*, 538 N.W.2d at 119-120; *Hoffman*, 587 N.W.2d at 70; *Dodd*, 2003 WL 21147151 at *1. Here, without excluded expert testimony, and without the excluded, selectively-retained evidence (the thermostat and transformer), Illinois Farmers will have no evidence to link Honeywell to the fire at the Krawetz residence – proof of proximate cause will be absent. Accordingly, Honeywell respectfully requests this court to dismiss the case with prejudice.

## IV. CONCLUSION

For the forgoing reasons, Honeywell respectfully requests this Court to preclude Illinois Farmers from offering any testimony or evidence derived from the fire scene or its hand-picked evidence, including all of Illinois Farmers' proffered expert testimony concerning the cause and origin of the fire. The Court should then dismiss the case for

lack of evidence. Additionally, Honeywell respectfully requests that this Court grant other and further relief as the Court deems just and proper.

**FLYNN, GASKINS & BENNETT, L.L.P.**

Dated: May 13, 2005

s/Scott M. Rusert
Scott M. Rusert, #231113
333 South Seventh Street, Suite 2900
Minneapolis, Minnesota 55402
(612) 333-9500
***Attorneys for Honeywell International Inc.***