# EXHIBIT A

STATE OF MINNESOTA | DISTRICT COURT

COUNTY OF RAMSEY | SECOND JUDICIAL DISTRICT

Case Type: Other Civil

Illinois Farmers Insurance Company,
as subrogee of
Paul Krawetz and Pamela Krawetz,

Plaintiff,

vs.

Honeywell International Inc.,
a Delaware Corporation,

Defendant.

Court File No.:

**COMPLAINT**

Plaintiff, for its cause of action against the Defendant, states and alleges as follows:

I.

That at all times relevant hereto, Plaintiff's insureds, Paul Krawetz and Pamela Krawetz, maintained a policy of insurance, policy No. 09175500778, issued by Plaintiff and providing coverage for their home located at 4552 Wyoming Street East, St. Paul, Minnesota (hereinafter "loss location").

II.

That at all times relevant hereto, Defendant Honeywell International, Inc. ("Honeywell") was a Delaware Corporation doing business in Minnesota, among other things, as a designer, manufacturer, importer, distributor, tester and seller of various

consumer products for the home, including, but not limited to, heating, ventilation, and air conditioning controls.

III.

That on or about January 27, 2000, a fire occurred at the loss location, causing severe damage to the real and/or personal property of Paul Krawetz and Pamela Krawetz.

IV.

That as a result of the loss, Paul Krawetz and Pamela Krawetz made claim to Plaintiff under the policy of insurance referenced above, and Plaintiff reimbursed Paul Krawetz and Pamela Krawetz in an amount exceeding $117,988.78.

V.

That immediately upon payment to Paul Krawetz and Pamela Krawetz, Plaintiff became subrogated to all rights, claims, or causes of action held by its insured.

VI.

That Plaintiff conducted an investigation into the loss and determined that the fire occurred when a thermostat at the loss location overheated and the overheating was caused by the defective failure of a transformer that was, among other things, manufactured, imported, distributed, tested, and/or sold by Defendant.

VII.

That subsequent to the loss, Plaintiff gave timely notice of its claim to Defendant.

**COUNT ONE**
**STRICT LIABILITY**

Plaintiff restates and realleges Paragraphs I through VII above and further states and alleges as follows:

VIII.

That at the time the subject thermostat and transformer was designed, manufactured, imported, distributed, tested and/or sold by Defendant, said thermostat and transformer was in a defective condition unreasonably dangerous to Paul Krawetz and Pamela Krawetz as the users and/or ultimate consumers of said thermostat and transformer.

IX.

That the Defendant is, therefore, strictly liable to Plaintiff for its damages suffered on or about January 27, 2000, at the loss location.

IX.

That Defendant's defective product was a direct, proximate and foreseeable cause of Plaintiff's damages in an amount in excess of Fifty Thousand and No/100 Dollars ($50,000.00).

**COUNT TWO**
**NEGLIGENCE**

Plaintiff restates and realleges Paragraphs I through IX above and further states and alleges:

XI.

That Defendant was negligent in this case in, and among other things, its design, manufacture, importing, distribution, testing and/or selling of said thermostat and transformer.

XII.

That Defendant's negligence was a direct, proximate and foreseeable cause of Plaintiff's damages in an amount in excess of Fifty Thousand and No/100 Dollars ($50,000.00).

**COUNT THREE**
**BREACH OF WARRANTY**

Plaintiff restates and realleges Paragraphs I through XII above and further states and alleges:

XIII.

That with the design, manufacture, importing, distribution, testing and/or sale of said thermostat and transformer, Defendant extended certain express and implied warranties, including, but not limited to, the implied warranties of fitness for a particular purpose and merchantability.

XIV.

That Defendant breached the above-referenced express and/or implied warranties.

XV.

That Defendant's breach of its express and/or implied warranties was the direct, proximate and foreseeable cause of Plaintiff's damages in an amount in excess of Fifty Thousand and No/100 Dollars ($50,000.00).

**WHEREFORE**, Plaintiff prays for judgment against the Defendant in an amount in excess of Fifty Thousand and No/100 Dollars ($50,000.00), together with costs and disbursements incurred herein and prejudgment interest thereon and for such other relief as the court deems proper.

Dated: 1-9, 2002

**HANSON LULIC & KRALL**

By [signature]
Kevin J. Kennedy (#193872)
Michael V. Benninghoff (# 0300998)
Suite 500
920 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 333-2530
***Attorneys for Plaintiff***

**ACKNOWLEDGMENT**

Pursuant to Minn. Stat. § 549.211, Plaintiff acknowledges, by its attorney(s) hereunder, that costs, disbursements and reasonable attorneys' fees and witness fees may be awarded to the opposing party pursuant to this statute.

[signature]
Kevin J. Kennedy (#193872)
Michael V. Benninghoff (# 0300998)

G:\HLK\17445\PLDG\Complaint

# NOTICE AND ACKNOWLEDGMENT OF SERVICE BY MAIL

## Notice

TO: **Honeywell International, Inc.**
**C/O CT Corporation Systems, Inc.**
**405 2nd Avenue South**
**Minneapolis, MN 55401**

The enclosed Summons and Complaint are served pursuant to Rule 4.05 of the Minnesota Rules of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within twenty (20) days.

**Signing this Acknowledgment of Receipt is only an admission that you have received the Summons and Complaint, and does not waive any other defenses.**

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

**If you do not complete and return the form to the sender within 20 days, you (or the party on whose behalf you are being served) may be required to pay any expenses incurred in serving a Summons and Complaint in any other manner permitted by law.**

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the Complaint within twenty (20) days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

I declare, under penalty of perjury, that this Notice and Acknowledgment of Receipt of Summons and Complaint was mailed on the 23 day of January, 2002.

______________________________
Signature

______________________________
Date

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the Summons and Complaint in the above-captioned matter at 405 2nd Avenue South, Minneapolis, Minnesota 55401.

________________________________
Signature

________________________________
Relationship to Entity/Authority
to Receive Service of Process

________________________________
Date of Signature

G:\HLK\17445\PLDG\Notice and Acknowledgment.wpd

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - -

Court File No. 02-410 JMR/FLN

Illinois Farmers Insurance Company,
As subrogee of
Paul Krawetz and Pamela Krawetz,

Plaintiff,

vs.

COPY

Honeywell International Inc.,
A Delaware Corporation,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

RICHARD RUSH

NOVEMBER 22, 2002

11:15 A.M.

Rhonda Olynyk
KINSELLA, HARTIGAN & KELZER
632 Wells Fargo Midland Building
Minneapolis, Minnesota 55401
(612)339-6132

(Rush Deposition Exhibit 1 was marked for identification.)

RICHARD RUSH,

the Witness herein, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. RUSERT:

Q. Sir, could you state and spell your full name for the court reporter's record, please?
A. Richard, R-i-c-h-a-r-d, Samuel, S-a-m-u-e-l, Rush, R-u-s-h.
Q. Mr. Rush, my name is Scott Rusert. I'm an attorney representing Honeywell in a lawsuit that's been brought by Illinois Farmers against Honeywell arising out of a fire that occurred at the residence of Paul and Pamela Krawetz located at 452 Wyoming Street East in St. Paul, Minnesota, that occurred on January 27th, 2000.
I understand that you were an adjustor representative of Illinois Farmers Insurance Company that worked on this loss?
A. That's correct.
Q. Okay. Could you tell me what your current business address is?
A. Route 2, Box 52, Bagley, B-a-g-l-e-y, Minnesota

A. The billing -- basically, the relationship is that we work for leads or supervisors with Farmers directly. We report to them regarding the files. And then when it comes down to billing, the billing is submitted through that supervisor. Then payment is forwarded from Farmers to Wardlaw, and then Wardlaw pays me.
Q. Okay. And you're considered to be Farmers' representative at a loss site like the Krawetzes' residence, correct?
A. Yes.
Q. You're authorized to make decisions on behalf of Farmers with respect to investigations?
A. Subject to review of management.
Q. Okay. Subject to review.
You're also authorized to make recommendations as far as the investigation?
A. Yes.
Q. Similarly with payments to be made, are you authorized to make decisions with respect to what payments should be made?
A. Basically, I'm authorized to prepare the source information, and then based -- now, this has varied some over the years, but the way that it's set up is that we would request that based upon giving

contact the insured immediately upon receipt of the claim, and also to make an attempt to be at the loss site within 24 hours and to at that point meet with the insured, go over their policy coverages with them, and then begin to look at their immediate needs, typically the immediate needs would be their housing, to get them into some type of a temporary situation, and then to go ahead and evaluate the claim.

Q. In an example of a fire claim, part of that would involve an investigation as to what caused it, correct?

A. That would be one area of concern that would be addressed.

Q. Okay. In the process of investigating to determine what caused it, are you also keeping in mind potential subrogation interests that Farmers may have?

A. We always keep potential subrogation possibilities in mind.

Q. Okay. You're aware of the potential for subrogation anytime you go out to a fire scene?

A. Try to be keenly aware of that.

Q. How is it that you came to become an insurance adjustor in 1998?

within log notes. They look sort of like they're summaries that you did.
A. That's correct.
Q. One page has at the top "Payment Record"?
A. Yes.
Q. And that's literally what it says, a record of payments that were made?
A. Yes, sir.
Q. To the Krawetzes?
A. Yes, sir.
Q. And then the page after that, the last page of 2-A says a log summary recap, correct?
A. Yes, sir.
Q. And that's sort of a run-through of what's in your log and what was part of your investigation in this case?
A. Yes, sir.
Q. Okay. And obviously at any point in time during the deposition if you need to take a look at those log notes to refresh your recollection or help you, please do that. I'd like you to testify to the best of your ability.
A. Okay.
Q. So Ron Doke from Farmers got in touch with you on January 28th, told you about a loss.

A. Yes.
Q. Okay. What happened next? I assume you were assigned now to handle this claim, to adjust this loss for Farmers?
A. Yes. And the next step was that -- well, I would have called the insureds.
Q. The Krawetzes?
A. Yes.
Q. Okay.
A. And set an appointment to meet at the loss.
Q. And this was the day after the fire, correct?
A. Yes. Can I -- I need to refer, because I'm --
Q. Absolutely.
MR. RUSERT: Off the record.
(Discussion off the record.)
MR. RUSERT: Back on.
A. All right. After speaking with Ron Doke, then on the same date I called the insured and spoke with the insured and set an appointment to inspect the loss.
BY MR. RUSERT:
Q. And before you went in and inspected the loss, did you do anything else?
A. Set up a claim file.
Q. Okay. What does that involve?

A. That was on 1-29.
Q. That was on that initial visit?
A. Yes.
Q. Okay.
A. And then I went on just to explain sort of the damage that I had observed.
Q. Did you ask him or do you recall asking him the manufacturer of the thermostat?
A. No, I didn't.
Q. At that point did the thought occur to you that the thermostat could be implicated as the cause of the fire?
A. I don't recall that entering my mind at that point.
MR. RUSERT: Why don't we go ahead and take the break.
(From 12:34 p.m. to 12:40 p.m. a recess was taken.)
BY MR. RUSERT:
Q. Mr. Rush, at some point when you were out at the site or during the course of this investigation, you made arrangements for Bob Whitemore of Ward & Whitemore to come out and do an origin and cause investigation?
A. Yes.

Q. How did you know about them, Ward & Whitemore, that is?
A. I had used Ward & Whitemore previously.
Q. Okay. How many times had you used them?
A. I don't recall.
Q. What did you ask him to do?
A. I asked him to do a full investigation as to what the cause and origin might have been.
Q. Do you know when you first contacted him? You can take a look at your notes, obviously.
A. January 29th.
Q. January 29th you got in touch with Ward & Whitemore and asked them to do this origin and cause investigation, correct?
A. Yes.
Q. Okay. Are there any specifics in your logbook, or does it just say contacted them?
Called Ward & Whitemore, five consultants, to conduct fire investigation. Left message. Okay.
Was there a deadline as to when they needed to be out there?
A. You mean one that I have established, I established a deadline?
Q. Right.
A. Well, I like to get them out as quickly as

possible.
Q. Okay. And I understand from talking to -- deposing Mr. Whitemore yesterday, he went to the scene on February 2nd. Does that square with your recollection?
A. Yes, uh-huh. Well, let's see. I show that I met with Bob Whitemore on February 2nd. I show it, I guess, on or about 12:45 p.m.
Q. Okay. Were you with him during the course of his investigation, or did you leave the scene while he was still there?
A. I was in the home reviewing my contents list while he was doing that work.
Q. Moving backwards for a minute, when you were there on January 29th, had the -- you may even need to look at your photographs for this one -- had the fire scene been, for lack of a better word, processed by the fire department already? In other words, had things been moved around?
A. I don't recall being aware of that actually at that time.
Q. There's been some discussion in this case about a chest, a piece of furniture that was located in the area of origin. Do you recall seeing that chest at any point in time when you were out at the home?

A. I was referring mainly to when the cause and origin would come out and look.
Q. Your investigator, for example, Mr. Whitemore?
A. That would be -- yeah.
Q. I don't think we need to mark this as an exhibit, but I'll show you. This was marked as Exhibit Number 11 at Mr. Whitemore's deposition yesterday.
Do you recall getting this? It's a fax to you. It says, to Mr. Dick Rush, hotel guest, from Robert B. Whitemore, CFI.
A. Do I specifically recall? I don't specifically recall getting it, no.
Q. I think I might have seen in your log notes reference to it. Maybe you can --
A. Okay.
Q. -- check your log notes and see if you made a notation of getting it.
A. What was the date again?
Q. February 2nd.
A. Okay. My log notes indicate that I received it.
Q. On February 2nd, 5 p.m. --
A. Yes.
Q. -- there's an entry that says, "Picked up fax from Ward & Whitemore, status letter, and reviewed letter," correct? That's what that entry says?

A. When I go in, yeah, that's something that's on my mind, yes.
Q. On other fire losses that you've handled, have you made note of products that were located in an area of origin and felt it advisable to contact the manufacturer of that product to let them know that they may be involved in a loss?
A. Basically, I would let that recommendation be made by the cause and origin individual, and if they would say they felt it was at a point that that needed to be done, then I would have responded to that.
Q. You would rely on in this case Mr. Whitemore to tell you if, for example, Honeywell needed to be put on notice?
A. I would look to him for direction in that regard.
Q. Did he give you any direction in that regard?
A. I don't recall at that point, no.
Q. Okay.
A. My understanding at that time, aside from what is here, my understanding was there was nothing definitive about the -- at that point, because there had to be further determination as to the actual thermostat and who the manufacturer was.
Q. Have you investigated fire losses for Farmers where

they insured, let's say, a contractor or someone who was potentially a defendant in a fire case?
A. I'm sorry. Would you say that again? I'm sorry.
Q. Have you handled any losses ever where it was an insured -- where you were working on behalf of an insured who may be a defendant in a fire case?
A. I've never been a liability adjustor.
Q. Okay. That's a more succinct way of putting it.
A. Yes.
Q. If Mr. Whitemore would have advised you at this point to put Honeywell on notice of the fire, would you have done that?
A. If I would have been advised, I would have contacted a supervisor and discussed it with a supervisor and then proceeded according to his directions.
Q. Okay. Are you familiar with what's called NFPA 921?
A. I've heard the term.
Q. Do you know what it is?
A. As much as I know about it, it's a standard, I believe, the cause and origin people go by when they inspect the cause and origin of fires.
Q. Is it a standard that you go by at all when you're investigating a fire loss?

A. That it does not apply to me?
Q. Yes.
A. I'm not aware enough of it, quite frankly, to say whether it applies, if there's something in there that would say it applies to me or not. To my knowledge, that's what they use as their standard of cause and origin, and that's as much as I know about it.
Q. If there's subrogation potential to a case, are you aware of the need to preserve the fire scene so that involved parties can investigate it?
A. Am I aware that that needs to be done?
Q. Yes.
A. Every scene is different. Yes, I'm aware that there needs to be preservation of scenes, more so it's been -- it's been an evolving-type situation there in adjusting and cause and origin as I understand it. But am I aware of it? Yes, I am.
Q. In your experience have you had instances where in the course of investigating a loss you've preserved the scene so that a potential defendant in a subrogation matter could be on the site to investigate it or see the scene?
A. I've relied on that type of direction from a cause

and origin expert in certain situations, yes.
Q. So there have been situations --
A. Yes.
Q. -- where that has come up?
A. Um-hmm.
Q. Has it ever come up with Honeywell before?
A. I don't recall being involved with anything with Honeywell.
Q. Has it ever come up with anything that you have worked on with Mr. Whitemore before?
A. You know, I don't recall. I don't know.
Q. I'm going to get into the specifics of your damage estimates in a little bit, but first I want to talk to you about any work done on the heating system at the house --
A. Okay.
Q. -- after the fire, okay?
A. Okay.
Q. All right. What do you recall about the heating system that was in place at the time of this fire? And feel free to look at your notes or anything you need to refresh your recollection.
I think the basis -- to narrow my question a little bit, what I'm asking about is, do you remember sort of what the components were? Was

Q. Okay. And you got a copy of his cause and origin report?
A. I received a copy at the time that he issued it, and then I believe that I would have forwarded that with the file.
Q. Forwarded it to the main office at Farmers?
A. To the main office, where it would be to Farmers, yes.
Q. If that report made reference to, again, a thermostat believed to be manufactured by Honeywell to have been involved in this fire, is that something that you would have made any recommendations about putting Honeywell on notice of the fire?
A. Basically, I would have to see the report to answer that. You know, what I would have done, I can't really say.
Q. I show you what was marked yesterday at Mr. Whitemore's deposition as Exhibit Number 4. I want you to go ahead and take a look at that, see if you remember seeing that.
It is dated March 27th, 2000, and addressed to you, correct?
A. Yes, it is.
Q. Okay.

A. (Witness perused document.) Okay.
Q. Do you recall getting that from Mr. Whitemore?
A. Yes, I do.
Q. Okay.
A. I do recall getting the report, and that seems to be in line with what I would have received and looked at.
Q. Page 3 of the report, the third -- fourth paragraph down, it says: The northwest corner of the living room at the time of the fire contained a small chest with various knickknack items located on it. Adjacent to the chest attached to the west wall of the living room was a programmable thermostat believed to be manufactured by Honeywell. And then it says in parens based on the insured's recollection.

The programmable thermostat provided operational controls for the HVAC system within the residence. Residual burn patterns illustrate a significant pattern associated with the fire originating at or near the location where the thermostat was attached to the west wall.

Did I read that correctly?
A. Yes.
Q. Okay. Reading that, does that indicate to you that

there is potential involvement of litigation against Honeywell in this case?
A. In reading that, if it were a Honeywell thermostat, then it would be something that there could be litigation on, yes.
Q. Okay. It says it's believed to be a Honeywell thermostat. So does that mean to you that there could be litigation with Honeywell?
A. That means there could be litigation with Honeywell.
Q. Did you make any recommendations that Honeywell be put on notice of this loss?
A. Did I make recommendations?
Q. After receiving that report.
A. Basically what I did was -- based upon this report, was follow the recommendation that Ward & Whitemore made and got an engineer involved.
Q. Okay. At what point in time do you recall thinking that there was going to be subsequent litigation or the potential for subsequent litigation in this case?
A. You're asking me to recall some things that I don't have completely clear recollection of, but just in basically searching for the conclusions that I came up with, my conclusion was to first take steps to

identify it, which it was not really, as I recall, identifiable, even though there had been -- there had been an allegation made by Mr. Krawetz that he had purchased the item, as I understood it, but I basically felt it safe to have -- follow the recommendation that Mr. Whitemore gave, which was to get an engineer to look at it, and to put faith in the fact that he would do it in a way that would be responsible as far as any future addressing of that thermostat.

Q. So you weren't willing to go on what you referred to as the allegation of Mr. Krawetz that a Honeywell -- that it was a Honeywell thermostat; you wanted more information?

A. I basically was going by what I saw in the reports and felt that it did need to be looked into further.

Q. Okay. My question earlier was a little bit different. It wasn't specifically with respect to the thermostat or with Honeywell.

It was, at what point in time do you recall, and you can give me in general terms if you want, that there was the potential for further litigation in this case as a subrogation matter?

A. As I recall, okay, when I received the engineering

report, which I don't quite recall the date, and --
Q. You're talking about from On Site?
A. Yes. And, again, I probably should be referring here again to log notes, but when I received the -- I believe it was On Site.
Q. For the record, you're referring to copies of some reports from on Site Engineering?
A. Yes, uh-huh.
I need to look through some log notes before I answer these questions. And also I'm going to need to defer, Kevin, to when I called you.
MR. KENNEDY: Okay. Let's go off the record a minute.
(Discussion off the record.)
MR. RUSERT: Go ahead. Back on.
BY MR. RUSERT:
Q. You're referring within what we referred to as Exhibit 2-A, your log notes?
A. Yes. I had been out apparently --
Q. What's the date of the entry that you're looking at?
A. 12-29-2000.
Q. Okay.
A. Okay. I had been out of town. I don't recall quite why. I just note here that I had been out of

town. And I had received a report regarding the faulty -- it says regarding faulty Honeywell thermostat transformer, and reviewed the report and a billing. And that was on 12-29-2000.
Q. Reviewed report and what?
A. Billing.
Q. Oh, billing. Okay.
A. And then it was on 1-16 in 2001 I spoke with Ron Doke about the report and thermostat. He asked that I contact Kevin Kennedy.
MR. KENNEDY: Any other discussions regarding counsel, your discussions with me --
BY MR. RUSERT:
Q. Yeah. I don't want the substance at all.
A. Oh, right. I won't. Yeah.
So then at that point I paid the invoice, and I probably deferred that to --
Q. So are you saying that on I think you said January 16th, 2001, that that was the first point in time in this case that you became aware of the possibility for further litigation?
A. Became aware of the possibility?
Q. Right.
A. Well, I think the possibility existed prior to that, but I think that that's the first time I

became aware that it was identified that it was a Honeywell thermostat.

Q. Okay.

A. And then on January 30th, 2001, I prepared a package and FedExed today the report to Kevin Kennedy.

Q. So you were aware of the possibility of further litigation during the entire course of this investigation, correct?

MR. KENNEDY: Objection, mischaracterizes his testimony. Go ahead.

A. Go -- I'm sorry.

MR. KENNEDY: Actually, can you read that question back?

BY MR. RUSERT:

Q. I'll say it again.

So you were aware of the possibility for further litigation in this matter during the entire course of your investigation, correct?

MR. KENNEDY: Object to the form of the question. Go ahead.

A. There was no further litigation. Possibility of some type of litigation against somebody?

BY MR. RUSERT:

Q. Right.

A. I'm always aware that that possibility exists on every claim.

Q. Yeah. You testified earlier you're keenly aware of the potential for subrogation, correct?

MR. KENNEDY: Repetitive.

A. Yes.

BY MR. RUSERT:

Q. But you didn't -- well, strike that.

And you had received reports as early as February 2nd that there was a thermostat believed to be manufactured by Honeywell that was involved in the area of origin of this fire, correct?

A. Um-hmm. Did I receive that report?

Q. Yes.

A. I received that report from Ward & Whitemore.

Q. But since it hadn't positively been identified as a Honeywell thermostat, you didn't think that there was any further possibility of litigation against Honeywell?

A. I don't recall giving that that thought process at that point.

Q. We're going to move to damages now.

A. Okay.

Q. What type of coverage did the Krawetzes have? I think you had talked about it earlier on that