# EXHIBIT C

Illinois Farmers, et al. vs Honeywell International, et al.

Depo of Robert B. Whitemore, CFI 11/21/02

***Page 1 to Page 107***

COPY

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

***Pat Carl & Associates***
***www.patcarl.com***
***4527 Sunset Ridge***
***Minneapolis, MN 55416***
***Phone: 763-591-0535***
***FAX: 763-591-0538***

Page 5

**identification.)**

BY MR. RUSERT:

Q. Before we do that, I'm going to show you what we have marked as Whitemore Exhibit No. 1. That is a copy of the notice of taking deposition duces tecum for you in this case. Have you seen that before?

A. **I believe I have, yes.**

Q. If you look at page 2 of that is a Schedule A of items that you were requested to bring with you to this deposition today, is that correct?

A. **Yes, sir.**

Q. I understand you have done that with an investigative file, a copy of which is before you in that binder, correct?

A. **Correct.**

Q. Then there is another copy of all of the contents of that binder with the exception of any privileged materials that were removed by Mr. Kennedy that you have provided to me, is that correct?

A. **Yes, sir.**

Q. I am not going to mark that as an exhibit. It's pretty voluminous but we'll just acknowledge that you did provide that here today.

Page 6

There are no other items responsive to that Schedule A that you have that you did not bring, is that correct?

A. **That is correct.**

Q. Moving to the fire itself, I understand you were retained to conduct an investigation of this fire?

A. **Yes, sir.**

Q. Can you tell me about that, how was it you came to be retained?

A. **My office was notified of the loss assignment on January 31, 2000, by Dick Rush who was adjusting the loss on behalf of Farmers Insurance Group.**

**(Whereupon, Whitemore Deposition Exhibit No. 2 was marked for identification.)**

BY MR. RUSERT:

Q. I noticed when you were answering that last question that you were consulting the first page of the file. I will show you what we have marked as Exhibit No. 2 to your deposition. That is a copy of the page from the file that you were just reviewing to answer that question?

A. **Yes, sir.**

Page 7

Q. You said it was Dick Rush from Farmers Insurance Company who called you, correct?

A. **Correct.**

Q. Did he speak with you?

A. **No.**

Q. Who did he speak with?

A. **He would have spoke with Pam Whitemore.**

Q. I assume Pam Whitemore works for you in your office?

A. **Correct.**

Q. Have you worked with Mr. Rush before?

A. **As of the time of this fire I don't believe I had ever worked a case with Mr. Rush before.**

Q. But since then you have?

A. **I have worked a few cases with him, yes, I have.**

Q. Were those cases that you worked with Mr. Rush on behalf of Farmers Insurance Company?

A. **Yes.**

Q. I think you said your office was contacted on January 31st of 2000?

A. **That is correct.**

Q. That was four days after the fire?

A. **Yes, sir.**

Page 8

Q. Before you went to the scene, did you yourself have any conversations with Mr. Rush?

A. **Not that I recall.**

Q. What was your office told by Mr. Rush with respect to what happened?

A. **Essentially what you see on Exhibit 2 is information that would have been obtained at the time that the loss investigation was assigned to my office, so it has information pertaining to who the client is, loss information as far as who the insured and information about the loss, and a public agency that is doing an investigation, fire discovery information, miscellaneous information.**

Q. It's an understanding that you are being hired to go conduct an origin and cause investigation of this fire?

A. **Yes.**

Q. So what did you do next after your office received that contact from Mr. Rush?

A. **I believe we would have scheduled a time when I could go to the loss site to investigate the loss.**

Q. How is it that you would go about scheduling a time to go to the loss site?

Page 9

A. My office typically schedules it looking at my calendar and looking for availability.
Q. When was it that you went to this loss site?
(Whereupon, Whitemore Deposition Exhibit No. 3 was marked for identification.)
BY MR. RUSERT:
Q. Maybe this will assist in answering the question. I'm going to show you what we have marked as Deposition Exhibit No. 3. I believe that it's an invoice from your office that we got from the file that you brought today that shows the work or the time spent at that loss site, is that correct?
A. Yes, sir.
Q. What was the date that you went to the loss site?
A. February 2nd, 2000.
Q. I see from Exhibit 3, travel to and from the loss site was 1.6 hours, correct?
A. Yes.
Q. And then your actual time at the loss site conducting your investigation was 2.4 hours?
A. Yes.

Page 10

Q. Who was there at the loss site when you were there?
A. Initially no one was present as I recall. Shortly after I arrived Mr. Rush arrived and along with Mr. Krawetz.
Q. What conversations did you have with Mr. Rush before you started your investigation when you were there at the scene?
A. Nothing is memorialized in any notes. As far as any conversation, I believe we probably just introduced ourselves and I would guess minimal information or discussion took place. He was there doing some measurements and documenting and adjusting the loss from his perspective.
Q. Did he give you any information as to what he saw as the scope of the loss or any information regarding -- well, regarding the scope of the loss?
A. Not that I recall.
Q. Did he give you any information with respect to where it appeared that the fire had started?
A. Not that I recall.
Q. How about any conversations with Mr.

Page 11

Krawetz?
A. Mr. Krawetz took me inside or allowed us access into the property, and was there throughout a portion of my investigation, and essentially just answered some general questions as to, as I recall, my focus was in the northwest corner of the living room, so I had some specific interest in that area based on what I was seeing, and just walking around with me and had a question about, for example, where the electrical panel was, he would show me where it was, and where the furnace was, he would show me where that was, et cetera. So just more or less providing some guidance as to the configuration of the house and certain things that I was interested in looking at.
Q. Did you have any discussions with Mr. Krawetz with respect to any work with respect to perhaps construction or anything else that was being done on the house at the time of the loss?
A. I suspect we did have some discussions because you could see by looking at the house that it appeared to be in various stages of construction. In other words, there appeared to be some work that was being done on it, and that appeared to be more toward the south end of the house where kitchen and bedroom

Page 12

and that sort of part of the house was located.
Q. Do you recall what the work was that was being done on the house?
A. Well, it looked like there was a fair amount of refinishing, interior refinishing work, flooring, side walls, maybe a ceiling, and there was also a stairway leading to the basement or at least an opening that was still under construction.
Q. Did you ask Mr. Krawetz who was performing this work on the house?
A. It was my understanding he was doing most of it, if not all of it.
Q. Was that based on discussions you had with him?
A. Yes.
Q. How about any electrical work being done, were you aware of any electrical work that was being done on the house at the time or before the fire started?
A. There did appear to be some areas where there was some unfinished electrical work. I don't recall whether he was doing that or whether someone else was doing that, but there were certain areas, as I recall there appeared to be some unfinished

Page 13

electrical work that had been done.
Q. Do you recall, did you make any mention of that unfinished electrical work in your report, and if you need to look at your report, you can go ahead and do that?
A. I don't know if I did or not. I doubt it.
(Whereupon, Whitemore Deposition Exhibit No. 4 was marked for identification.)
BY MR. RUSERT:
Q. Mr. Whitemore, I'm going to show you what we have marked as Deposition Exhibit No. 4, and I will ask you to take a look at that and see if that appears to be a true and correct copy of your report, absent photographs and a diagram, but just the text part of your report?
A. Yes. It would appear to be my final report on this investigation.
Q. Okay. Go ahead and take a look in that report. Was there any spot in the report where there was mention of any exposed electrical work?
A. The only reference to the work that was going on is in paragraph 2 under analysis, page 2

Page 14

where it talks about there appeared to be various construction projects throughout a period of time, and talks about evidence of unfinished trim, wall coverings, floor coverings, et cetera, and it appeared that the residence had been under construction or renovation for some period of time prior to the fire.
Q. The paragraph below that, it mentions that the electrical, mechanical and HVAC systems were photographed and documented, correct?
A. Yes.
Q. Do you recall if you photographed or documented any of the open electrical work that you saw?
A. Other than what was in or around the panel would probably be all that I photographed, in addition to, you know, the area of origin, focusing on that area, but beyond that just general photographs throughout the house and the basement, I believe.
Q. Okay. The open electrical work that you saw, did you attach any significance to that or did it make any impressions on you?
A. The only significance I attached to it --
Q. Are you flipping through your

Page 15

photographs now?
A. Yes.
Q. We are going off the record for a second.
(Whereupon, Whitemore Deposition Exhibit No. 5 was marked for identification.)
BY MR. RUSERT:
Q. I show you what we have marked as Exhibit No. 5. Take a look at that. I believe it's color photocopies of the photographs that you took as part of your investigation in this case, is that correct?
A. Yes. That appears to be correct.
Q. A total of 45 photographs?
A. Yes.
Q. All right. Now, going back to the question that I had for you, I think you were looking through the photographs when I had asked about if you had photographed any of the open or exposed electrical work?
A. Yes. The only thing, when you ask about any significance or any issues pertaining to the electrical, as I recall the cover to the circuit

Page 16

breaker panel was not attached to the panel. In other words, it had been removed. I don't know if it had been removed, you know, at the time of the investigation by the St. Paul Fire Department or by Mr. Krawetz at sometime, but nonetheless it was off. That is how I found it. That is how I photographed it. So that wiring and the panel itself was exposed at the time of my investigation.
Q. Why is that significant to you?
A. The only significance is obviously from an electrical hazard, primarily from a shock hazard because you have an exposed panel that has, I believe it's about 100 ampere rated panel with up to 240 volts present, and as I recall, take a moment here, yes, that was in a bathroom off of the master bedroom. So obviously if that had been off, you know, throughout the time prior to the fire, that would have presented some hazard to people that were in the bathroom.
Q. This is an example of an unsafe electrical condition?
A. If it was off at the time of the fire or prior to the fire, I would say, yes, it is.
(Whereupon, Whitemore Deposition Exhibit No. 6 was marked for

Page 17

identification.)
BY MR. RUSERT:
Q. Other than your investigation that you conducted out at the loss site or the fire scene on February 2nd, what other things have you done to assist you in formulating opinions that you are going to give in this case?
**A. Other than reviewing all of the documents that I have received in this case, which you have a copy of that I provided for you, essentially that is what I have done since my field investigation. I did follow up and eventually the evidence that the St. Paul Fire Department obtained during their investigation was transferred to my office, and in turn we transferred it to Onsite Engineering, and that took place after my site investigation. But beyond that, that was the end of my investigation.**
Q. Did you perform any investigation of that evidence itself?
**A. No, sir.**
Q. I will show you what we have marked as Deposition Exhibit No. 6. That is a copy of the expert witness disclosure that you provided in this case, I believe. Take a look at that and tell me if

Page 18

I'm correct.
**A. Yes, sir.**
Q. On page 3 of that expert witness disclosure, item 7 I think is the list of documents or data that were considered by you in this matter, correct?
**A. Yes.**
Q. Those are the things that you had in your file here that you brought today?
**A. Yes, sir.**
Q. I see item A is examination and documentation of the site that you performed, correct?
**A. Yes, sir.**
Q. Item B is the St. Paul Fire Department incident report, correct?
**A. Yes, sir.**
Q. Item C is the St. Paul Fire Department investigation report, correct?
**A. Yes, sir.**
Q. I'm not going to read them out loud at this point but there are items D through H that you also considered. As we look at D through H, was there anything in those that assisted you in formulating opinions in this case?

Page 19

**A. Not really. It was just supporting documentation that Mr. Kennedy provided to me. The majority of that dealt with Honeywell documents that Mr. Choudek will be testifying about.**
Q. Sure.
**A. So essentially, no.**
Q. Essentially your opinion is based on your site investigation on February 2nd and the St. Paul Fire Department incident report and investigation report, correct?
**A. Yes.**
Q. In formulating that opinion, did you review any photographs from the St. Paul Fire Department?
**A. Yes.**
Q. Are those referenced, they are considered as part of this fire investigation report?
**A. Yes.**
Q. I didn't notice copies of those in your file though. Where did you review those?
**A. Mr. Kennedy had those.**
Q. When did you first review those photographs?
**A. I believe sometime after the**

Page 20

**investigation. I refreshed my recollection today, but at some point in time after the investigation I would have seen them.**
Q. Did you see them after March 27th of 2000 when you issued your initial investigation report in this case which is marked as Exhibit 4?
**A. I would say probably after.**
Q. Did you see those before you issued what we have marked as Exhibit 6, your expert disclosures in this case, and that was provided on August 23rd, 2002?
**A. I would say they probably were before.**
Q. You say probably. Do you know that?
**A. I'm just speculating.**
Q. What opinions have you formulated with respect to the origin and cause of this fire, and actually, strike that. I'm not going to confine it with respect to the origin. What opinions have you formulated in this case?
**A. Essentially what has been disclosed in Exhibit 6. As I view it, there are three opinions.**
Q. Okay.
**A. Number one, based upon the residual fire patterns, it was determined that the level of**

Page 21

origin within the residence was identified as the first floor.
Q. That is level of origin, you say?
A. That is correct.
Q. Okay.
A. Number two, the area of origin was defined as the northwest corner of the living room. This is based upon significant residual burn patterns. The fire originated at and/or near a thermostat which was mounted to the west wall near the northwest corner of the living room.
And opinion 3, the interior of the west wall near the area of origin showed no indications of fire within the confines of the wall structure. The only source of ignition within the area of origin was a thermostat that operated the HVAC system within the residence.
(Whereupon, Whitemore Deposition Exhibit No. 7 was marked for identification.)
BY MR. RUSERT:
Q. Mr. Whitemore, I show you what we have marked as Deposition Exhibit No. 7. I believe that was provided to us as part of your report in this

Page 22

case. Is that a copy of a diagram that you prepared as part of your investigation?
A. It's a diagram I did not prepare, but it is a diagram that an individual that provides services to my company based upon field diagrams that we prepare.
Q. Okay. What does that diagram show?
A. This photograph, excuse me, this diagram represents the first floor of the Krawetz residence which was determined to be the floor of origin.
Q. So that is opinion one of the three opinions that you talked about, correct?
A. Yes, sir.
Q. Does it depict anything else?
A. Well, it depicts several things like the various rooms, door openings, et cetera. There is also an identification of the rooms. There is an area of origin that is defined within the northwest corner of the living room, and within that area of origin there is a T with a circle that depicts a thermostat. There is also a rectangle that says chest, which was a wood chest that was sitting there at the time of the fire. And then there are a couple of little circles

Page 23

with hash marks in them representing receptacles that were found along those two walls.
Q. Electrical receptacles?
A. Yes, sir.
Q. So essentially that sort of squiggly line or the line that sort of looks like a cloud with the T and the chest in that has the area of origin, that is pretty much opinion two that you gave of the three opinions, correct?
A. Yes.
Q. I think I know where it is, but could you take a pen and mark on Exhibit 7 where the breaker box was that you had examined?
A. I will mark it just by C/B panel.
Q. Standing for circuit breaker panel?
A. Correct.
Q. And that is in the bathroom, the southern most of the two bathrooms in the home, correct?
A. Yes. It's also depicted by the little box there that is along the west wall of the bathroom.
Q. Right. With respect to that second opinion, how was it that you determined that the area of origin was in the northwest corner of the living

Page 24

room?
A. This particular fire was, actual fire damage appeared to be relatively confined to a small area. There was evidence of a lot of smoke damage throughout the entire residence, but actual physical fire damage noted by the residual burn patterns on the sheetrock, ceiling, wall surfaces, et cetera, clearly pointed to the origin of the fire being in the northwest corner of the living room.
Q. Then within Exhibit No. 2 you state that, "The fire originated at and/or near a thermostat that was mounted in the west wall near the northwest corner," correct?
A. Yes, sir.
MR. KENNEDY: Let me just correct the record, Scott. I think you referred to Exhibit No. 2.
BY MR. RUSERT:
Q. I didn't mean to say Exhibit No. 2. I meant opinion number 2 of what was marked as Exhibit 6. Thanks. At and/or near, how near, or what's the distance that you define as near with respect to that thermostat?
A. Well, within the area of origin, opinion number 2 defines my area of origin. Within

Page 37

had within the residence at the time of the fire. I then would have focused primarily on the area of origin. As I have testified to previously, the only device which I found within what I defined as the area of origin was the thermostat. There were no receptacles, again, no wiring, nothing that I found within that area.

On the back side of where the thermostat was located, which would be in the bedroom, which I would describe as the northwest bedroom, well use Exhibit 7, there is photographs depicted in Exhibit 5 that shows this bedroom and depicts the east wall and northeast corner of the northwest bedroom. What I was attempting to do there was show, A) this wall was totally intact.

Q. This is the wall that from the opposite side you have referred to as the west wall that was behind that chest and the thermostat was mounted on it?

A. Correct. So I was trying to show, A) that it was intact; B) there was virtually no fire damage into this room; C) there was a light switch that would have been mounted behind the thermostat and somewhere along that east wall, northeast corner of

Page 38

the northwest bedroom. And I was just showing the condition of that.

There is also photographs within Exhibit 5 that showed that circuit that is within the wall, the one we keep referring to as the west wall of the northwest corner of the living room which you see at the top where the sheetrock was removed that A) there is no burning in that wall, and B) the circuit is still clearly visible and intact.

Q. Can you show me the photograph that shows that circuit that you just talked about?

A. Yes. First, if I might, photographs 25 through 27 document, of Exhibit 5, depict the east wall, northeast corner of the northwest bedroom that I just described, and illustrate the light switch in that wall showing that there is no fire in that wall, and that it's hardly damaged. Photographs 21 and 22 of Exhibit 5 show the stud channel of the wall where the circuit leading to the light switch ran, and this photograph was taken on the living room side of the wall looking west at or near the ceiling level where that circuit came from.

Q. Did you examine any of the wiring for the thermostat itself that went to the thermostat

Page 39

itself to see any evidence of any electrical involvement in the fire?

A. I don't recall right at the thermostat about any wiring. I don't have a recollection of that and my photographs I don't think show anything pertaining to that. Down in the basement where the wires went for the furnace, there are photographs of those and the transformer that would have been attached to that went to the thermostat.

Q. Did those demonstrate, the photographs down in the furnace, the electrical wiring that you saw down there, did those show any sign of electrical involvement in the fire?

A. When I initially looked at it, I took photographs and didn't do a closer look at that thermostat, or excuse me, at the transformer. I left it as I found it. Now, I believe since then Mr. Choudek has found some indications of some electrical activity on that transformer, but that was not something that I recognized at that time because it took a closer examination that I did while it was still in the furnace.

Q. Did you do any examination in the furnace itself or were you leaving that to other

Page 40

people if necessary?

A. I was just documenting the furnace and that the furnace seemed to be A) it wasn't within the area of origin; B) there was no actual fire damage associated with it; C) I was documenting the gas valve and the inner workings of the furnace; and D) eventually focusing on the transformer, and that is basically the way I left it.

Q. What discussions, if any, did you have with the Krawetz's to determine possible causes of the fire; you have already talked a little bit about discussions with Mr. Krawetz?

A. Yeah. The primary thing I was trying to as I recall identify was essentially what was in that corner of the room that could have caused the fire. And as I recall there was every question that came up that was there wasn't anything in there, in the area prior to Mr. Krawetz's departure that afternoon that he felt could have started the fire. The only thing that was within this damaged area as I have said before was this thermostat.

Q. There is that chest that was there, correct?

A. Yes.

Page 41

Q. Did you have any discussions with Mr. Krawetz about what was in the chest?
**A. I'm sure we did, again, trying to flush out, for example, if there were candles or if he had incense on, you know, something going on there that may have involved this area. And as I recall, there was nothing there.**
Q. Did you interview or have any discussions with Mrs. Krawetz about possible causes of the fire?
**A. I don't recall her being at the scene when I was there. She might have appeared late. But I have no recollection of any discussion with her.**
Q. Any discussions with the Krawetz's son?
**A. No.**
Q. Can you explain for me your opinion as to how this fire started and spread, for example, what's the heat source in your opinion that started this fire?
**A. In this case as is indicated in Exhibit 6, the only source of ignition that I was able to identify within the area of origin was the thermostat that operated the HVAC system within the residence. That would be the heat source.**

Page 42

Q. What did that ignite, what was the fuel that that thermostat ignited in your opinion?
**A. Initially I would surmise that it would be the material that the thermostat was comprised of.**
Q. Which is what, the house, the body of the thermostat?
**A. Some plastic material that would have ignited.**
Q. How does that happen, how does the thermostat body start on fire or ignite?
**A. If there is some type of failure within the thermostat itself, eventually it would ignite any combustible material that was in or around the thermostat.**
Q. Have you encountered situations in the past where thermostats have started fires?
**A. Not that I recall.**
Q. Thermostats don't typically start fires, do they?
**A. I can't recall of one that I ever had.**
Q. Do you know why that is?
**A. Typically it's low voltage wiring that leads from some transformer within whatever the system is, and leads into the thermostat itself. So**

Page 43

**typically those operate in the range of probably 12 volts somewhere. There is usually a 10 to 1 stepdown transformer that comes off of an ordinary 120 volt house current that steps down to the voltage for the thermostat.**
Q. What you are basically saying is the voltage is so low you don't expect the thermostat to start a fire, correct?
**A. Typically the voltage is extremely low. The only -- I guess the only issues that I have heard pertaining to these would be if you have the induction of high voltage into that line feeding the transformer, or excuse me, feeding the thermostat, or if there is a failure itself at the thermostat. So that is essentially the way it can happen.**
Q. Okay. I want to run through sort of your ignition sequence. You've got what you perceive to be some electrical incident within the thermostat that ignites the thermostat body, is that correct?
**A. Some event happens at the thermostat to cause the ignition of the body or other combustible material that is inside of the thermostat.**
Q. You say some event. Is there something other than an electrical event?

Page 44

**A. I would say probably an electrical event.**
Q. So the thermostat body is ignited. Now what happens? We've got a fire on a thermostat in your opinion. What happens next?
**A. The fire begins to develop at the location of the thermostat, and as that is taking place, you will have material dropping as a result of the fire that is taking place.**
Q. What's the material that is dropping?
**A. Whatever is burning within the thermostat or the body of the thermostat is starting to drop. Best analogy like smoke detectors. Every fire you go into has smoke detectors. Fire takes place, plastic housing melts off, drops, here it is. So that is kind of a similar I guess characterization that would happen in this case.**
Q. So some material drops down from the thermostat. Then what happens?
**A. And then any material that was within the area where it dropped as well as the fire that is developing as a result of the transformer or the thermostat itself begins to ignite anything within that area, and that includes the cabinetry that was**

Page 45

sitting next to it either at floor level, which obviously it did have an event that caused fuel to burn up that side of the chest, as well as next to the chest because the thermostat was looked to be fairly close to where the chest was located.

Q. Do you know how far the chest was from the thermostat?

A. I would say probably within 6 inches.

Q. Is 6 inches from the thermostat close enough for a thermostat that starts on fire to then ignite a chest?

A. If the duration of the fire is sufficient, yes. It's a wood chest.

Q. The chest is alongside the thermostat, correct?

A. Correct.

Q. Is the fire going to burn sideways over to the chest to ignite it?

A. Not necessarily the fire, but the radiant energy from the fire itself, as well as the material that has dropped.

Q. Is it your theory or your opinion that the material that dropped dropped and came in contact with the chest and ignited it?

Page 46

A. May have come into contact or the radiant energy from the burning ignited the target fuel, which would be the sheetrock behind it which has a paper covering on it, obviously, but the wood chest which is right adjacent to this area.

Q. Did the sheetrock burn?

A. Yes. The covering of the sheetrock burned off, yes. The gypsum itself doesn't burn. It degrades from the thermal insult to the material, but the paper, if you will, craft paper, material that covers it will, yes, burn, discolor.

Q. Continuing on, you had possibly the material that dropped down possibly ignited the chest. Were there any other combustibles that you knew of in the area that that could have ignited?

A. Again, going back to our discussion about that area before, there wasn't anything that I was aware of that was in that area according to Mr. Krawetz and according to what I found. There was the cabinet itself and the thermostat which was next to the cabinet. That appears to be the fuel. Once the thermostat ignited, that appeared to be the next series of fuels that were targeted that would have ignited.

Page 47

Q. The next series is then the chest, from the thermostat to the chest?

A. Correct.

Q. Then what happens after that?

A. Then the fire develops vertically until it reaches a horizontal surface to cause it to mushroom or extend virtually in any direction from the point it impacts the horizontal surface. In this case that would have been the ceiling structure.

Q. Is that where it was when the fire department got there and put it out, or what else burned that you know of?

A. As I believe I stated at the start of this, it was a fairly small, confined fire. Again, a lot of smoke, and some heat throughout, but my looking at the residual patterns, I would say the fire was relatively confined to that area when they would have gotten there. Otherwise it would have been, you know, throughout the building.

(Whereupon, Whitemore Deposition Exhibit No. 8 was marked for identification.)

BY MR. RUSERT:

Q. I show you what we have marked as

Page 48

Deposition Exhibit No. 8. Can you go ahead and take a look at that and tell me if you recognize it?

A. It is an incident report from the St. Paul Fire Department and their fire investigation report.

Q. That is stapled together as both the incident report and the fire investigation report for this fire at the Krawetz home, correct?

A. Yes.

Q. And that is something that was in your file also that you obtained and reviewed as part of your opinions in this case, correct?

A. Yes.

Q. How did you get a copy of it for your files?

A. We sent a letter to the St. Paul Fire Department on January 31, 2000, which is a routine correspondence we would have.

Q. What was the date?

A. January 31, 2000.

Q. Okay. The day the assignment came in?

A. Yes. That is not unusual for us to generate or our office to generate this request as soon as the loss assignment comes in.

Page 53

**identification.)**
BY MR. RUSERT:
Q. Showing you what we marked as Deposition Exhibit No. 11, that is the fax that you were just referring to out of your file?
A. **Yes.**
Q. Go ahead and continue.
A. **In response to your question, you asked if there was any discussions held with Mr. Rush regarding the thermostat or transformer.**
Q. Transformer.
A. **And the only information that I provided to Mr. Rush on February 2 of 2000, as I look at it, second paragraph, pertains to a thermostat that was retained by the St. Paul Fire Department. So at that time I'm not sure the status of the transformer.**
Q. Okay.
A. **And I don't recall having a verbal conversation with him. This is just something typically I do to notify them of any developments or information that may take place.**
Q. So this was the same day as your investigation you sent this fax out to Mr. Rush telling him that the St. Paul Fire Department had a

Page 54

thermostat that was believed to be a Honeywell programmable digital thermostat, correct?
A. **That was based upon what Mr. Krawetz told me, yes.**
Q. And it was in this same fax to Mr. Rush right before that you say the area of origin appeared to be along the west wall of the room involving an area where this thermostat was located, correct?
A. **Yes, sir.**
Q. Did you advise Mr. Rush to contact Honeywell and put them on notice of potential involvement in this fire?
A. **I did not.**
Q. Why not?
A. **Mr. Rush was notified as to the status of the investigation, and that issue is typically left up to claims personnel as to how they want to proceed.**
Q. As a fire investigator you don't give any advice to the claims person as to, hey, there may be some other folks involved in this thing, you might want to get them out here?
A. **On occasion if I'm asked or if there are issues that give rise to where someone asks me as to whether we should or shouldn't, certainly. I don't**

Page 55

**recall that happening in this particular case.**
Q. So it's only if someone asked you, you mean the claims person?
A. **I report to the claims people as to the status of my investigation, here's what I found, what do you want me to do next, so that is kind of where it's left. I'm not a person to put people on notice. I'm the origin and cause person.**
Q. Right. I'm not asking if you are the person to put people on notice. My question was whether you gave advice to Mr. Rush, hey, you should put Honeywell on notice about this thing since it's their thermostat, what we have reported to be their thermostat was involved in this fire?
A. **Not that I recall.**
Q. Do you recall Mr. Rush asking whether you thought he should contact Honeywell?
A. **Not that I recall.**
Q. Did Mr. Rush express to you anything that he planned on contacting Honeywell or should contact Honeywell?
A. **No, not that I recall.**
Q. Have there been instances in the past where you have advised a client that you are reporting

Page 56

to put the manufacturer of a product on notice of a fire?
A. **If we could positively identify what it was, absolutely. In this case we weren't sure. Obviously it was extremely damaged, and so whatever was in their mind set as far as putting Honeywell on notice, I don't know. But I have when asked, for example, I find something that the fire starts let's say around a coffee maker, I will get asked can you identify who the manufacturer is, and without doing any destructive examination can determine, yes, in fact this is who manufactured it. They may then proceed to put people on notice, tell me to do whatever.**
Q. That is still based on instruction or inquiry from them as to whether or not there is someone that should be put on notice?
A. **Correct. They are the ones hiring me to do the origin and cause. I tell them what I find and then it's up to them to decide how they want to proceed.**
Q. We had talked earlier that this was the first case that you recalled where the fire had originated at the thermostat, correct?

Page 57

**A. Yes.**
Q. And then as we talked about that, you had said that you would expect that would typically involve some sort of either an electrical event to the thermostat itself or some sort of malfunction within the thermostat, correct?
**A. I would believe that that would take place, have to take place.**
Q. Did you yourself do anything to investigate whether there was any sort of electrical event or malfunction within the thermostat?
**A. No.**
Q. Did you consider whether a fire external to the thermostat had spread to it?
**A. I think I considered all possibilities because as I testified before, I was trying to inquire as to what was in that corner of the living room, so, yes, I was actively trying to figure out what exactly was there. Through Mr. Krawetz and through the physical remains, concluded that there was one potential heat source that could have started this fire, and that was the thermostat.**
Q. With respect to the issue of either an electrical event to the thermostat or malfunction in

Page 58

the thermostat, did you advise Mr. Rush that he should have that possibility investigated further?
**A. I don't know if I advised that specifically. At some point there was some dialogue to retain Mr. Choudek who eventually came into possession of the thermostat and transformer.**
Q. Was it you who arranged for Mr. Choudek to get the thermostat and transformer?
**A. I would have arranged for that transfer to take place. Once it was in our possession, it would have been transferred to Mr. Choudek.**
Q. In fact, in your report that we marked as Exhibit No. 4, page 3 of that, the last paragraph, and this report is sent to Mr. Rush, correct?
**A. Yes.**
Q. Page 3, the last paragraph of that you state, I think there is a sentence, "You may desire to have an electrical engineer examine the thermostat once it is received to determine what, if any, involvement there was with respect to the thermostat with respect to this fire," correct?
**A. Correct.**
Q. So on March 27 when you sent this report to Mr. Rush, you were advising him that he

Page 59

should look further into the involvement of the thermostat into the fire, correct?
**A. I was just advising him that that is an option he may want to explore. Again, as always, it's their decision. It's their money they are spending. It's whatever they want to do with it.**
Q. Did you give him any advice as to whether or not the furnace or any other portions of the HVAC system should be retained for examination?
**A. No.**
Q. The thermostat's connected to the HVAC system, correct?
**A. Correct.**
Q. But there was no need for you to advise him to consider investigating the other components of the HVAC system?
**A. My investigation focused on the origin and cause. What I identified is as to the origin and cause I have testified to. And that is the extent of what I did.**
Q. Sure. And then you told him you may want to have an electrical engineer look at the thermostat, but you didn't tell him you may want to have an electrical engineer look at other portions of

Page 60

the HVAC system, correct?
**A. Correct.**
Q. That was because your focus was just on the origin and cause?
**A. Correct. There is another facsimile that might help you clarify, too, where we were requested to transfer the evidence or obtain the evidence from the St. Paul Fire Department, and then -- or at least obtain the transfer.**
Q. Let me find that and I will mark it.
**A. I don't know if that is something you want to talk about. That is when the transfer took place and who we got instructions from.**
**(Recess taken.)**
**(Whereupon, Whitemore Deposition Exhibit Nos. 12-13 were marked for identification.)**
**BY MR. RUSERT:**
Q. Mr. Whitemore, I will show you what we have marked as Exhibit No. 12. I think before the break that is what you were discussing with respect to the request for the evidence on a transfer by you from St. Paul to Mr. Choudek, was it?
**A. Yes. Initially it was transfer to**

Page 61

Warden Whitemore, but the transfer took place very quickly from Warden Whitemore to Onsite Engineering.
Q. Right. The transfer wasn't for you to examine it. It was just take possession of it and take it to Onsite?
A. Correct. And that second document --
Q. I will show you what we marked as Exhibit No. 13. I think this is where you were going next, the document that discusses the transfer?
A. Yes.
Q. That is the evidence, what's it called, the evidence release?
A. Right.
Q. Stewart Bestland was the St. Paul fire investigator, correct?
A. Right.
Q. Does he work for Ward & Whitemore?
A. He has worked part-time for me, yes, at times. But I see his name is here, but my secretary initialed it, so I assume that is how the evidence transferred, either my secretary or someone transferred it to Mr. Hartzler rather than Mr. Choudek.
Q. Was Mr. Bestland working part-time for

Page 62

you at the time in January of 2000 when this fire occurred?
A. He probably was.
Q. You had no discussions with him about this fire or the investigation of it?
A. Not that I recall. I mean we may have at some point. But not that I recall.
Q. Were there any other things that the St. Paul Fire Department took other than the transformer and the thermostat?
A. I believe they may have taken a debris sample. Yes, on the bottom of page 2 of Exhibit 8, it says a sample of fire debris was collected from the living room near the northwest corner.
Q. Did you ever look at that sample of fire debris?
A. No.
Q. Why not?
A. No reason other than it's pretty routine for the St. Paul Fire Department to take a debris sample for ignitable liquids, and they do that pretty routinely on every fire.
Q. Okay. So taking this sample from the floor was a search for ignitable liquids?

Page 63

A. Yes.
MR. KENNEDY: Objection. Let me object on foundation to that question.
BY MR. RUSERT:
Q. Do you know if St. Paul Fire Department found any evidence of ignitable liquids?
A. Not that I'm aware of.
Q. Do you know if they ruled out the presence of any ignitable liquids?
A. Typically if there is an issue with ignitable liquids based upon samples that they take, it's usually reflected in their reports. Seeing none, I can only assume that there was none, if they even had a test.
(Whereupon, Whitemore Deposition Exhibit No. 14 was marked for identification.)
BY MR. RUSERT:
Q. I want to ask you some questions now about that chest that we talked about earlier. That was something that was in that area of origin, correct?
A. Yes.
Q. That was something you even placed in

Page 64

the diagram or had placed in the diagram that you prepared with respect to this fire, correct?
A. Yes.
Q. Did you consider it significant, is that why you placed it in the diagram?
A. I placed it there because there appears to be a protected area along the wall where something was sitting, and come to find out it was a chest which was later found in pieces out in the dumpster. So I put that there to reflect, A) the location of it; and B) the pattern on the wall clearly shows that there is an outline where this chest had been sitting. So basically to just explain that something was sitting there at the time of the fire.
Q. You took photographs of that chest at the scene, correct?
A. In the dumpster, yes.
Q. Right. When you got there, it wasn't in place anymore?
A. No.
Q. And it's photographs I think 44 and 45 that show the chest in the dumpster?
A. Yes.
Q. Did you conduct any examination of that

Page 65

chest?
**A. Just looking in the dumpster and obviously seeing that it had been damaged by fire, as you can also see it's in pieces now so the chest in its entirety wasn't as it appeared at the time of the fire. But just to say that it had burned and that obviously was consistent with where the fire had originated.**
Q. Did you make any effort to take it out and try and sort of place it together to examine any burn patterns on it?
**A. Piece it back together?**
Q. Sure.
**A. No, I did not.**
Q. Why not?
**A. Essentially it was a furnishing that was within the area of origin, and based upon the information that I had been provided, in addition to what I was seeing on the ceiling and wall surfaces of the area of origin, I was comfortable as far as the area of origin.**
Q. So you didn't examine it for any burn patterns?
**A. I examined it, what I could in the**

Page 66

**condition it was, but, again, the burn pattern analysis that I was looking at was reflected on the walls and clearly showed the damage patterns on the ceilings and walls that I was interested in.**
Q. So you didn't consider the need to examine any burn patterns on it as significant?
**A. I looked at it, took a couple of photographs of it, but, again, the content or where the chest was would represent a smaller pattern, if you will, of the larger pattern that was still very apparent on the walls and ceiling.**
Q. Did it occur to you that any other parties interested in the case might want to examine it for burn patterns?
**A. Well, at that time, not knowing there were any other parties, the answer would be no.**
Q. At the time you were there you had been informed that the thermostat where you placed the origin of this fire was a Honeywell thermostat, correct?
**A. I was advised that Mr. Krawetz thought that it might be a Honeywell thermostat. I had not seen the thermostat. I couldn't tell you whether it was or was not.**

Page 67

Q. So if you had seen the thermostat and said that it was a Honeywell thermostat, would that have changed your approach to investigating the information?
**A. No. I did what I was asked to do to determine the origin and cause of the fire, reported back to Farmers Insurance and that is how we proceeded.**
Q. If you were able to identify the thermostat as a Honeywell thermostat, would you have made arrangements to keep that chest safe so that someone from Honeywell could examine the burn patterns?
**A. Given its condition that I found it, probably not. Not unusual as in all fire cases to have debris thrown outside. In this case it was thrown out, damaged obviously, was in the general area of origin, but patterns are pretty clear in this particular case.**
Q. The patterns on the wall that you saw?
**A. The patterns on the wall and the surfaces I think reflect quite significantly as to where the fire originated.**
Q. I show you what we have marked as

Page 68

Deposition Exhibit No. 14. It's a series of 40 photographs. Do you recognize those photographs?
**A. I believe they came from the St. Paul Fire Department.**
Q. I will represent to you that those are copies of photographs that I obtained from the St. Paul Fire Department with the exception that the numbering down at the bottom is my numbering, just to put them in a relative order. Do you recall seeing those?
**A. Yes.**
Q. I would like you to take a look at photograph number 17 of the St. Paul Fire Department photos. Do you have it there?
**A. Yes, sir.**
Q. You had testified earlier that from what you saw in your photographs, you saw significant burn or the most significant burn I think you said was on the south side of the chest, correct?
**A. Yes.**
Q. And that is to the left as we look at this photograph number 17?
**A. Yes.**
Q. There appears to be significant burn to

Page 69

the right of that chest also, doesn't there?
A. **Yes, there is.**
Q. Is the burning that you see on the left more significant than the burning that you see on the right?
A. **First of all, there is two different wall compositions; but, secondly, yes, I do believe it is based on what I observed as far as the pattern traveling from left to right. You can see on the right the pattern is much higher up toward the top of the opening leading to the porch, and I believe the pattern is more significant on the left.**
Q. You said in fact there is two different wall surfaces, correct?
A. **Yes.**
Q. That wall surface on the right appears to be some paneling of some sort?
A. **Yes.**
Q. That paneling wasn't there when you were out there to investigate, was it?
A. **That is correct.**
Q. So you didn't have the opportunity to see that when you were conducting your investigation?
A. **The trim around the opening is still**

Page 70

**there which you can see in my photographs, but the boards or the tongue and groove, there were three or four boards that had been placed as the interior finish of that north wall had been removed.**
Q. Did you make any effort to find those boards to help you analyze the burn pattern on that wall surface?
A. **No.**
Q. Why not?
A. **Because the pattern that I was seeing showed a natural flow of fire from left to right in photograph 17 of Exhibit 14 consistent with a typical migration or propagation of the fire, so I see no need to, A) look at those boards; and B) the corresponding trim showed very nicely the flow of that fire.**
Q. Go to photograph 16 in that set of photographs if you will. That is a photograph again of that chest, and that is sort of directed at the left side of the chest that was nearer to the thermostat, correct?
A. **Yes.**
Q. It appears to me that there is a line of demarcation in an unburned portion on that chest on the upper side of it, correct?

Page 71

A. **Yes.**
Q. Do you see that, too?
A. **Yes.**
Q. In fact it looks to me to the left of it you can see the remnants of the thermostat sort of dangling on the wall still, correct?
A. **Yes.**
Q. Do you have any explanation for that line, as to why there is burn on the chest above or below but then a very clear line where it's not burning?
A. **Yes.**
Q. What's that?
A. **It would appear that the door for that chest was swung open and flush up against the protected area which you see on the side of that cabinet. As you can see, there is hinges and the door is missing to that cabinet so in essence that door was swung around and flush up against the south side of that cabinet which created what you would call a protected area. And so that would have been protected and the door itself would have been what would have been subjected to the fire.**
Q. So that unburned area is more or less a

Page 72

silhouette of the door?
A. **Correct.**
Q. That line that we see running across the side of the chest sort of marks the bottom of the door where it swung open?
A. **Yes.**
Q. So it's your belief that that door was open at the time of the fire and that is what got ignited by the burning thermostat?
A. **That along with whatever drop down fire may have occurred resulting in the fire damage you see on the lower portion of the south side of that chest.**
Q. That paneled wall to the right of the chest that we talked about shows some heavy char, you would agree, wouldn't you?
A. **Yes.**
Q. In fact at the top it's burned right through, correct?
A. **Either burned through or opened up by the fire department, similar to what they did to the top of the sheetrock wall on the west side.**
Q. As we see, for example, in photograph 17, the header behind the chest on the west, what we call the west wall shows pretty much no burning,

Page 73

correct?
A. Correct.
Q. On Exhibit, I think 16 is probably a better one, the header that was behind the paneling shows some pretty significant burning, doesn't it?
A. Yes.
Q. Does there attach any significance to that or have any explanation for it?
A. Yes.
Q. What's the explanation?
A. The sheetrock extended up to the ceiling covering and protecting the header on the west wall, specifically the top of the west wall, and provided a thermal barrier against the fire that took place within this corner. The damage to the north header behind or a part of the boards that were attached to the wall surface, there was no thermal barrier there, so the fire was able to penetrate and char that header.
Q. So in essence the fire burned right through the paneling and then put some significant char on to the header behind it also, right?
A. It appears it may have burned through the paneling or cracks, openings, et cetera, would

Page 74

have allowed it to ignite that header, understanding there is no thermal barrier there like there is to the west wall.
Q. In both of those photographs 16 and 17, there are some wires that you can see stringing out of that paneled wall, correct?
A. There appears to be, yes.
Q. Those were gone when you were there to conduct your investigation, right?
A. I don't recall seeing any wires laying on top or in that area when I was there.
Q. In fact if they were there, you would have photographed them, right?
A. I probably would have, yes.
Q. Those wires, had they been there, would have been something that you would want to examine as part of a thorough investigation, right?
A. Well, first of all, had I believed the fire was in the ceiling of this room, obviously that would have been something I wanted to address. Obviously it wasn't.
Q. The fire wasn't in the ceiling at all?
A. Wasn't in the ceiling to the extent originating in the ceiling. Otherwise we would see a

Page 75

far different damage pattern than we see in this particular case. So I was extremely comfortable that we had a fire that originated on the first floor between the ceiling and the floor of this particular corner of the room, and that it was not originating within the ceiling structure, otherwise, we would have had an attic fire rather than a fire in the living space.
Q. So had you arrived at the scene and seen what's depicted in photographs 16 and 17 of Exhibit 14, you wouldn't have conducted your investigation any differently than the investigation you conducted, is that a true statement?
A. Well, I would have analyzed the burn patterns to determine, like I did, as to the level where the fire originated. And in this case we had a fire that the St. Paul Fire Department surpressed within the confines of the residential portion of the building. Had there been a fire up above the ceiling behind the sheetrock and the wood framing members of the attic, we would have had a far different scenario. We would have been up in the attic looking at fire damage rather than down on the first floor looking at fire damage.

Page 76

Q. So is there anything that you would have done differently if you would have arrived and seen the chest in place and those wires coming from the paneled wall and the paneled wall in place as we see in 16 and 17?
A. I don't believe I would have done anything differently because I believe I testified there was nothing within the confines of this space, i.e., receptacles, wiring, cords, candles, whatever there may be that I was aware of or observed that would have gave rise to me considering it.
Q. Had you arrived at the scene and seen what's depicted in photographs 16 and 17, would you have examined those wires that we see coming from that paneled wall out of the opening?
A. I'm sure I would have looked at them. However, again, looking at this picture and looking at what I observed, I was extremely comfortable the fire wasn't up in the ceiling.
Q. Sure. Do you know if anybody had been doing any work on the furnace before this fire?
A. I don't have a recollection of that happening.
Q. What you are saying is you don't know

Page 93

**artifacts were examined and eventually tested destructively or nondestructively. Mr. Choudek can certainly answer that.**

Q. Let me interrupt you there. Do I understand that you agree that ASTM E860 is something that is applicable to the facts and circumstances of this case as a guiding principle, but in your view wasn't violated?

**A. I don't if know if it is a guiding principle. ASTM E860 is not something that X, if you will, adopted in the State of Minnesota, but it is certainly a guide that has been utilized in the industry for several years. When evidence is taken and before that evidence is disassembled destructively, that if in fact it may be subject to litigation or is subject to litigation, that the party or parties be placed on notice and they be present when that destructive examination takes place. That is what ASTM E860 talks about.**

Q. Is it something that you follow during the course of your investigations, even though it hasn't been enacted in Minnesota?

**A. Follow in the sense that in many of my cases, they follow a similar path and route that this**

Page 94

**one did. The examination or destructive examination of a particular component, in this case the thermostat took place after my investigation was conducted. So most of this type of work typically takes place with an electrical engineer, mechanical engineer, et cetera, and in this case that is what happened.**

Q. How about NFPA 921, that is also something Mr. Churchward references in his report that is a guide for fire explosion investigation, is that correct?

**A. Yes.**

Q. Is that something that you follow during the course of your fire investigations?

**A. I would use it as an occasional reference, yes.**

Q. It's something that applies to fire investigators, it's a guide for fire investigators, is that correct?

**A. That is correct.**

Q. It's not a guide for insurance claims adjusters necessarily?

**A. It is a guide that is typically used for fire investigators, but is used routinely within this industry which we all are in by fire**

Page 95

**investigators, firefighters, fire officers, insurance personnel, prosecutors, defense lawyers, lawyers such as both of you sitting in this room, that is what that document is used for.**

Q. Mr. Churchward references a section I think from the -- well, I'm not sure what version of it. He references 24.2 called "Understanding between the parties." I'm looking at a version from 1998, and if you could look on with me, Section 16.2 in that one says, "Understanding between the parties," that first sentence says, "Interested parties should be allowed to participate in the investigation and examine the evidence in its undisturbed condition," correct?

**A. Yes.**

Q. Honeywell wasn't allowed to view any evidence in its undisturbed condition or participate in any fire investigation in this case, right?

**A. I believe they looked at the undisturbed condition of the artifacts as they were recovered by the St. Paul Fire Department, and they along with us had the opportunity to look at the artifacts that were recovered by the fire department at the same time, on or about the same time as Mr. Choudek I believe did.**

Page 96

Q. You got to examine artifacts at the scene itself, right, at the fire scene itself?

**A. No, I didn't examine any artifacts at the scene because they had been removed by the St. Paul Fire Department.**

Q. You got to examine evidence at the fire scene, right, charring on walls, that chest, for example?

**A. I got to observe the fire scene, that is correct.**

Q. Honeywell didn't get a chance to observe the fire scene, did it?

**A. No.**

Q. Isn't there also a section of the NFPA that talks about preserving the fire scene and the physical evidence for interested parties to examine?

**A. Chapter 9, physical evidence.**

Q. 9-3 talks about preservation of the fire scene and physical evidence, correct?

**A. Yes.**

Q. It appears by saying, "Every attempt should be made to protect and preserve the fire scene as intact and undisturbed as possible with the structure, contents, fixtures and furnishings

Krawetz

WARD & WHITEMORE

UNIVERSAL FIRE CONSULTANTS

EXHIBIT
tabbies
4 PC
Whitemore

WARD & WHITEMORE
UNIVERSAL FIRE CONSULTANTS

CINCINNATI
DALLAS FT WORTH
JACKSONVILLE
LOS ANGELES
MIAMI
MINNEAPOLIS
TALLAHASSEE

P.O. BOX 475
PRIOR LAKE, MN 55372
(612) 461-7000
FAX: (612) 461-7100
TOLL FREE: 1-877-362-FIRE

March 27, 2000

Farmers Insurance Group
Attn: Mr. Dick Rush
Route #2, Box 52
Bagley, MN 56621

Re: Paul E. and Pamela M. Krawetz
452 Wyoming Street East
St. Paul, Minnesota 55107
Claim #U4175942
Policy #130917550778
Date of Loss: January 27, 2000
W&W File #00-M023

Dear Mr. Rush:

On January 31, 2000 Ward & Whitemore Universal Fire Consultants, Inc. was retained by Farmers Insurance Group for purposes of conducting an investigation into the origin and cause of a fire at a single-family dwelling in St. Paul, Minnesota. Per your request I traveled to the loss site on February 2, 2000 and conducted my investigation into this matter. This report will provide you with a synopsis of my investigation conducted to date including my opinions with respect to the origin and cause of this fire.

## BACKGROUND INFORMATION

At approximately prior to 4:30 P.M. on January 27, 2000 a fire was discovered within a single-family dwelling located at 452 Wyoming Street East in St. Paul, Minnesota. The risk was a one-story, wood frame, single-family dwelling owned and occupied by your insured Paul Krawetz, his wife Pamela Krawetz and their son. At the time of the fire no one was present at the Krawetz residence.

Paul Krawetz indicated that he was the last individual to leave the residence at approximately 2:30 P.M. on January 27, 2000. When he returned to his residence at approximately 4:30 P.M. on January 27, 2000 the St. Paul Fire Department and St. Paul Police Department were at the scene.

The St. Paul Fire Department of St. Paul, Minnesota investigated the fire. A request has been made to the St. Paul Fire Department for purposes of obtaining a copy of their fire in addition to obtaining the evidence that they have in their possession. As a result of their investigation it is my understanding that they have retained a programmable thermostat for the HVAC system within the residence. The thermostat was located in the living room at the time of the fire and was retained by the St. Paul Fire Department. Attempts are still underway in which to obtain the report and evidence from the St. Paul Fire Department.

**ANALYSIS**

On February 2, 2000 I traveled to St. Paul, Minnesota for purposes of conducting an investigation into the origin and cause of a fire at a single-family dwelling located at 452 Wyoming Street East in St. Paul, Minnesota. Access to the site was obtained through your insured Paul Krawetz who met me at the loss location. In addition I also met you at the site during the course of my investigation.

The risk consisted of a one-story, wood frame, single-family dwelling. The risk appeared to have been undergoing various construction projects throughout a period of time. There was evidence of unfinished trim, wall coverings, floor coverings, and etc. throughout the majority of the residence. It appeared that the residence had been under construction or renovation for some period of time prior to the fire.

During the course of this investigation both the interior and exterior of the structure was photographed and documented. In addition the electrical, mechanical and HVAC systems were similarly photographed and documented.

The electrical service for the residence contained a circuit breaker panel with a 100-amphere rated over current protection main circuit breaker. The panel contained eight (8) single pole circuit breakers and one (1) double pole circuit breaker. All of the circuit breakers were found in the "on" position with the exception of a 20-amphere single pole circuit breaker and a 30-amphere double pole circuit breaker. The panel was located in the bathroom for the master bedroom. There was no indication in or around the panel indicative of the electrical service equipment being involved in the cause of this fire.

The basement contained the water heater for the residence. Documentation of the water heater revealed that it was a natural gas fired appliance. No evidence existed suggesting that the water heater was involved in the origin and/or cause of this fire.

The residence contained a forced air furnace located in the basement. Heat Controller, Inc. of Jackson, Michigan, manufactured the furnace. The model number was GZU-A75-03.5N. The serial number was NN5D302 F3689 8134. The furnace had a rated input of 75,000 BTU/hour and was a natural gas fired appliance. Based upon the physical inspection of the furnace it did not appear to be involved in the origin and/or cause of the fire. However, the thermostat, which controlled the operation of the furnace, did appear to be involved in the cause of this fire and will be commented on later in this report.

Based upon the residual fire patterns it appeared that the origin of the fire was located within the first floor of the residence. The origin appeared to be located within what was identified as the living room within the first floor of the residence. The first floor consisted of two bedrooms, two bathrooms, kitchen/dining area, living room and sunroom. The focus of the investigation centered on the northwest corner of the living room.

The northwest corner of the living room at the time of the fire contained a small chest with various "knick-knack" items located on it. Adjacent to the chest, attached to the west wall of the living room was a programmable thermostat believed to be manufactured by Honeywell, (based on the insured's recollection). The programmable thermostat provided operational controls for the HVAC system within the residence. Residual burn patterns illustrate a significant pattern associated with the fire originating at or near the location where the thermostat was attached to the west wall.

An examination of the interior of the west wall of the living room behind the location of the thermostat revealed no indication of fire within the interior confines of the wall. The only identifiable source of ignition within the defined area of origin was the programmable thermostat. As of the time of this report efforts have been undertaken in which to obtain a copy of the St. Paul Fire Department's Investigation Report in addition to the remains of the thermostat. Once this information is received it will be forwarded to your attention. You may desire to have an electrical engineer examine the thermostat once it is received to determine what, if any, involvement of the thermostat with respect to this fire.

This concluded my investigation into this matter at this time. If you have any questions relative to this investigation please feel free to contact me at your convenience.

Sincerely,

**Ward & Whitemore Universal Fire Consultants, Inc.**

Robert B. Whitemore, CFI

Robert B. Whitemore, CFI
Senior Fire Consultant

RBW:ldf

# INVESTIGATION PHOTOGRAPHS

W&W File #00-M023 Claim # U4175942

| | |
|---|---|
| Insured: | Paul and Pamela Krawetz |
| Location/View: | 452 Wyoming Street East<br>St. Paul, MN 55107 |
| Date/Time: | February 2, 2000 |
| By: | Robert B. Whitemore, CFI |
| Photo No. | 1 |
| Comments: | This photograph is looking south at the Paul Krawetz residence located at 452 Wyoming Street East in St. Paul, Minnesota. |



EXHIBIT
tabbies
5 PC
Whitemore

# INVESTIGATION PHOTOGRAPHS

W&W File #00-M023 Claim # U4175942

| | |
|---|---|
| Insured: | Paul and Pamela Krawetz |
| Location/View: | 452 Wyoming Street East<br>St. Paul, MN 55107 |
| Date/Time: | February 2, 2000 |
| By: | Robert B. Whitemore, CFI |
| Photo No. | 2-3 |
| Comments: | This series of photographs are looking northwest at the Krawetz residence at 452 Wyoming Street East in St. Paul, Minnesota. |

---



W&W File #00-M023 Claim #U4175942 Refer to Previous Photo #2

Photo #3



# INVESTIGATION PHOTOGRAPHS

W&W File #00-M023 Claim # U4175942

| | |
|---|---|
| Insured: | Paul and Pamela Krawetz |
| Location/View: | 452 Wyoming Street East<br>St. Paul, MN 55107 |
| Date/Time: | February 2, 2000 |
| By: | Robert B. Whitemore, CFI |
| Photo No. | 4-5 |
| Comments: | This series of photographs are looking south depicting the kitchen and dining area on the first floor of the Krawetz residence. |

---



Photo #5



# INVESTIGATION PHOTOGRAPHS

W&W File #00-M023 Claim # U4175942

| | |
|---|---|
| Insured: | Paul and Pamela Krawetz |
| Location/View: | 452 Wyoming Street East<br>St. Paul, MN 55107 |
| Date/Time: | February 2, 2000 |
| By: | Robert B. Whitemore, CFI |
| Photo No. | 6 |
| Comments: | This photograph depicts the bathroom located directly off of the kitchen within the Krawetz residence. |

---



# INVESTIGATION PHOTOGRAPHS

W&W File #00-M023 Claim # U4175942

| | |
|---|---|
| Insured: | Paul and Pamela Krawetz |
| Location/View: | 452 Wyoming Street East<br>St. Paul, MN 55107 |
| Date/Time: | February 2, 2000 |
| By: | Robert B. Whitemore, CFI |
| Photo No. | 7 |
| Comments: | This photograph is looking west and depicts a view of the kitchen and a portion of the dining room area. |



# INVESTIGATION PHOTOGRAPHS

W&W File #00-M023

Claim # U4175942

Insured: Paul and Pamela Krawetz

Location/View: 452 Wyoming Street East
St. Paul, MN 55107

Date/Time: February 2, 2000

By: Robert B. Whitemore, CFI

Photo No. 8-9

Comments: This series of photographs depicting portions of the living room and porch area.

---

