# EXHIBIT E

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---------------------------

Illinois Farmers Insurance Company,
As subrogee of
Paul Krawetz and Pamela Krawetz,
Plaintiff,

vs. File No. 02-410 JMR/FLN

Honeywell International, Inc.,
A Delaware Corporation,
Defendant.

---------------------------

The Deposition of DAN CHOUDEK, taken pursuant to Notice of Taking Deposition, taken before Kelly L. Hemsath, RPR, a Notary Public in and for the County of Hennepin, State of Minnesota, taken on the 21st day of November, 2002, at 920 Second Avenue South, Minneapolis, Minnesota, commencing at approximately 1:55 p.m.

(At this time CHOUDEK Deposition Exhibit 1 was marked for identification by the Court Reporter.)

DAN CHOUDEK,

the witness in the above-entitled matter, after having been first duly sworn, deposes and says as follows:

EXAMINATION

BY MR. RUSERT:

Q. Mr. Choudek, can you state and spell your full name for the Court Reporter's record, please.

A. Dan Choudek. C H O U D E K.

Q. Mr. Choudek, my name is Scott Rusert, and I represent Honeywell in a lawsuit that's been brought by Illinois Farmers on behalf of Paul and Pamela Krawetz against Honeywell that arises out of the fire that occurred at the Krawetz residence located at 452 Wyoming Street East in St. Paul, Minnesota on January 27, 2000.

I understand that you have been retained by Illinois Farmers to offer some opinions in this case and to conduct an investigation, and, in fact, have done that; is that correct?

A. That's correct.

Q. First question: How is it that you came to be retained to conduct an investigation in this case?
A. I recall being contacted by someone from Ward & Whitemore.
Q. Ward & Whitemore was the company that did the origin and cause investigation for this?
A. That's correct.
Q. Do you remember when it was, approximate time frame, in terms of relation to the fire when you were contacted?
A. Approximately August or September.
Q. Of what year?
A. 2000.
Q. Do you remember what it was that the conversation consisted of?
A. Not specifically.
Q. How about generally.
A. Generally when I get a call like this it's, Dan, we have a fire, we have some artifacts, can you take a look at it, and in this case they had the artifacts in possession, can you make arrangements to come out, pick them up and take a look at them.
Q. In fact, ultimately you were retained in this case by Illinois Farmers, correct?
A. That's correct.

A. I wouldn't -- yes, that's the manual that came with the 2800, yes.

Q. What we'll do is we'll mark that as Exhibit Number 4.

(At this time CHOUDEK Deposition Exhibit 4 was marked for identification by the Court Reporter.)

BY MR. RUSERT:

Q. That's the manual that came along with the 2800 MagicStat that you did some testing on as part of your investigation?

A. Yes.

Q. Any other research that you recall doing besides what we've already talked about in any exemplar testing?

A. No.

(At this time CHOUDEK Deposition Exhibit 5 was marked for identification by the Court Reporter.)

BY MR. RUSERT:

Q. Mr. Choudek, showing you what's been marked as Deposition Exhibit 5. Is that a copy of a report prepared by your company as part of the investigation in this case?

A. Yes.

Q. This was one of those initial examinations

that you had discussed?
A. Yes.
Q. And this was done on December 19th of 2000, or the report was prepared on December 19th of 2000?
A. The reports are dated that day.
Q. The report discusses that you had received these artifacts, the thermostat and transformer, from the Krawetz residence, correct?
A. Yes.
Q. How did they come to you, or better question, can you tell me the chain of custody as to how you came to possess them?
A. Yes. On September 12, 2000, the artifacts were picked up by Ted Hartzler of my office.
Q. Picked up from where?
A. From Ward & Whitemore.
Q. Where had Ward & Whitemore got them from?
A. I can't answer that.
Q. And at some point in time it's my understanding that the St. Paul Fire Department obtained these artifacts; is that correct?
A. That's my understanding.
Q. They were in evidence bags from the St. Paul Fire Department when you got them; is that correct?
A. That's correct.

Q. Do you know when or how the St. Paul Fire Department came to be in possession of these artifacts?
A. I have the St. Paul Fire Department reports. It may indicate in there.
Q. If you need to take a look in there to see if it indicates you can go ahead and do that.
A. In the fire investigation report dated, I believe it's dated, 2/15/2000 there's a comment made by, it appears, Stu Bestlund, that the wall-mounted thermostat was collected, the transformer for the thermostat and the thermostat was collected.
Q. Did the St. Paul Fire Department literally take the transformer off the furnace or did someone else give it to them?
A. It had a St. Paul Fire Department label on the bags.
Q. How it came to be in that bag you don't know?
A. No. I wasn't there. I didn't witness the recovery.
Q. On the second page of this December 19, 2000, report that we marked as Exhibit 5, I think the second to last paragraph has the conclusions that you reached at that time based on your investigation, correct?
A. Yes.
Q. And it was your opinion that the thermostat at

the house had overheated and caused the fire damage that was seen?

A. Yes.

Q. And then it was your opinion that the thermostat's overheated condition was a direct result of a failed transformer?

A. Yes.

Q. And how was it that you determined that the transformer was failed?

A. By the electrical measurements referenced on the first page, bottom paragraph. Electrical measurements showed that the DC resistance was greater than 20 Meg.

Q. What's that mean?

A. That means that it's an open circuit for that coil.

Q. Briefly and in general terms can you describe what a transformer does, how it works?

A. Sure. I'll describe this transformer.

Q. Sure. That would be better. I'd rather do it with this transformer anyway.

A. A simple transformer of this nature it's intended to transform from one voltage level to another voltage level, in this case 120 volts AC to 24 volts AC.

In order to do that that requires winding copper wiring around the transformer core, connecting that

fusing level of 15 amps, and if the current exceeds 15 amps what happens?

A. It acts like a fuse and melts open.

Q. A contact melts open and that's the end? Well, what do you mean it melts open?

A. The copper wire itself melts.

Q. The windings?

A. Yes.

Q. And literally we're talking just like, in rudimentary terms, just like a fuse or a circuit breaker on my electrical panel at home, if something in excess of 15 amps goes through it it pops and there's no more flow of current, correct?

A. In simple terms, yes, it will. That size wire, that fine gauge wire, can conduct up to 15 amps, so after 15 amps it melts, literally melts.

Q. And when it opens it melts then there's no more current in that circuit that it's connected to, correct?

A. That's correct.

Q. Also, going to the last paragraph of that first page of the July 2, 2001, report, there's a sentence that said, "It is my opinion that a defect existed within the Honeywell transformer."

At that point on July 2, 2001, do you know

what the defect was in that Honeywell transformer?

A. No.

Q. In fact, if there had been a short on the secondary circuit that came to it, would that have been an instance of a defect in the Honeywell transformer?

A. One more time.

Q. When you were talking about the means of getting that fusing action or the open wires on the primary are either turn to turn shorts within the primary winding, correct?

A. Yes.

Q. Or the other way is that there's a short on the secondary circuit that sends excess current to it and causes it to melt open, correct?

A. Yes.

Q. If there's a situation where there's a short on the secondary circuit that sends excess current to that primary winding and causes it to melt open, that's not a defective transformer, is it?

A. In that case, no.

Q. In that case it would be a transformer doing what it should do?

A. In that case it's responding to the circumstances it's subjected to.

Q. Responding as you would expect it to respond?

circuit diagram for the 2500, or 2550.

Q. The melting that you saw on the circuit board, the metal melting that you saw, was that also something that could be the by-product of fire damaging the thermostat rather than fire beginning in the thermostat?

A. Certainly if it was melting of the solder, that can certainly happen in a fire environment, but I wouldn't expect copper traces to melt as a result of fire impingement.

Q. Would copper traces melt if the circuit was active and fire impinged on it?

A. If it was energized?

Q. Right.

A. That's possible, yes.

(Whereupon, a recess was taken.)

(At this time CHOUDEK Deposition Exhibit 7 was marked for identification by the Court Reporter.)

BY MR. RUSERT:

Q. Mr. Choudek, taking a look at what was marked as Exhibit Number 7. Is that a copy of that expert disclosure that you provided in this case?

A. Yes, it is.

Q. And that's dated August 29, 2002?

A. Yes.

Q. Second page of that, going on to the third, has a section entitled Statement of Opinions, and it lists 11 separately numbered paragraphs of opinions, correct?

A. Yes.

Q. Are those 11 paragraphs the sum total of the opinions that you've reached in this case? My question to you is: Are there other opinions that you're expressing besides those?

A. I don't believe so.

Q. And are any opinions that you expressed in the earlier reports that we marked in this case, are those opinions also contained within these 11?

A. I believe so.

Q. Do you follow what I'm saying? Those aren't separate opinions from these?

A. That's correct.

MR. KENNEDY: I should indicate for the record that we reserve rebuttal testimony in the form of opinions to what has just been disclosed from Mr. Forss. I think Dan would certainly testify to that.

MR. RUSERT: I'll probably get to that at the end at this point.

BY MR. RUSERT:

Q. I'm just probably going to sort of run through them in order a little bit. That first numbered paragraph

it take for it to be exposed to an open flame to ignite, did you make any notes on that?

A. Didn't make notes. My notes show, I said readily ignited, which means I didn't have to sit there for an extended period of time. It lit with a stick match, and a stick match is only going to go for ten seconds or more. It lit before that.

Q. And then I think you also said that it continued to burn; is that correct?

A. Correct. With the flame moved away the plastic it continued to burn.

Q. Until it was consumed and gone?

A. Yes.

Q. I interrupted you. Then you said you exposed it to what?

A. A new section was removed.

Q. Same size?

A. Same size. And subjected to hot surface ignition.

Q. What's that?

A. Basically not an open flame but a heating element.

Q. What were you using as a heating element?

A. We have a hot plate. So a hot plate with that size, three-eighths by one inch, coming in contact with the

heating element, that ignited, again, continued to burn through completion.

Q. What temperature did you turn the hot plate up to?

A. Maximum.

Q. What's maximum?

A. Didn't measure maximum temp.

Q. How long did it take for it to ignite?

A. My notes show that it initially smoked and then ignited. My recollection is it was a matter of seconds.

Q. In your opinion could the current, I don't know if I'm using the right phrase, current or voltage produced by the transformer, generate the same level of heat as the heating element on that hot plate that you set the plastic on? Do you follow me?

A. Yes. And I'm not sure technically if that was.

Q. I'm sure it wasn't. The crux of my question is: Could this transformer create the same situation as that heating element?

A. Can it produce enough energy to ignite plastics, yes.

Q. Would it produce the energy in the same manner as that heating element, essentially a glowing coil or

something like that that you set that plastic onto and it ignited?

A. Yes, a hot surface.

Q. Same mechanism?

A. Yes.

Q. Did you do any testing of the thermostat or of the transformer compared to that hot plate to verify that it could reach the maximum temperature that you exposed that plastic to?

A. Well, the testing and the data from the transformer test show that there's plenty of power available to do that. I didn't have a 2550 to try and recreate a scenario, but the data from the output of the transformer clearly show that there's plenty of available power to ignite, or energy available, to cause ignition of that plastic.

Q. But what I'm asking is: Is there somewhere in your notes evidence of energy produced by your exemplar testing of the transformer that matches up the energy -- matches to the energy produced by the hot plate that you used to burn the plastic?

A. No, there's no correlation in that scenario. The object was to show that it did not require open flame to ignite that plastic. That hot surface ignition would occur to the plastic. That's the basis for that test.

**ONSITE ENGINEERING**
**& FORENSIC SERVICES, INC.**

December 19, 2000

Mr. Dick Rush
Farmers Insurance Group
Route 2 Box 52
Bagley, MN 56621

Re: Krawetz Residence Fire
Claim No: U4175942
DOL: 1/27/2000
Onsite Engineering file: 00-142

Dear Mr. Rush:

On January 27, 2000, a fire occurred at the Paul and Pamela Krawetz residence, located at 452 Wyoming Street East, St. Paul, Minnesota. The fire origin was determined to be the area near a wall-mounted thermostat in the living room. Onsite Engineering & Forensic Services, Inc., was retained to examine the thermostat and its associated transformer to determine what role, if any, they played in the cause of the fire. A copy of select photographs is included with this report.

On September 12, 2000, Onsite Engineering & Forensic Services, Inc., received the thermostat and transformer from Ward & Whitemore Universal Fire Consultants. The artifacts were examined, documented and photographed.

The home was unoccupied at the time of the fire. Residents of the house stated there were no other electrical devices or cords in use near the thermostat.

The transformer supplied power to the thermostat and furnace controls. It was manufactured by Honeywell. The primary side of the transformer had the following markings: AT72D 1683 (2), 120V 50/60HZ, PRI. WHT. BLK., HONEYWELL MNPLS. MN., 40VA. MEETS 24V. NEMA D, UL LISTED 179H. A sticker on the primary side read: "When mounting in a knock out, install on metal box only. Rev. 97-3626." The secondary side had these markings: 9029, CLASS 2 NOT WET, CLASS 3 WET, LOAD. The two output terminals were labeled R and C.

The primary side of the transformer had a DC resistance of greater than 20 meg-ohms. This resistance is an indication of an open winding on the primary side. The secondary side had a DC resistance of 0.7 ohms. The DC resistance between all terminals and the metal housing was greater than 20 meg-ohms. The transformer showed no visible signs of heat damage.

Chuck DEP. EXH. 5
11-21-02

P.O. BOX 718 • PRIOR LAKE, MN 55372 • (952) 440-4321 • FAX: (952) 440-4324

The wall mounted thermostat appeared to be a digital, programmable model. No recognizable identifying marks were found on the remains of the thermostat. The only marking found on the circuit board was the code 190?2??, which appeared to possibly read 190025C. The circuit board had a three-conductor cable attached to it. The brown-jacketed cable had one red, green, and white conductor inside. The circuit board exhibited localized heating along the edge where the connections to the cable were made. Some of the copper traces on the circuit board were bubbled, deformed and corroded due to heating. Several diodes near the cable connection had cracked open and showed evidence of heating.

Based on my examination of the artifacts, my education, training and experience, it is my opinion that the thermostat overheated and caused the fire damage observed in the living room. It is further my opinion that the thermostat's overheated condition was the direct result of the failed transformer. The exact failure mode of the transformer is unknown at this point in the investigation.

The transformer would require disassembly in order to determine its failure mode. This disassembly may be considered destructive. Therefore, I would recommend that the manufacturers of the transformer and thermostat be notified of the destructive examination.

If you have any questions or need further assistance, please contact me at your convenience.

Report prepared by:

Todd J. Hartzler, M.S.E.E.

Report reviewed by:

Daniel J. Choudek, PE

Enclosure




Photograph # 00-142 1 1 artifacts



Photograph # 00-142 1 3 transformer



Photograph # 00-142 1 4 transformer - primary side



Photograph # 00-142 1 5 transformer - secondary side



Photograph # 00-142 1 7 thermostat



Photograph # 00-142 1 8 thermostat - back side