# EXHIBIT G

to the dresser, chest, whatever we might want to call it. I have no idea if there was any evidence of it. I never saw the scene and, of course, the scene was altered before it was documented in a pre-investigation -- what's a good way to say it? It was altered before it was documented when they began the fire investigation.
Q. So you know of no evidence of a wastebasket next to the dresser; is that a fair statement?
A. That's a fair statement.
Q. Did someone suggest careless smoking as a potential cause of this fire to you or is it something that you first brought up?
A. I don't recall who brought it up. Might have been me, might have been Mr. Rusert. I can't say.
Q. Is there any evidence in this case of careless smoking as the cause of the fire?
A. Not that I'm aware of.
Q. Below the reference to careless smoking there's a note regarding spoliation; do you see that?
A. Yes.
Q. Who raised the issue of spoliation with you?
A. I believe I raised the issue of spoliation.
Q. On September 27 of 2002?
A. In that conversation, yes. It may have come up



earlier than that but it certainly came up in that conversation.
Q. Back on Exhibit 5 -- I apologize for skipping around a little bit -- at the top you have "supply transformer" and then below that "faulting in windings," below that "surge or spike to transformer." What does the reference to surge or spike to transformer mean?
A. That's a note that I made to try to find out more about the damage to the transformer, specifically, as I recall, the characterization was made, and I don't know whether I created it or it was given to me by Mr. Rusert, but, nevertheless, a characterization was made that there were open windings in the transformer. And my discussion point was: Were the windings open because they broke? Were the windings open because there was faulting? Faulting meaning arcing. And if the windings were open, did they open because of a surge or a voltage spike?
And then the note off to the side, John Forss, I do -- Mr. Rusert offered that I should contact Mr. Forss and he would -- if we could talk would try to provide some of the information in regards to that.



Q. Now, who were you retained by in this case?
A. Flynn and Gaskins. I'm sorry, Flynn, Gaskin & Bennett.
Q. On behalf of Honeywell?
A. I believe so, yes.
Q. When were you first retained?
A. 15 May of 2002.
Q. Were you at any inspection of the artifacts maintained from the fire scene?
A. No.
Q. Have you ever inspected the artifacts?
A. No. Other than to view the documentation created by On-Site.
Q. You've seen documentation including photographs?
A. Specifically photographs. I don't believe I've seen anything else.
Q. In your time summary, Exhibit 2 -- I'll just refer to that document for a moment -- there's time entries for October 8 and 9 of 2002, October 10, 2002, October 22, 2002, and October 23, 2002, described as preparing reports; do you see those?
A. Yes.
Q. How many reports did you prepare in this case?
A. One.
Q. Why do you refer to it as preparing reports,



plural?
A. Because it's a menu and you just click on it and it goes into it.
Q. So the report that I have which is part of Exhibit 1, your report dated October 29, 2002, is the only report you've issued in this case?
A. That's correct.
Q. Let's refer to the report then which is part of Exhibit 1. Start at page 2. I just want to, first of all, confirm your opinions in this case today. First of all, do your opinions as you sit here today, are they different at all from the opinions you rendered in the October 29, 2002 report?
A. No.
Q. It's your opinion that the area of fire origin for this fire was in the northwest corner of the home's living room; correct?
A. Yes, living room, yes.
Q. And you believe the area of origin is either in the living space or within the interstitial spaces associated with that corner; is that correct?
A. That's correct.
Q. Can you define what you mean by interstitial spaces?

began in the wall or in the living space of the room.
Q. And you cannot conclude definitively whether the point of origin of this fire was the thermostat on that wall?
A. I see several fire patterns that contradict the thermostat being the origin. I cannot conclude what the origin is, but there are several fire patterns that I see in the house that point the finger away from the thermostat as being the origin for the fire.
Q. Are you saying within a reasonable degree of fire investigation certainty that the thermostat was not the point of fire origin?
A. No. What I am saying is that the -- there are several contradictions to the determination that the thermostat was the origin. Those contradictions are such that it could be argued the thermostat could not have caused the fire and left the set of facts we have today to look at. But I'm not inclined to make that call because I can't make it to a reasonable degree of scientific or engineering certainty.
Q. So another way of saying that is you cannot rule out the thermostat as the point of fire origin



within a reasonable degree of fire investigation certainty?
A. No, it's not the same thing. I can't prove that this thermostat is the area of origin. There's too many contradictions to it. That's different than saying I can't rule it out. Since it's a proactive effort here, I cannot prove that the thermostat caused this fire or at least that the origin started at the thermostat since we're talking origin at this point. I can't prove that so I'm not going to say that. There are some conflicting and contradictory fire patterns to that determination. I'm not calling the thermostat the origin so I don't feel compelled to argue that there's an argument here to justify the origin being at the thermostat. I'm not arguing that. That's for someone else to argue.
Q. I don't know that that answered my question though. My question is: Can you rule it out within a -- can you rule out the area of the thermostat itself as the point of fire origin within a reasonable degree of fire investigation certainty?
A. I can't answer that. That's a question that's -- puts me in a position where I have to make a



decision based on insufficient evidence. To rule where the fire started, you have to have facts to prove it. I'm saying there aren't sufficient facts here to prove that to my degree of certainty. Further, the facts that I see contradict that. Now, whether or not somebody else wants to argue contrary to that, that's fine. I can't argue that. I can't disprove it because the circumstances here, I'm not having seen the scene, the documentation doesn't answer all the questions I have, I simply can't answer that question.
Q. And I understand that. We'll get to what you feel are the shortcomings of the fire investigation by other people and what information you don't have available to you, but for the moment just to summarize what your opinions are, is it fair to say that you don't have enough information as you sit here today to either conclude that the thermostat was the point or origin or was not the point of origin?
A. No, I can't say that. You're asking the same question, just a different way. I can say I have not seen sufficient facts to say the thermostat is the point of origin. I've specifically seen facts



that contradict it.
Q. Let me ask you this: Have you seen sufficient evidences to formulate an opinion that the point of origin is somewhere other than the thermostat?
A. That's -- again, that's another question that's simply -- it's too ambiguous. I can't say that the point of origin wasn't in the garage. I can't say the point of origin wasn't in the car in the driveway. I never saw those things. Certainly, there's some logical arguments against that, but that's the type of question you're asking and I have to make a proactive stance. It is -- there's proof it's the point of origin. I don't see that proof. If somebody else wants to argue that, you ask them that question. I can't sit here today and say, well, I need to prove a negative or disprove a negative. That's not my job. My job is to try to identify the area of origin and I'm saying the facts here don't support it and in some instances directly contradict it.
Q. Do you in terms of cause -- let's talk about cause for a moment. Your testimony or your report says the cause for the fire -- back up a minute. This is in your report. It's opinion number 3. The cause for the fire cannot be determined with the

41

facts presented. Based upon the evidence that you know of, that you've reviewed in this case, can you rule out the thermostat as the cause of the fire within a reasonable degree of fire investigation certainty?
MR. RUSERT: Objection; asked and answered.
A. I have to give the same answer I gave to the origin. There are facts that specifically contradict the thermostat as being the cause for this fire. There are a body of facts that I'm familiar with on other type low-voltage devices that contradict the thermostat being a cause for this fire. I certainly don't think there's sufficient facts to cause -- a thermostat to cause -- I think there's a near absence of facts actually for that. But my purpose is trying to identify the cause. If someone else wants to identify that, then I say, fine, prove it. That's your job. That's not my job.
Q. Your testimony is that you cannot determine the cause of this fire?
A. That's right.
Q. Would you agree with me, Mr. Churchward, that in fire investigations there are cases in which you

42

can -- in which you've concluded that the cause of the fire is undetermined?
A. Yes.
Q. But that there are certain hypothetical causes that you can eliminate?
A. Yes.
Q. In this case, even though your testimony is that you cannot determine the cause of the fire, can you eliminate the thermostat as the cause?
A. Based on what I know today, I believe so, but I can't prove it.
Q. Do you believe so within a reasonable degree of fire investigation certainty?
A. I can't do that. I can't prove it. If I can prove it, I'd say that. In fact, I'd really like to be able to say that but I don't have the facts.
Q. Now, in this case there is a distinct difference -- whether you believe the plaintiff's theory or not, there's a distinct difference between the origin of the fire and the cause of the fire. One scenario is that the transformer, also manufactured by Honeywell, may have led to a thermostat fire. I give you that introductory statement just to lead into my next question. Do you have an opinion as to whether the transformer

43

in the furnace of the Krawetz home had any involvement in the cause of the fire?
A. I have no information on the transformer firsthand other than Mr. Forss's report, so I have no opinion as to the transformer's role in any hypothetical failure, mechanism or scenario.
Q. And you weren't asked to do any electrical system analysis to determine cause in this case, were you, other than what you observed at the fire -- from the fire scene photos?
A. Well, that was all I had to choose from. If I would have been to the scene, I would have done electrical analysis, not necessarily on the furnace, transformer or thermostat, but certainly the branch circuit wiring would have gotten my analysis, and I would have offered opinions assuming there were facts associated with those that I could use to formulate an opinion.
Q. If you were at the fire scene retained by the property insurer for the Krawetzes, would you have retained an electrical engineer such as Mr. Forss?
A. Not initially. I would have certainly done the examination of the electrical system myself. However, if I were working on the furnace, if I were trying to make the case that the plaintiff

44

presently is presenting, I don't know that I'd have hired Mr. Forss -- obviously, he works for Honeywell -- but I would have -- I might have retained someone who is familiar with the construction of the transformer or the construction of the printed circuit board for the thermostat. So I might have done -- I typically don't -- I don't do a lot of solid state cases so I might have brought somebody in for that, particularly the circuit board.
Q. Could you turn to page 36 of your report which is part of Exhibit 1. The first paragraph on that page, which actually starts on the previous page, but I want to call your attention to the one sentence you have in there: "The critical component is the documentation." That refers to when a site, when a fire scene is unavailable to you as an investigator, the critical part for you is the documentation of the scene?
A. For me it is, yes.
Q. And then you go on in the next paragraph to conclude that the documentation in this case is incomplete?
A. That's correct.
Q. The first element that you talk about in terms of

-- first piece of physical evidence that you address in this report after you state that the documentation is incomplete is a wood shelving unit or chest of drawers and you note it sustained considerable fire damage. Do you know what the condition of that chest was at the time Mr. Whitemore first investigated the scene?
A. Only part of it.
Q. Tell me what you know.
A. I saw a picture in Mr. Whitemore's photos that looked to be the bottom most portion of the chest laying in a dumpster. I do not know what the rest of it consisted of, but that piece was intact, however, disattached from any vertical components of the chest.
Q. Do you know how the chest got in the dumpster?
A. My guess is someone threw it in there but I don't know that specifically.
Q. Do you know if the chest was still in its original location when Mr. Whitemore first investigated the fire?
A. My knowledge is he first saw it in the dumpster.
Q. Is it your understanding that the fire department removed the chest from its original location?
A. I have no idea who moved the chest.



Q. In your report you say that Whitemore provided -- and this is the third paragraph on page 3, second full paragraph, but third paragraph -- "Whitemore provided almost no information about the chest." Now, I assume that means from your review of his reports?
A. Strictly. Yes, sir. That was prior to his deposition.
Q. Right. "The rear (west) side and the right (north) side were not documented by either Whitemore or the fire department." That's in your report. How would you have documented this chest had it been in the dumpster at the time you first arrived at the scene?
A. Well, assuming that all the pieces that are apparent in the fire department photos were there either in pieces or intact, some measure of intactness -- poor word but I think it gets my point -- then I would have taken it out of the dumpster and brought it back into the scene and tried to reconstruct the chest, putting the sides back up on the bottom. In times past, I've used hammer and nails and nailed them together, used the handyman special duct tape and duct taped them together, but I would have tried to put it back



together in as complete a configuration as possible and then I would have photographed all surfaces starting from the top, the rear, both sides, the face. I would have particularly concentrated on the inside surfaces, that is, on the shelves, because there is damage in there that has not been documented to my satisfaction. I would have done a depth of char survey on the chest, all surfaces, to try to determine where it burned the worst, the deepest. And then I would have saved it and maintained it as evidence.
Q. Would you agree with me that when Mr. Whitemore arrived at the scene, that the scene itself was altered?
A. It looked to me to be substantially altered.
Q. By the fire department?
A. I can't -- I don't know. It could have been by the homeowner after the fire department. I have no idea.
Q. Would you agree that the removal of the chest from its original location would have been indicative of an altered scene?
A. Clearly.
Q. And the removal of the remains of the thermostat from the wall before Mr. Whitemore appeared at the



scene would have been an altered scene?
A. That would have been an alteration. I don't think as significant as moving the chest, but certainly it was an alteration.
Q. Well, certainly any removal of any electrical appliance or electrically-powered component in the area defined as the area of origin would be an altered condition, wouldn't it?
A. Well, clearly. Removal of the first shovelful of debris begins to alter the scene.
Q. Your testimony that you just gave regarding what you would do in terms of trying to reassemble this chest assumes that all the pieces were there; correct?
A. Assumes that, or a good share of them. And that they were not broken into pieces so fine that I couldn't reassemble them.
Q. Do you know one way or another whether the chest in the dumpster was broken to such a degree that it could not have been reassembled?
A. I have no idea.
Q. When you talk about wanting to document all of the surfaces of the chest, what surfaces of the chest are not adequately documented in your opinion?
A. The top, the outboard north side, the inboard

surfaces on the top shelf, and the second shelf from the top, and the rear. Actually, I shouldn't say that. The left side is not documented adequately in my opinion. And now understand, I'm including documentation to be not just photographs but a depth of char survey.
Q. So you're using the term "documentation" a little differently than what I would. Depth of char is more of a test, isn't it?
A. No, that's a matter of documentation as well.
Q. If you would refer to the fire department photographs and specifically photo number 16. Can you tell from your review of photographs in scene documentation whether the doors, the hinged doors to the chest were opened or closed at the time of the fire?
A. No.
Q. Do you see on photo 16 from the fire department this line of demarkation on what we call the left side of the chest?
A. Yes.
Q. Can you explain that?
A. Not at present.
Q. Would you agree that it appears to show a protected area of the chest on the upper portion



of that side?
A. On the upper half of the south side, yes, the outboard surface. It does show a protected area or an area that certainly didn't suffer any fire damage.
Q. And on that photograph you can also see some wiring that appears to run into the wall cavity on that short wall to the north of the chest?
A. Yes.
Q. Do you know what that wiring was for?
A. I do not.
Q. Do you know whether that wiring would have been exposed to someone's view before the fire?
A. Given the state of the wiring in this house, no. I suppose it could have been, but it may have been hidden in the walls.
Q. And there also appears to be a wire that is laying on top of the chest in photo 16?
A. At least one, yes.
Q. At least one, maybe two?
A. Can't say with certainty.
Q. Do you know -- does it appear that those ran into the wall cavity as well?
A. They go that direction, but I can't tell you where they went after they leave the image that I can



see. I'm assuming they went into that wall cavity.
Q. And you don't know what those wires serviced either?
A. I do not.
Q. In your report you also indicate that it would be valuable to you to know what may have been setting on or in the chest at the time of the fire?
A. Yes, sir.
Q. Would you agree that the best people or the best source of that information would be the owners of the home?
A. I would hope so.
Q. And based upon the information provided -- well, strike that. Are you aware that Mr. and Mrs. Krawetz were deposed in this case?
A. Not specifically.
Q. Have you reviewed their depositions?
A. No.
Q. Do you know of any evidence in this case of a potential cause of the fire sitting on or in this chest?
A. I know of no evidence.
Q. You're not aware of any other electrical appliances in your defined area of origin other



than the thermostat?
A. Oh, that's a different question. All of the wiring laying on top of that unit and coming out of what appears to be that wall's cavity on the north side of the chest I believe are potential fire causes, assuming they are electrical wiring. I can't tell by these pictures that all are electrical wiring. They may be something else. At least some of them may be. Furthermore, since I have not been to the scene, I can't verify the Krawetzes' statements as characterized by Mr. Whitemore that there were no candles on any of these areas. There is specific evidence of candles that would remain after a fire, that if I would have been able to see that, I would have been able to say yes or no, that there's evidence to verify their statements. Otherwise, their statements, we have no verification of their statements. All I have is their statements or at least Mr. Whitemore's characterization of their statements.
Q. So in your experience investigating a fire of this type, if a candle was the cause of the fire you would expect to find some evidence of that?
A. Oh, yes. I clearly could have found evidence of

probably will not propagate a lot of fire across the floor as oriented horizontally so that won't provide a great deal of fuel. The only fuel we have is the side of the chest, the south side. Now, although the south side has got damage to it, if this fire burns sufficiently to burn back up to the top of the wall, burn across the top of the chest, burn into the partition wall and consume the knotty pine panel boards, possibly consume a stud but certainly char those studs, and then move down that header to the east along the north wall of the living room charring that knotty pine that served a wall cover to that header, and yet didn't move south at all, didn't move into the bedroom at all, and didn't char or destroy the -- I shouldn't say "char" but didn't destroy the south wall of the cabinet, I believe that is inconsistent with the origin starting on the south side of this chest. Consequently, the chest and the patterns on it, I believe, are crucial to a determination of origin, no matter whether you wish to accept Mr. Whitemore's hypothesis or mine. That chest is a huge piece of evidence to validate either of our investigations.

Q. Would you agree with me that the wall covering on



that north wall, that short wall north of the chest of knotty pine paneling, is more combustible than the Sheetrock on the west wall?

A. Well, it's clearly more combustible. Also takes more energy to burn it too.

Q. Would you expect -- I'm not sure what that means in terms of whether you expect more damage to a Sheetrock wall versus the knotty pine wall.

A. To breach the gypsum board takes a -- I'm sorry, not the gypsum board, the paper on the gypsum board takes very little energy. To consume the knotty pine boards takes a substantial quantity of energy. All the energy that's going to do that is originating here if you accept the premise that the origin is at the south side of the chest. That's the origin of all this energy. So the fire, which is growing back up the wall, the only energy that's being liberated is the energy that's coming out of this charred paper, that's all that's -- has got to now communicate across the top of the chest -- the top of the chest appears to be burned; how badly, I don't know -- and punch a hole through the wall on the north side of the chest. That takes a substantial amount of energy considering it didn't punch a hole through the



side of the cabinet at the floor, which is where the seed of the fire would have been. Now, if it takes energy to punch it through that knotty pine and it did, if you accept the premise the fire's on the south side, originating on the south side, then why didn't it punch a hole in the side of this cabinet, which is six inches away instead of four feet away? That's my point by it takes more energy. So it isn't just an issue of what's more fire resistant or what isn't. It's how much energy did it take to consume it.

Q. Which do you believe would be easier to ignite, the knotty pine wall paneling or the south side of the chest?

A. I don't know. I don't know what the south side of the chest is comprised of. It's a wood product, but I don't know whether it's honest-to-God wood like pine boards, or a compressed composite made up of a homogenous mix of sawdust and rosin. I don't know what it's made of. And that would make all the difference as to which would be more durable.

Q. Let me just ask hypothetically -- let's just assume hypothetically that the fire started from some source, let's say a candle on the top of the



chest. Okay. In fact, let's put it right in the -- let's assume it's right in the -- on the top of the chest closest to the knotty pine wall. Where would you expect -- and let's again assume that the fire originates on top of the chest. Would you expect more fire damage to the knotty pine wall or to the Sheetrock wall?

A. I would not expect a candle on the top of the chest causing a fire to communicate to either of those surfaces. There would be damage but I don't think either one of them would be breached. If a candle -- now I'm basing a candle theory on my knowledge of how candles fail and I would not expect it to set fire to the knotty pine wall or to set fire to the gypsum board on the wall behind it or for that matter to set fire to the gypsum board above it.

Q. Do you know what materials or contents were on the chest at the time the fire occurred?

A. No.

Q. Would that be important to you?

A. Very.

Q. Let's assume the chest was not there and instead in that northwest corner was a wastebasket that started on fire. Would you expect more damage to

the knotty pine wall or to the Sheetrock wall?
A. Let me ask clarification of your question. Are you referring to only the paper on the gyp/rock wall or are you referring to the entire gyp/rock membrane?
Q. More damage in terms of exposing the wall cavity.
A. I would expect the wastebasket to breach through the knotty pine before it would go through the gyp/rock.
Q. Do you know the age of the carpet in that northwest corner?
A. No.
Q. Do you know the quality of the carpet in the northwest corner?
A. No.
Q. Do you know what type or brand it was?
A. No. I have no information on the carpet.
Q. Do you know if there was any combustible materials sitting on the carpet next to the chest, south of the chest, immediately below the thermostat?
THE WITNESS: I'm sorry, could you read back the question to me?
(Discussion held off record.)
(The previous question was read back.)
A. I cannot say with certainty. Mr. Whitemore



testified that there was not.
Q. Do you know if the -- well, immediately to -- as you're facing where the thermostat was located, immediately to the left of it, which would be to the south, was a door; correct?
A. Yes, to the bedroom.
Q. Do you know if that door to the bedroom was open or shut at the time of the fire?
A. Not with absolute certainty but I believe I see enough information to say that it was open.
MR. KENNEDY: Let's take a break for a minute.
(Recess taken.)
Q. Mr. Churchward, do you know if the wall, the gypsum wall on the -- well, where -- the wall on which the cabinet sat, the west wall --
A. Yes, sir.
Q. -- was that wallpapered?
A. It's not likely.
Q. Why not?
A. I believe probably not.
Q. Why not?
A. Well, look at the fire department's photo 9. It shows that wall as it continues to the south and it shows no evidence of wallpaper. And then if



you look at photo 10, at the bottom of the wall which is an area where you might expect the wallpaper to have survived, there's no apparent remains of the wallpaper there so I would be inclined to think it was plain gypsum with probably just paint on it.
Q. In your report at the bottom of page 3 you mention depth of calcination measurements. Would you, had you been on the scene, done a depth of calcination measurement?
A. If the argument would have been presented to me that the origin was on the south side of the chest, I would have definitely.
Q. For what purpose?
A. To establish if there were facts to support that hypothesis.
Q. What is a depth of calcination measurement? How does one do that?
A. If I can be a little long-winded on this, calcination is a term-of-art that doesn't really serve the purpose. What actually it is referring to is the dehydration of the gypsum board. The gypsum board has water in its molecule and as a consequence of that -- or, I'm sorry, it has water molecules in its makeup, and as a consequence of



that, if it's exposed to a fire it gives off this water and when it does it changes color and to a lesser degree relative compressive strength. So if you measure the depth to which the dehydration occurs, and it's called calcination for some reason that escapes me, if you measure the depth of that, then that is a relative measurement of how much heat was applied to the wall, not in watts per square centimeter but as compared to the section of wall immediately next to it. So in this particular case, if we look at photo 11 of the fire department -- in fact, I think 9 may even be a better one because it shows the overall wall. If we look at photo 9 of the fire department, there is a pattern that's somewhat like an inverted U on that wall and if one were to do a depth of calcination up that wall on the south side of where the chest resided and across the top of the chest in the gypsum board, one might have been able to determine whether or not the south side of the chest had gypsum board that was more dehydrated than the north side or vice-versa. That would be a fact. Now, the interpretation of that fact would be if it -- where the dehydration was the deepest, that would have been where the

77

opinion?
A. Certainly that wiring remains a potential ignition source. Given the damage on the shelving unit, top two shelving units, I believe that a candle remains a potential ignition source. To my knowledge, there are no others. Part of the advantages of having seen the fire or the advantage that I would have had if I'd seen the fire is I would have been able to say that with more certainty. These are the potentials. Now I'm only able to say what I can see in photos versus firsthand.
Q. Going to page 5 of your report, the top paragraph discusses or references numerous electrical code violations in the home. And your last sentence in that first paragraph says, "Although violations of the National Electrical Code may not produce fire, there may have been violations that could explain the damage found in the transformer." What code violations in the Krawetz home could, in your opinion, explain the damage to the transformer?
A. At the time that I wrote this, the damage in the transformer was not clear to me. I now know having read Mr. Forss's report what that damage now consists of, although it seems to be some

78

conflict between Mr. Choudek and Mr. Forss as to the extent of damage in the transformer. Prior to that, it was just characterized as damage to me. So when I stated this, I included things that may not now be germane to this issue. The argument I was referring to was: Is the transformer -- has the transformer been damaged by a voltage spike? One of the ways that a voltage spike can occur is if someone has miswired a circuit or has wired a circuit in such a haphazard fashion to have caused a voltage to occur on the circuit associated with the transformer. That is, as I understand it, a 24-volt circuit but if someone were to have wired it haphazard -- and there were several instances of haphazard wiring in this house that gave me reason for discussing it in my report -- then I believe that was within the bounds of possibility and therefore had to be pursued to either eliminate it or establish whether it's still a possibility.
Q. Are there any specific electrical code violations in the Krawetz home that you believe could explain the damage in the transformer?
A. Not that I'm aware of today, based on information I have today versus the information I had at the

79

time I wrote the report, and I believe I'm more informed now than I was then.
Q. Are there any electrical code violations that you're aware of in the Krawetz home that in your opinion explain the cause of the fire?
A. It's on the table for me. In regards to the circuits that are apparent in photo 16 -- I'm going back to that because it's a very good photo for quality and quantity -- if those circuits that we see laying out here on the top of the chest and protruding out of the wall, if those circuits were installed haphazardly, there may be some -- haphazard being outside the boundaries of the National Electrical Code -- then there may be some violation on those circuits that would have caused this fire to occur. There is some evidence to suggest they were installed haphazardly. The very fact that they are hanging down and laying loose in that fashion suggests they were not installed in the wall properly, with proper staples and restraints. Instead they look to me like if they had been in the wall at the time of the fire, they were just stuffed in the wall. I have no idea if that's -- that doesn't indicate in itself a fire cause but it indicates in itself a haphazard

80

manner of wiring practices which leaves open the discussion for electrically-related fire causes.
Q. Do you know whether Mr. Krawetz did any of the wiring on these wires shown in photo 16?
A. I have no idea.
Q. So even if, hypothetically, there were electrical code violations with respect to these wires, you don't know whether those were due to Mr. Krawetz's work or some third party?
A. I have no idea who did it.
Q. If the ignition source of this fire was electrical arcing on those wires that you see in fire department photo 16, would you expect fire damage within the wall cavity?
A. Yes, I would, if the wires were located in the wall prior to the fire.
Q. Right. In fact, you would expect the fire to occur there before the living space of the house?
A. Definitely.
Q. Your report on page 5 then, the next paragraph talks about -- or at least in the third paragraph of the page is two circuit breakers that were tripped. How do you know they were tripped?
A. I do not.
Q. Why did you put that they were found tripped in

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Illinois Farmers Insurance Company,
As subrogee of
Paul Krawetz and Pamela Krawetz

Court File No. 02-410 JEL/JGL

Plaintiff,

vs.

**DEFENDANT'S RULE 26(A)(2) DISCLOSURES**

Honeywell International Inc.,
A Delaware Corporation,

Defendant.

---

TO: Plaintiff and its attorneys, Kevin J. Kennedy, Esq. and Michael V. Benninghoff, Esq., Hanson Lulic & Krall, 920 Second Avenue South, Suite 500, Minneapolis, MN 55402.

Defendant Honeywell International Inc., for its Rule 26(a)(2) disclosures, discloses the following experts who are expected to testify at the trial of this matter:

1. John Forss
   Sigma Engineering
   4421 Lafayette Lane
   Spring Park, MN 55384

   a. A copy of Mr. Forss' expert report regarding this matter is attached as Exhibit A;
   b. A copy of Mr. Forss' curriculum vitae is attached as Exhibit B;
   c. A listing of the deposition and trial testimony of Mr. Forss in the last four years is attached as Exhibit C; and
   d. Mr. Forss' compensation for his work on this matter is $100 an hour.
   e. Mr. Forss' reserves the right to use as exhibits his photographs, file materials, technical literature on the involved products, engineering specifications, industry standards, the physical evidence removed from the scene, an exemplar valve and any video, photographs, drawings and documents produced by the parties through discovery in this case.

Churchward
DEPOSITION EXHIBIT
TS 1 12-11-02

2. Daniel Churchward, C.F.I.
Kodiak Enterprises Inc.
6409 Constitution Drive
Ft. Wayne, IN 46804

a. A copy of Mr. Churchward's expert report regarding this matter (which includes his curriculum vitae, a listing of his deposition and trial testimony for the past four years, and his fee schedule) is attached as Exhibit D;

b. Mr. Churchward reserves the right to use as exhibits photographs of the fire scene, his file materials, technical literature on fire origin and cause, physical evidence removed from the scene, and any video, photographs, drawings and documents produced by the parties through discovery in this case.

Honeywell reserves the right to call any rebuttal experts who cannot be identified at this time. Honeywell also reserves the right to supplement its submissions with the names of any expert witnesses that they acquire during the course of discovery and further investigation.

**FLYNN, GASKINS & BENNETT, LLP**

Dated: October 30, 2002

Scott M. Rusert, #231113
333 South Seventh Street
Suite 2900
Minneapolis, Minnesota 55402
(612) 333-9500
***Attorneys for Defendant***
***Honeywell International Inc.***

EXHIBIT A

**Sigma Engineering Inc.**
4421 Lafayette Lane
Spring Park, MN 55384
Telephone (952) 471-8795
Fax (952) 471-0536
October 29, 2002

Scott M. Rusert, Esq.
Flynn, Gaskins & Bennett
333 South Seventh Street, Suite 2900
Minneapolis, MN 55402

Re: Illinois Farmers/Krawetz v. Honeywell
Your File No. 36.15051

Dear Mr. Rusert:

This is a report summarizing my opinions and conclusions regarding a fire that occurred on 1-27-00 in the Krawetz residence located at 452 Wyoming Street East in St. Paul, MN. My opinions and conclusions are based on the following:

1) Inspection and testing of the transformer and thermostat remains that had been removed from the fire scene. This inspection and testing took place on 5-17-01 at the Onsite Engineering & Forensic Services facility located in Prior Lake, MN.
2) Review of various documents including:
   a) St. Paul Fire Department Incident and Fire reports
   b) Robert B. Whitemore report dated 3-27-00
   c) Robert B. Whitemore expert witness disclosure
   d) Todd J. Hartzler reports dated 12-19-00 and 7-2-01
   e) Daniel J. Choudek expert witness disclosure
   f) Underwriters Laboratories Standard for Safety for Class 2 and Class 3 Transformers, UL 1585
   g) Richard Rush expert witness disclosure
   h) Paul Krawetz expert witness disclosure
   i) General Assembly drawings and specifications for the Honeywell AT72D1683 Transformer
   j) Color copies of fire scene photographs

RESULTS OF THE INSPECTION

The transformer was a Honeywell AT72D1683 Class II low voltage 40 VA transformer manufactured during the 29th week of 1990. The resistance of the low voltage (24VAC) secondary winding was 0.9 ohms, which was normal for this device. The resistance as measured in the high voltage (120 VAC) primary winding indicated that there was an open circuit in this winding.

The transformer was disassembled and it was found that the primary lead going to the white wire terminal was melted off near the terminal, the other melted end was on the primary winding. The transformer secondary winding was in good condition.

The only portion of the thermostat that was presented for inspection was a severely damaged printed wiring board with three leads attached to the field wiring terminals. The terminal board was most severely damaged in the area of the field wiring terminals. It could not be determined who manufactured the thermostat based on this evidence.

DISCUSSION

The plaintiffs allege that the thermostat overheated and caused the fire either because the AT72D failed internally and provided excessive current to the thermostat, or a short circuit within the thermostat caused high current in the AT72D secondary resulting in ignition of the thermostat and causing the primary winding to open. The first of these scenarios is not plausible because the AT72D transformer is an energy limiting transformer that meets Underwriters Laboratories and the National Electric Code requirements for Class II low voltage control circuits. In this transformer, the fine wire in the primary winding acts as a fuse to open the circuit if excessive current flows in the secondary for a sustained period of time. The primary winding did open as intended in this instance. In addition, the chances of the second scenario occurring are remote. The more likely scenario would be an external fire that damaged the thermostat and caused a high current in the transformer secondary resulting in an open primary.

Another possible scenario that would cause the thermostat to overheat due to excessive current would be if the valve resistance became totally or partially bypassed. An attachment to the Expert Disclosure of Mr. Krawetz, Hinding Heating & Air Job Work Order S 62916, states that the main circuit board was replaced shortly after this fire before the furnace was replaced. This could be an indication of a malfunction in the control circuit which could create the excessive current evidenced in the thermostat and transformer. In addition, it was previously noted that the thermostat printed circuit board had the most severe damage in the area of the field wiring connections. If the terminal screws were not properly tightened at the time of installation, the extra current resulting from bypassing the load would cause heating in this area as well as the damage seen in the transformer.

CONCLUSIONS

The following conclusions are based on a reasonable degree of engineering certainty:

1) The AT72D Transformer did not malfunction to cause the fire in the Krawetz residence.
2) Based on the evidence submitted, the exact cause of the fire cannot be determined.

Sincerely,

John Forss

John Forss, P.E.

**EXHIBIT B**

Curriculum Vitae

John Forss, P. E.
4421 Lafayette Lane
Spring Park, MN 55384
Telephone (952) 471-8795

Summary

Extensive knowledge and experience in the design, manufacture and application of the following types of products:

- Residential smoke detectors
- Heating, ventilating and air conditioning controls such as thermostats, humidity sensors, gas valves, water valves, furnace/boiler controls, filled element devices, relays and contactors
- Electronic air cleaners

Have been involved in the investigation and litigation of claims involving the above types of products; including consumer products such as portable heaters, humidifiers and fans. Have testified in approximately 60 depositions and 35 trials.

Professional Experience

- 1992 to present----President of Sigma Engineering Inc.
- 1987 to 1992-----Self employed as John Forss, Consulting Engineer
  In both of the above positions, have investigated, reported and testified as needed regarding claims and lawsuits involving the types of products listed in the Summary section.
- 1957 to 1987----Employed by Honeywell Inc.
  Home and Building Controls Group

  1984 to 1987—Senior Development Engineer, Commercial Building Controls; developed preliminary and final design concepts for commercial burner controls and electronic air cleaners.

  1981-1984—Lead Engineer, Advanced Technology ; in charge of sensor development for Home and Building Controls Group.

  1967 to 1981—Senior Development Engineer, New Products; developed preliminary and final design concepts for kitchen range controls, gas leak detectors, gas/oil heating controls and smoke detectors.

1961 to 1967---Development Engineer; design of electric heat and refrigeration/air conditioning controls.

1958 to 1961---Quality Liaison Engineer; investigated and implemented programs for the improvement and maintenance of product quality.

1957 to 1958---Quality Analysis Engineer; tested products removed from finished stock to determine if engineering specifications were met.

- Awarded 4 patents

Education

- Luther Junior College, Associate of Arts Degree, 1951
- US Army, 1952-1954; trained as diesel repair mechanic
- University of Nebraska, Bachelor of Science in Mechanical Engineering Degree, 1957
- University of Minnesota, Electrical Engineering studies on undergraduate and graduate level, 1960-1966
- Continuing Education Courses/Seminars
  Developing Solutions (in house), 9-84
  Project Management (in house), 6-85
  Personal Computers in Engineering and Science (U of M), 7-86
  Product Safety and Liability Prevention (U of W), 12-87
  How to Conduct a Fire Investigation (U of W), 4-88
  Oil Burner Systems, Theory and Maintenance (Beckett Burner), 5-95
- Taught a course titled Pre-trial Investigation at the Civil Pre-Trial Practice Institute of The Minnesota Institute Of Legal Education, 6-99

Professional License and Memberships

- Licensed Professional Engineer, Minnesota
- National Society of Professional Engineers
- National Fire Protection Association
- International Association of Arson Investigators

EXHIBIT C

**DEPOSITION AND TRIAL TESTIMONY OF JOHN FORSS**

(October 1998 through October 2002)

| Testimony Given at Deposition | Testimony Given at Trial |
|---|---|
| Michelle Mercier v. Honeywell Inc.<br>Superior Court, San Mateo County, California<br>Court File No. 409579<br>Depositions given 11/9/2000, 11/10/2000<br>05/09/02 and 09/12/02 | Sylvie Sidebottom v. Honeywell Inc.<br>Superior Court, Shasta County, California<br>Court File No. 133319<br>Trial Testimony given 6/8/99 |
| Phillips v. Honeywell<br>Circuit Court, Orangeburg County, South Carolina<br>Court File No. 99-CP-38-117B<br>Deposition given 8/27/02 | Sherek v. Honeywell Inc.<br>Small Claims Court, Hennepin County, Minnesota<br>Court File No. Unknown<br>Trial Testimony given 4/23/99 |
| Poletti v. Honeywell<br>Supreme Court, Westchester County, New York<br>Court File No. 01-10612<br>Deposition given 6/20/02 | Shah v. Honeywell Inc.<br>Supreme Court, Albany County, New York<br>Court File No. None<br>Testified at Arbitration Hearing<br>Testimony given 12/14/98 |
| Bartholomew v. Honeywell<br>U.S. District Court, Northern District of NY<br>Court File No. 3:01-CV-1196<br>Deposition given 3/13/02 | |
| Riviere v. Honeywell<br>Supreme Court, Suffolk County, New York<br>Court File No. 00-05999<br>Deposition given 1/25/02 | |
| Graf v. Honeywell<br>U.S. District Court, Eastern District of PA<br>Court File No. 99 CV-3805<br>Deposition given 1/16/02 | |
| Perez v. Honeywell<br>District Court, Hidalgo County, Texas<br>Court File No. C-3962-99-G<br>Deposition given 1/14/02 | |

| | |
|---|---|
| Karlen v. Honeywell<br>Circuit Court, Marathon County, Wisconsin<br>Court File No. 00-CV-590<br>Deposition given 1/11/02 | |
| West Newbury Mutual Ins. Co. v. Honeywell<br>U.S. District Court, District of Massachusetts<br>Court File No. 01-CV-10338 JLT<br>Deposition given 12/5/01 | |
| State Farm as Subrogee of Wilson v. Honeywell<br>Circuit Court, St. Clair County, Michigan<br>Court File No. K-01-000223CZ<br>Deposition given 8/7/01 | |
| Angelina Costa v. Honeywell Inc.<br>Superior Court, Union County, New Jersey<br>Court File No. UNN-L-4273-98<br>Depositions given 4/17/00, 8/7/00 and 7/19/01 | |
| Allianz v. Honeywell<br>Houston, Texas<br>Court File No. Unknown<br>Depositions given 4/9/01 and 6/1/01 | |
| State Farm and Brown v. Rheem Mfg Co. and Heat Controller<br>Denver District Court<br>Case No. 2000-CV-2996<br>Deposition given 5/2/01 | |
| Allstate as Subrogee of Cheatham v. International Comfort Products, Inc.<br>U.S. District Court, Middle District of Tennessee, Nashville Division<br>Court File No. 1-99-0101<br>Deposition given 2/13/01 | |

| | |
|---|---|
| Daniel Cleary v. Honeywell Inc.<br>Supreme Court, Suffolk County, New York<br>Court File No. 98-4546<br>Deposition given 10/18/00 | |
| Michael Fowler v. Honeywell Inc.<br>U.S. District Court, District of Connecticut<br>Court File No. 3:99cv01633 (PCD)<br>Deposition given 8/31/00 | |
| Pittman v. White-Rodgers<br>Court Information and Court File Number are Unknown<br>Amity, Louisiana<br>Deposition given 2/23/00 | |
| Valley Forge Ins. Co. v. Honeywell Inc.<br>U.S. District Court, Eastern District of Kentucky, London Division<br>Court File No. 98-505<br>Deposition given 10/27/99 | |
| Joseph Moss v. Honeywell Inc.<br>Superior Court, Fulton County, Georgia<br>Court File No. E-71401<br>Deposition given 10/6/99 | |
| Willie Davis v. Honeywell Inc.<br>Circuit Court, City of Richmond, Virginia<br>Court File No. LE-1028-1<br>Depositions given 12/18/98 and 7/12/99 | |
| Arthur Woolridge v. Honeywell Inc.<br>Court of Common Pleas, Orangeburg County, South Carolina<br>Court File No. 99-CP-38-45<br>Depositions given 12/18/98 and 7/12/99 | |
| Mireya Santiago v. Honeywell Inc.<br>Superior Court, Orange County, California<br>Court File No. 720214<br>Deposition given 5/4/99 | |

| | |
|---|---|
| Conti v. Honeywell Inc.<br>Supreme Court, Morris County, New Jersey<br>Court File No. I3631-96<br>Deposition given 11/12/98 | |
| Sylvie Sidebottom v. Honeywell Inc.<br>Superior Court, Shasta County, California<br>Court File No. 133319<br>Deposition given 11/3/98 | |
| Clarkson v. Honeywell Inc.<br>Circuit Court, Greene County, Tennessee<br>Court File No. 97-CVV-168<br>Deposition given 10/7/98 | |

**EXHIBIT D**

Kodiak
Fire & Safety Consulting

29 October 2002

Flynn, Gaskins & Bennett, L. L. P.
Scott M. Rusert, Esq.
333 South Seventh Street, Suite 2900
Minneapolis, MN 55402

Re: Krawetz v. Honeywell
Your file # 36.15051
Project # KE10606

Dear Mr. Rusert:

On 15 May 2002 Kodiak Enterprises, Inc. was asked to analyze documents related to a residence fire at the Paul and Pamela Krawetz home, 452 Wyoming Street East, St. Paul, MN, 55107. The fire occurred on 27 January 2000. A fire investigation was performed by representatives for Illinois Farmers Insurance Company, the insurance company for the property as well as by the St. Paul, MN, Fire Department. The documents submitted for study were related to these investigations. The fire scene was not available for inspection or evaluation.

Materials submitted for evaluation included:

1. St. Paul Fire Department Incident Report, dated 15 February 2000, authored by S. Bestland, C Shift Fire Investigator,
2. Illinois Farmers Insurance Company as subrogee of Paul Krawetz and Pamela Krawetz Plaintiff vs. Honeywell International Inc., Defendant, Complaint filed in Ramsey County, MN District Court, Second Judicial District, dated 9 January 2002.
3. Photographs (45) taken by Ward & Whitemore Universal Fire Consultants of the subject property, report dated 2 February 2000,
4. Photographs (121) taken by Illinois Farmers Insurance Company of the subject property, report dated 1 February 2000,

6409 Constitution Drive Fort Wayne, IN 46804 (260) 432-6590

5. Photographs (3) taken by Illinois Farmers Insurance Company of the subject property, report dated 9 October 2000,
6. Photographs (8) taken by Onsite Engineering and Forensic Services, Inc., of evidence items, date unknown,
7. Photographs (40) taken by the St. Paul Fire Department of the subject property, date unknown,
8. Owners Manual for Magic Stat® CT2550 Seven-day Electronic Programmable Thermostat with Comfort Level Programming,
9. Ward & Whitemore Universal Fire Consultants fire investigation report, authored by Robert B. Whitemore, dated 27 March 2000,
10. Onsite Engineering & Forensic Services, Inc. engineering report, authored by Todd J. Hartzler and Daniel J. Choudek, dated 19 December 2000,
11. Onsite Engineering & Forensic Services, Inc. engineering report, authored by Todd J. Hartzler and Daniel J. Choudek, dated 2 July 2001,
12. Ward & Whitemore Universal Fire Consultants expert witness disclosure, authored by Robert B. Whitemore, dated 23 August 2002,
13. Onsite Engineering & Forensic Services, Inc. expert witness disclosure, authored by Daniel J. Choudek, dated 29 August 2002,
14. Richard Rush, Independent Insurance Adjuster expert witness disclosure, authored by Richard Rush, dated 28 August 2002,
15. Paul Krawetz expert witness disclosure, authored by Paul Krawetz, dated 29 August 2002

OPINIONS:

1. The area of fire origin was in the northwest corner of the structure's living room and may have been in either the living space or within the interstitial spaces associated with that corner.
2. The point of fire origin cannot be determined with the facts presented.
3. The cause for the fire cannot be determined with the facts presented.
4. The lack of access to the structure, before post-fire alterations were done, prevented the analysis of significant evidentiary items.

ORIGIN DISCUSSION:

The determination of a fire origin is, generally, made by the analysis of fire patterns that remain on the surviving structure and contents and the

consideration of heat release rates from fuel packages in the compartment. If the site is unavailable, then proper and complete documentation by another investigator, that had access to the site, can be utilized by other interested parties to formulate opinions on the fire origin. The critical component is the documentation. If the documentation is incomplete or of poor quality, then any investigation by other interested parties is thwarted.

The documentation of the fire scene produced by Ward & Whitemore Universal Fire Consultants (Whitemore) and by the St. Paul Fire Department (Fire Department) is incomplete. Both investigations provide some details regarding the gross fire patterns. However, both sources fall short of providing sufficient documentation about a tall wood shelving unit/chest of drawers (chest) that had set in the northwest corner of the living room, and about a combustible wall adjacent to the chest.

The chest sustained considerable fire damage, in the form of charring, to the top panel, inboard surfaces associated with the top two shelves, the contents on these same two shelves, and the bottom surfaces on the front (east) and left (south) sides of the chest. These damages are apparent in the Fire Department photographs. Whitemore provided almost no information about the chest. The rear (west) side and the right (north) side were not documented by either Whitemore or the Fire Department.

The documentation is incomplete because there is insufficient documentation of the wood chest that had been setting in the northwest corner of the living room within the Fire Department's and Whitemore's stated area of origin. Not knowing the damage on all surfaces of the chest, or what may have been setting on or in the chest, prevents full analysis of this significant fuel package within the alleged area of origin, or assessment of the fire patterns on the fuel package.

Given that the fire patterns on the living room wall were around the chest, the significance of the missing chest is great. The wall behind the chest that the fire patterns were on had been made of gypsum board which is relatively non-combustible except for the paper covering. Once the paper covering was burnt away, no further visual appraisal can be made as to intensity or movement of the fire except for depth of calcination measurements, an exercise which apparently had not been done. However, the chest was made of wood or wood products and was combustible. Fire patterns on it could have been assessed for intensity and movement characteristics, if it had been retained or documented

adequately. Further, if there had been another object(s) in or on the chest, then it (they) may have offered similar data for consideration.

Another area of interest that was not adequately documented was the short wall on the north side of the chest that partitioned the living room off from the entry door space. This wall had been clad in vertically-oriented, knotty-pine boards. These boards were badly charred near ceiling level but appeared to be relatively unscathed near floor level. However, documentation of this combustible surface is lacking because no clear photographs were taken of the wall that fully depict the pine boards without the chest blocking the view. The Fire Department's photographs come tantalizingly close but lack sufficient detail. Whitemore's photographs depict the wall after the pine boards had been removed. Again, this wall was a combustible surface that had been partially damaged by the fire. Fire patterns on it could have been assessed for intensity and movement characteristics. A depth of char survey could have been performed on it to further document areas where charring was the deepest – a fact that could have pinpointed a location where the fire first attacked the wall or where fire attacked the wall with the greatest intensity.

Absent the data from the missing chest and the knotty-pine partition wall, the determination or the fire's origin can only be defined as being in the northwest corner of the living room. This lack of definition is unfortunate because the living room fire did not progress to full-room involvement. With the fire size limited to pre-flashover conditions, the opportunity was lost to examine fire patterns that normally would have been obscured by a post-flashover environment.

CAUSE DISCUSSION:

The determination of a fire cause normally involves the identification of three components: the heat or ignition source, the first fuel ignited and the ignition sequence, or how the ignition source and first fuel combined to create a hostile fire. If the fire scene is available, the investigator has the obligation to investigate and document all potential heat sources within the area of origin and all fuel packages that were present to interact with the heat sources. The obligation extends to any alternate potential fire causes that may have existed. If the fire scene is not available to the investigator, then the only alternative is to analyze the data developed by the investigator that did process the fire scene. There is a lack of data involving significant areas for investigation that precludes my determining the fire cause.

Neither the Fire Department nor Whitmore reports discuss areas that could have played a role in the cause of this fire. Specifically, the electrical system, as depicted in Whitemore's and Farmers' photographs, exhibited deficiencies. However, the obvious deficiencies in the electrical wiring were not investigated to determine if they could have played a role in the alleged failure of the supply transformer for the thermostat, a vital component in the alleged fire cause. Further, the Fire Department stated that a local building official found "numerous electrical code violations" in the home. Although violations of the National Electric Code may not produce fire, there may have been violations that could explain the damage found in the transformer.

The Fire Department photographs depict at least five cables lying on top of the chest in the northwest corner of the living room. These cables appear to originate from within the short partition wall at the north side of the chest. No documentation has been found to suggest that any of these circuits were analyzed for evidence of electrical arcing or faulting. Such an analysis could have allowed for several developments. The arcing could have been utilized in an arc survey to further define the origin of the fire. The arcing could have been potential ignition sources for the fire. And the arcing may have addressed the issue related to the alleged failed transformer.

Two circuit breakers in the service panel were found tripped. Whitemore's report states that there was "no indication in or around the panel indicative of the electrical service equipment being involved in the cause of this fire." However, some event or consequence had to have caused the two circuit breakers to trip. Studying "in or around" the service panel for clues at to what had happened to the branch circuits down steam from the panel will provide no worthwhile data. The circuits needed to be analyzed as to what loads were present on them and what conditions existed on both the branch circuit conductors and the loads.

Related to the electrical system in the home, neither report considered the possibility that the supply transformer for the thermostat may have failed from a voltage surge that entered the home from the power line. If lightning, or another source of power, had caused a momentary high voltage surge, this surge could have resulted in damage to the electrical system in the home, including the supply transformer for the thermostat. The means to investigate this possibility is to look for collateral damage in other electrical devices within the home. The fact that the printed circuit board for the furnace had to be replaced within a month of the fire

suggests that other electrical damage may have existed in the HVAC system. A failure, such as that alleged in the supply transformer for the thermostat, may not have caused a printed circuit board failure. However, the failed printed circuit board could have been damaged by a voltage surge entering the home from the power line.

The investigation to determine the initial fuels was apparently not performed by either the Fire Department or Whitemore, or if it was there is scant discussion on it in the reports. The first fuel in the alleged failure of the thermostat would have been the plastic housing for the thermostat. How that thermostat may have ignited the housing is not clear. If an over-voltage condition on the thermostat circuit board existed, did a component short circuit and allow a board trace to glow and ignite the board? Did a connection glow at the board terminals for the incoming conductors and ignite the housing? These are issues that have not been discussed by Whitemore or Onsite Engineering & Forensic Services (Onsite).

Once the circuit board or plastic housing is alight, combustion must produce the ignition of a secondary fuel. The simple burning of the thermostat body would not have caused the extent of damage found in this fire. No mention is made by any of the investigators as to what the second fuel was that ignited. If the plastic dripped down onto the dresser or behind it onto the floor, were there sufficient fuel sources to sustain combustion? The lack of analysis of the chest and knotty-pine wall prevents the investigation of this aspect of the cause determination.

This lack of consideration of the second fuel for this fire is significant. The burning of the plastic housing for the thermostat would produce a small fire that would most likely drop down and accumulate on the floor below the thermostat's wall location. The burning plastic would have pooled there and whatever fire might have progressed to the rest of the room would have had to originate from that pool of plastic. Yet, the side of the chest, above the location where the burning plastic would have been, appeared to not be burned. A clear line of demarcation is apparent on the south side of the chest where the wood appears to be pristine. Assuming that the alleged fire cause occurred as described by Whitemore and Onsite, the fire would have had to progress up the south side of the chest to involve the top panel and to involve the front two shelves. In this instance, however, the south side of the chest appears unscathed and the greatest damage about the chest appears to be concentrated on the north side, top two shelves and to the knotty-pine wall adjacent to the north side of the chest.

Another consideration related to the ignition of the second fuel package is the ability of the plastic thermostat body to ignite the solid wood chest. The plastic body has a finite mass of plastic that would drip and pool on the floor below its pre-fire location. This pool of burning plastic would not represent the entire mass of plastic, just that portion that fell to the floor. This pool of plastic would burn for a finite period of time. If the chest was not ignited by the pool of burning plastic before the pool self-extinguished, then the thermostat would have no further opportunity to ignite the chest. This concept is significant because this type of analysis would determine if the burning thermostat body was a competent ignition source for the chest. This determination is an inquiry that needs to be done in this case before a prima facia case can be made that the burning thermostat body is a competent ignition source for a fuel package such as a wood chest.

Potential alternate scenarios for this fire include a candle burning out of control on the chest and electrical malfunction to the cables that had been on the north side of the chest in the partition wall. Although denied by the homeowner, if a candle had been left burning on the chest and the candle began to flare, a fire could have erupted that could have created the same or similar fire patterns as found in this case. Further, if a fault had occurred in any of the electrical cables seen in the Fire Department photographs, a fire could have developed that could have created the same or similar fire patterns as found in this case. Neither of these ignition scenarios can be investigated by other interested parties because the scene was not made available and the documentation does not allow for such evaluations.

SPOLIATION DISCUSSION:

The fire occurred on 27 January 2000. The Fire Department identified the thermostat as a potential ignition source on that same date. Whitemore identified the thermostat as a potential ignition source for the fire on 2 February 2000. On 10 February 2000, the homeowner was notified that the furnace transformer was "bad." On 16 February 2000, the homeowner was notified that the "main circuit board" for the furnace was replaced. On 18 February 2000, the entire furnace was replaced. Yet, no contact was made with the thermostat manufacturer, transformer manufacturer, or furnace manufacturer to allow for an independent examination of the fire scene by the manufacturers' representative. The manufacturer of the thermostat was tentatively identified by the owner as having been a Honeywell device. The manufacturer of the

transformer and furnace could easily have been determined by observation.

The Whitemore report states that a "significant [fire] pattern associated with the fire originating at or near the location where the thermostat was attached to the west wall." Given the alleged area of fire origin, and the "significant pattern associated" with it, any devices associated with the thermostat should have been recognized as being relevant to the investigation. Such circumstances should have made Farmers recognize that the thermostat, transformer and furnace could generate litigation. Standards of care in the industry dictate that other interested parties be given the opportunity to participate in the site and physical evidence evaluations.[1] [2]

The analysis of a fire scene to determine the origin and cause is a difficult process that relies on the identification of sufficient facts to allow the fire analyst to offer opinion testimony. Investigators that have the opportunity to process a fire scene have the burden to insure that sufficient facts are gathered and documentation is performed to allow for an informed peer review by other interested parties. Without a complete collection of facts and documentation of the fire scene, the only alternative to other interested parties is access to the fire scene before any alteration is done. Under such circumstances, the entire fire scene should be considered physical evidence and should be protected and preserved. In this instance, neither of these conditions was met.

The scene was investigated by two parties, the fire department and the insurance carrier for the property owner. Even though there was an early determination that there might be other interested parties, no attempt was made to delay the fire scene analysis or hold the fire scene until notification of those interested parties. Interested parties should be allowed to participate in the investigation and examine the evidence in its undisturbed condition. Such a step is routinely taken in fire scenes and especially in cases that evolve into subrogation, such as this one. The extent of documentation and the width and breadth of the investigation did not consider several aspects of the fire scene that could have provided significant evidence to other interested parties. Such

[1] American Society for Testing and Materials, ASTM E 860 - 97, Standard Practice For Examining and Testing Items That Are Or May Become Involved In Litigation, (1982, West Conshohocken, PA: ASTM, 1997).
[2] National Fire Protection Association, NFPA 921 Guide for Fire and Explosion Investigation, rev. ed. (1992; rpt. Quincy, MA: NFPA, 2001), §14.3 Preservation of the Fire Scene and Physical Evidence & §24.2 Understanding between the Parties

encompassing investigations are routinely done in other fire investigations, especially by other interested parties.

CONCLUSIONS:

The point of fire origin cannot be determined based on the facts as known today. The proof offered by Farmers does not address significant areas of the investigation.

The fire cause cannot be determined based on the facts as known today. The proof offered by Farmers is insufficient and addresses only one aspect of the cause, i.e. the alleged ignition source, while ignoring the first fuel ignited the ignition scenario and alternate potential fire causes. Further, the competency of the alleged ignition source to propagate fire to the remaining structure has not been proven.

Significant evidence on the scene that may have aided in assessing other potential origins and causes, and that may have refuted the alleged fire origin and cause, was lost to all interested parties except for the plaintiff.

QUALIFICATIONS:

This report is based on the material reviewed and the knowledge, training and experience of Mr. Daniel L. Churchward the author of this report. If facts or circumstances become known that impact the opinions of this report, the author reserves the opportunity to review and amend this report. The knowledge, training and experience of the author can be seen by reviewing the attached Curriculum Vitae. Further, a listing is attached of the deposition and trial experience of the author spanning back four years from the date of this report.

FEE SCHEDULE:

The author, Mr. Daniel L. Churchward, is a fulltime employee of Kodiak Enterprises, Inc. The charge rate for his time can be seen by reviewing the attached Fee Schedule, effective as of 01 September 2002.

Daniel L. Churchward

# CURRICULUM VITAE

**Daniel L. Churchward**
**Kodiak Enterprises, Inc.**
**6409 Constitution Drive**
**Fort Wayne, IN 46804**

19 May 2002
219-432-6590
FAX 219-436-0768
PAGER 800-426-2959
Dchurchward@KodiakConsulting.com

## EXPERIENCE

1995 to Present - President and Owner of Kodiak Enterprises, Inc., 6409 Constitution Drive, Fort Wayne, IN 46804. Duties include: the investigation and site management of major fires to determine origin and cause; forensic and electrical engineering; case study evaluation of fire investigations for accuracy and competency; training in fire investigation procedures; and consulting on product safety issues.

1991 to 1995 - Senior Investigator for Royal Insurance Company Special Investigations Unit, 9300 Arrowpoint Blvd., Charlotte, North Carolina, 60504. Duties included: the investigation and management of major fire losses to determine origin and cause.

1976 to 1991 - Engineering Laboratory Manager and Forensic Engineer for Barker and Herbert Analytical Laboratories, Inc., 207 Main Street, New Haven, Indiana, 46774. Duties included: determine origin and cause of fires; reconstruct motor vehicle and industrial accidents; assign and manage work load of forensic engineers and fire investigators including training of new employees; work with legal profession in preparing cases and serving as an expert witness in federal and state courts on the determination of origin and cause for fires and reconstruction of accidents; preparing and giving seminars and training programs; and serve as company representative to professional organizations.

1978 to 1981 - Firefighter for the Adams Township Fire Department, 910 Hartzel Road, New Haven, Indiana, 46774. Duties included: instruction, and documentation of the training for the station personnel; investigation of fires in the township.

1972 to 1978 - Firefighter and fire investigator for the Saint Joseph Township Volunteer Fire Department 6033 Maplecrest Road, Fort Wayne, Indiana, 46835. Duties included: investigation of fires in the township.

1971 to 1978 - Police Officer for the Allen County Police Department, 12535 Lima Road, Fort Wayne, Indiana. Duties included: investigation of fires in the county.

## EDUCATION

1988 Bachelor of Science Electrical Engineering Technology, Purdue University
1986 Associate of Applied Science Electrical Engineering Technology, Purdue University
1977 12-credit hours toward Associate Degree for Fire Science Technology at Indiana University.

## AFFILIATIONS

- National Fire Protection Association (NFPA), Chairman & Charter member of Technical Committee on Fire Investigations, responsible for NFPA 907M, Manual for the Determination of Electrical Fire Causes, 1988 Edition, and NFPA 921, Guide for Fire and Explosion Investigations, 1992, 1995, 1998 & 2001 Editions
- NFPA alternate member of the Technical Committee on Fire Investigator Professional Qualifications, responsible for NFPA 1033, Standard for Professional Qualifications for Fire Investigators, 1998 Edition
- NFPA Research Foundation: Research Advisory Council on Post Fire Analysis
- International Association of Arson Investigators (IAAI): 1975-1999
- Indiana Chapter #14 IAAI - Past President
- National Association of Fire Investigators (NAFI) - Treasurer
- Indiana Arson and Crime Association (IACA) - Past President
- Allen County Fire and Arson Specialized Team - Charter Member
- Phi Theta Kappa and Tau Alpha Pi National Honor Societies

## TRAINING

Certified Fire Investigator - International Association of Arson Investigators (1990-1999)
Certified Fire and Explosion Investigator - National Association of Fire Investigators
Attended over 400 hours classroom instruction in aspects related to fire investigation

## PUBLIC SPEAKING/TEACHING

Lectured in many states and foreign countries on the following aspects of fire investigation:

- NFPA 921: Guide for Fire & Explosion Investigations
- Electrical Theory and Electrical Fire Causes
- Vehicle Fire Investigation
- Origin and Cause Determination
- Fire Behavior and Fire Science
- Field Notes, Photography and Fire Scene Documentation
- Building Construction for the Fire Investigator
- Wood-burning Stove and Fireplace Fire Investigation
- Collection and Handling of Fire Scene Evidence
- OSHA Compliance on the Fire Scene
- Interviewing

Kodiak
Fire & Safety Consulting

**DANIEL L. CHURCHWARD**
**DEPOSITION & TRIAL LIST**

| | | |
|---|---|---|
| 04 JUN 02 | Depo: | Canfora et al v. Exxon Mibil Corporation, et al, Clark County, NV District Court, Case No. A417140, Project KE10587. |
| 22 MAY 02 | Arbitration: | Ada Owens v. S. C. Johnson & Son, Inc., Metairie, LA, Arbitration forums, Docket # P042001360100, Project 10553. |
| 09 MAY 02 | Depo: | Joyce McDowell et al v. City of Detroit, Wayne County, MI, Circuit Court, Case No. 00-039668-no, Project KE10433. |
| 06 DEC 01 | Depo: | Kenneth Gorg & Mary Gorg, d/b/a Ken Gorg Golf Shop, et al v. Metro Dental Care, et al, Dakota County, MN, 1st Judicial District Court, Court File No. C4-0000-9359, Project KE10228. |
| 17 APR 01 | Depo: | Illinois Farmers Insurance Company v. John Fields and Deanna Fields, Porter County, IN, Superior Court No. 1, Cause # 64D01-9411-CP-2809, Project KE10473. |
| 26 MAR 01 | Trial: | State Farm Fire & Casualty (Krilosky) v. Black & Decker (US) Inc. Cyuahoga County, OH, Court of Common Pleas, Case # 402255, Project KE10400. |
| 02 MAR 01 | Depo: | State Farm Fire & Casualty (Krilosky) v. Black & Decker (US) Inc. Cyuahoga County, OH, Court of Common Pleas, Case # 402255, Project KE10400. |
| 15 FEB 01 | Depo: | Travelers Property & Casualty Corporation v. General Electric Company, U. S. District Court, District of Connecticut, Civil Action # 398CV50(SRU), Project KE10394. |
| 09 NOV 00 | Depo: | Shannon Renee Cole et al v. Gilbert & Linda Lamar et al, Ottawa County, MI, Circuit Court, Cause # 99-35527-NO, Project 98KE10202. |
| 25 OCT 00 | Depo: | Fireman's Fund Insurance Company v. Marvin Stern et al, U. S. District Court for the District of Missoula, Montana, Cause CV99-46-M-LBE, Project KE10374. |
| 20 JULY 00 | Depo: | Juarez, et al v. Century Products Company, Inc. et al, Starr County, TX, District Court, 229th Judicial District, Cause # DC-98-174, Project #KE10360. |
| 16 DEC 99 | Trial: | Bruce P. Jankowski v. State Farm Fire & Casualty Company, Cass County, MI Circuit Court, Case#98-537-CK, Project #99KE10154. |

| | | |
|---|---|---|
| 11 NOV 99 | Depo: | Shaniece Milledge v. Michigan Basic Property Insurance Association, Wayne County Circuit Court, Case # 99-907681-CK, Project # 99KE10207. |
| 18 OCT 99 | Trial: | United Congregational Church v. Michigan Basic Property Insurance Association, Wayne Co. MI, Circuit Court, Case # 98-812-371-CK, Project # 98KE10206. |
| 09 SEPT 99 | Depo: | Farideh R. Bagne & Donald G. Bronn v. L & S Heating & Cooling, et al, Oakland County, MI, Circuit Court, Case # 95-490981-CK, Project # 97KE10145. |
| 07 SEPT 99 | Depo: | Ronald Taepke & Expressions Unlimited v. Lake State Insurance Company, Charlevoix County, MI, Circuit Court, Case # 98-1496-18-CK, Project # 97KE10116. |
| 22 JULY 99 | Depo: | Catfish Bend Casinos, L.C. v. Color-Ad Signs, Inc., Lee County, Iowa District Court, Case # LALA004152, Project #97KE10120. |
| 07 MAY 99 | Trial: | Arbitration for Shelly Flanigan et al v. S. C. Johnson & Son, Inc., Fulton County, GA State Court, Case # 95VS50106475, Project # 96KE10074. |
| 28 APR 99 | Depo: | Quick Save Food Stores, Ltd. v. Travelers et al, Genesee County, MI, Circuit Court, Case # 98-63169-CK, Project # 97KE10148 |
| 26 APR 99 | Trial: | Dan Hudkins v. Farm Bureau Mutual Insurance Company of Michigan, Wayne County, MI Circuit Court, Case # 96-690458-CK, Project 98KE10190 |
| 12 APR 99 | Depo: | Mid-America Auto Parts, Inc. v. Secura Insurance Company, Genesee County, MI Circuit Court, Case # 97-61400-CK, Project 99KE10213 |
| 12 APR 99 | Depo: | Dan Hudkins v. Farm Bureau Mutual Insurance Company of Michigan, Wayne County, MI Circuit Court, Case # 96-690458-CK, Project 98KE10190 |
| 29 MAR 99 | Depo: | Bruce P. Jankowski v. State Farm Fire & Casualty Company, Cass County, MI Circuit Court, Case # 98-537-CK, Project 98KE10154 |
| 25 JAN 99 | Depo: | United Congregational Christian Church of Detroit v. Michigan Basic Property Insurance Association, Wayne County, MI Circuit Court, Case # 98-812371-CK, Project 98KE10206 |
| 30 NOV 98 | Depo: | Big West Oil v. Ford Bacon & Davis, Inc, CCI Mechanical, Inc, Consolidated Pipe & Supply, Inc, Great Plains Stainless Co, Vallourec, Inc, 2nd Judicial District Court of Davis County, UT, Civil # 960700041CN, Project # 98KE10164 |

* Contact Barker & Herbert Analytical Laboratories, Inc., 207 Main Street, New Haven, IN, 219-749-0124 for further information.
** Name of an attorney involved in case.
*** Insufficient information available to document further.

Kodiak Fire & Safety Consulting

Effective 1 September 2002

# FEE SCHEDULE

**TECHNICAL SERVICES:**
US $140.00/hr (D.W. Smith, T.E Loraine)
US $175.00/hr (D.L. Churchward)

Technical services can include:

- Origin & Cause Investigations
- Large-loss Site Management
- Engineering Analysis
- OSHA Compliance
- Building & Fire Code Analysis
- Case Studies & Consultations
- Safety Evaluations
- Report Preparation
- Depositions & Trial Testimony

**TRAVEL TIME:**
US $140.00/hr (D.W. Smith, T.E.Loraine)
US $175.00/hr (D.L. Churchward)

- Travel time is billed on a portal-to-portal basis
- Air travel expenses are billed at cost
- International air travel is at business class or higher (Smith/Loraine)
- All air travel is at business class or higher (Churchward)

**TRAINING SERVICES:**
Rates Quoted on Request

Training services can include:

- Lectures and Workshops
- Handout Materials
- Sponsorship, if requested
- Testing, if requested
- Certification, if requested

**LOGISTICAL COSTS:**

- Vehicle mileage is charged at the rate of US $.30/mile
- Photographs are charged at the rate of US $50.00/roll of 36 exposures
- Long distance telephone charges are US $10.00/call plus hourly rate

# BILLING POLICY

6409 Constitution Drive Fort Wayne, Indiana 46804 (260) 432-6590

**CLIENT AGREEMENTS:**
It is Kodiak Enterprises, Inc. policy that the firm or individual who originally arranges for our services, or to whom we designate, is our client. The client is responsible for any outstanding accounts. In the specific case where a law firm utilizes our services on behalf of its client, we consider the law firm to be our client and responsible for all charges.

In the case where Kodiak Enterprises, Inc. is asked or ordered to perform work by some firm or individual other than our client, our client will be notified of the request or order. Any work done toward that project will be charged back to our client for payment, notwithstanding any agreements between parties regarding payment of fees.

Kodiak Enterprises, Inc. reserves the option to suspend work on, or withdraw from, any project in which payment is past due. Furthermore, Kodiak Enterprises, Inc. reserves the option not to resume work or otherwise to prepare for testimony until payment has been received for amounts owed.

**RETAINERS:**
Retaining fees will be requested on all projects. The size of the retainer will be determined on a case-by-case basis. All work is billed against the retainer. As the project progresses, additional retainers may be required. Clients are encouraged to discuss financial issues and budgets on each project prior to commencement of work.

**BILLING POLICY:**
Outstanding accounts are billed on a monthly basis with payment due within 30 days. Balances remaining unpaid beyond 30 days are subject to interest charges of 1.5 % per month calculated from the date of the original invoice. Delinquent accounts may be turned over for professional collection. The costs of collection, including any legal fees and expenses are the responsibility of the client and will be added to the client's principal and will be subject to the monthly service charge.

Services and expenses are billed according to the published rate schedule in effect at the time that the services were rendered. All fees are on an hourly basis.

**DEPOSITIONS AND TRIALS:**
All outstanding accounts must be paid in full prior to any testimony. Deposition fees will be estimated and requested to be paid in advance. Unless special arrangements are made prior to commencement, deposition testimony will be given only during regular weekday business hours (8:00 A.M. to 5:00 P.M.).

**EVIDENCE STORAGE:**
Evidence storage is available by Kodiak Enterprises, Inc. A fee will be charged per month based on the size of the evidence container. Storage fees will be billed every three months. Special arrangements can be made to bill on a bi-annual or annual schedule. Rates for bi-annual and annual schedules may differ from these published rates. Storage fees are:

- < 5 cubic feet: $25.00/month/project
- > 5 cubic feet: $50.00/month/project
- > 10 cubic feet: $75.00/month/project

6409 Constitution Drive Fort Wayne, Indiana 46804 (260) 432-6590

STATE OF MINNESOTA )
) ss. AFFIDAVIT OF SERVICE BY MAIL
COUNTY OF HENNEPIN )

Tammy T. Wittbecker, being duly sworn, says that on October 30, 2002, she served the annexed:

1. Defendant's Rule 26(a)(2) Disclosures

on the party(ies) listed below by mailing to them a copy thereof, enclosed in an envelope, postage prepaid, and by depositing the same in the post office at Minneapolis, Minnesota, directed to their last known address(es) and fax number(s):

Kevin J. Kennedy, Esq.
HANSON, LULIC & KRALL
920 Second Avenue South
Suite 500
Minneapolis, MN 55402
Fax No. (612) 392-3675

Subscribed and sworn to before me
on October 30, 2002.

Leann M. Moch
Notary Public

LEANN M. MOCH
Notary Public
Minnesota
My Commission Expires January 31, 2006