# EXHIBIT I

C

**Motions, Pleadings and Filings**

United States District Court,
D. Minnesota.
Dennis W. **FISCHER** and Judith **Fischer**, and
Western National Insurance Group,
Plaintiffs,
v.
**RHEEM** MANUFACTURING COMPANY,
Robertshaw Controls Company, and Reliant Energy
Resources Corporation, d/b/a Reliant Energy
Minnegasco, Defendants.
**No. Civ.011739(PAM/RLE).**

May 13, 2004.
Bradley L. Doty, Stempel & Assoc, Hopkins, MN, for Plaintiff.

James L. Haigh, Peter G. Van Bergen, Cousineau McGuire & Anderson, George W. Flynn, Hal A. Shillingstad, Flynn Gaskins & Bennett, Minneapolis, MN, for Defendants.

MEMORANDUM AND ORDER

MAGNUSON, J.

*1 This matter is before the Court on Defendant Robertshaw Controls Company's Motion in Limine. This Motion seeks sanctions for **spoliation** of evidence against Plaintiff Western National Insurance Company. For the reasons that follow, the Motion is granted.

BACKGROUND

On March 10, 1999, a fire destroyed the home of Plaintiffs Dennis W. Fischer and Judith Fischer. Plaintiff Western National Insurance Company ("Western National") insured the home at the time of the fire. Less than a week after the fire, Western National's investigators determined that the probable cause of the fire was a natural gas water heater located in the basement of the home. Defendant Rheem Manufacturing Company ("Rheem") designed, manufactured, and distributed the water heater. Defendant Robertshaw Controls Company ("Robertshaw") designed, manufactured, and distributed the gas control valve connected to the water heater. Defendant Reliant Energy Resources Corporation d/b/a Reliant Energy Minnegasco ("Reliant") was responsible for the natural gas delivery system into the home, including the gas meter and regulator.

After Western National's investigators determined the probable cause of the fire, Western National hired a company to demolish the fire scene. More than two months later, Western National notified Robertshaw that its gas control valve was the likely cause of the fire. At that time, all that remained of the fire scene was the foundation of the house, the water heater and control valve, and some wiring that was above the water heater. [FN1]

FN1. Reliant preserved the natural gas service regulator from the fire scene, but subsequently lost this evidence.

The majority of the claims in the lawsuit have been settled. The only claims that remain are Western National's claims against Robertshaw. In this Motion, Robertshaw seeks to preclude Western National from introducing any evidence at trial derived from the fire scene, including opinions and testimony from Western National's retained experts or from the state fire marshal. Robertshaw argues that this sanction is appropriate because Western National did not preserve the fire scene to allow Robertshaw to investigate the scene.

Western National admits that it did not preserve the fire scene but contends that its failure to preserve

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the scene itself did not prejudice Robertshaw. According to Western National, it preserved the relevant evidence from the fire scene: the water heater and the gas control valve from the water heater. In the event the Court determines that sanctions are appropriate, however, Western National asks that the Court only give a negative inference instruction, rather than the sanction Robertshaw seeks.

DISCUSSION

The Court has broad authority to impose sanctions for the **spoliation** of evidence. *Patton v. Newmar Corp.,* 538 N.W.2d 116, 119 (Minn.1995). Sanctions for **spoliation** are not limited to bad-faith destruction of evidence, but are appropriate when the party destroying the evidence "knew or should have known" that the evidence was "relevant to imminent litigation." *Dillon v. Nissan Motor Co.,* 986 F.2d 263, 267 (8th Cir.1993). The Court must examine "the nature of the item lost in the context of the claims asserted and the potential for remediation of the prejudice" caused to the opposing party. *Patton,* 538 N.W.2d at 119.

*2 In this case, there is no dispute that Western National knew or should have known that the fire scene itself was relevant to potential litigation. Western National's Director of Special Investigations, Nancy Jacobson, testified that the fire scene is a valuable piece of evidence, (Shillingstad Aff. Ex. B at 91 (Jacobson Dep.)), and courts recognize that "a fire scene itself is the best evidence of the origin and the cause of the fire." *Hoffman v. Ford Motor Co.,* 587 N.W.2d 66, 71 (Minn.Ct.App.1998). Thus, the Court must examine the prejudice to Robertshaw from Western National's failure to preserve the fire scene and determine whether the prejudice is sufficient to warrant the sanctions Robertshaw seeks.

Western National argues that, in this instance, there is no prejudice to Robertshaw from the destruction of the fire scene. According to Western National, Robertshaw need only establish that its control valve was not defective, and thus Robertshaw's inability to investigate other potential causes of the fire is immaterial. Western National's argument amounts to an argument that half a defense is better than no defense at all.

Although it may be true that Robertshaw's only substantive burden is to rebut Western National's claim that the control valve was defective, Robertshaw also bears a persuasive burden. One of the elements of a prima facie case of products liability is that the product at issue caused the injury. *Gerhard v. Bell Helicopter Textron,* 759 F.Supp. 552, 554 (D.Minn.1991) (Devitt, J.). Because Robertshaw did not have the chance to examine the fire scene, Robertshaw cannot argue to the jury that something other than the water heater caused the fire. The only firsthand evidence the jury will hear as to causation is Western National's experts, and of course those experts all believe that the fire started in the water heater and specifically in the control valve for the water heater. Robertshaw's inability to rebut the evidence of causation is clearly prejudicial to Robertshaw's defense of this action. *See Hoffman,* 587 N.W.2d at 71 (noting that, because of destruction of fire scene, defendant "would be confronted with the challenge of meeting probative and convincing firsthand evidence with sketchy, relatively speculative secondhand evidence").

Because the Court determines that Robertshaw has been prejudiced by Western National's **spoliation** of evidence, the Court must consider what sanctions would constitute an appropriate remedy for that prejudice. The Court does not agree with Western National that a negative inference instruction is all that is necessary in this case. Such an instruction is no substitute for firsthand evidence of the cause of the fire. Rather, the Court agrees with Robertshaw that Western National should be precluded from relying on evidence obtained from the fire scene, including its experts' opinions and the opinions of the state Fire Marshal. Although it is a severe sanction, it is the only sanction that truly levels the playing field in this instance. *See Dodd v. Leviton Mfg. Co.,* No. CX-02-1570, 2003 WL 21147151, at *1 (Minn.Ct.App. May 20, 2003) (finding exclusion of evidence to be appropriate remedy for destruction of fire scene).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*3 Certainly, it is not always possible to preserve a fire scene until every possible tortfeasor has inspected the scene. When a fire destroys a building, it is in the insured's interest to demolish the fire scene as quickly as possible so that a new building may be constructed on the site. In this instance, however, it is clear that Western National knew very shortly after the fire that the Robertshaw control valve was a likely cause of the fire. In such a situation, it is incumbent on the insurance company to provide notice to the potential tortfeasor and to allow that tortfeasor the opportunity to conduct its own investigation of the fire scene. *See Dodd,* 2003 WL 21147151, at *5 (finding that trial court properly gave significant weight to insurer's failure to provide notice to potential tortfeasor until months after insurer knew that tortfeasor's product was a likely cause of the fire). Western National's failure to give such notice to Robertshaw prejudiced Robertshaw's defense of this matter to such an extent that the only appropriate sanction is to preclude Western National from relying on the evidence gleaned from the fire scene.

CONCLUSION

For the foregoing reasons and based on all the files, records, and proceedings herein, the Court concludes that the prejudice to Robertshaw from the destruction of the fire scene warrants the exclusion of all evidence gleaned from that fire scene. Accordingly, IT IS HEREBY ORDERED that Defendant's Motion in Limine to exclude evidence (Clerk Doc. No. 36) is GRANTED.

2004 WL 1088328 (D.Minn.), 64 Fed. R. Evid. Serv. 553, Prod.Liab.Rep. (CCH) P 16,996

**Motions, Pleadings and Filings (Back to top)**

- 0:01CV01739 (Docket) (Sep. 24, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
REGENT INSURANCE COMPANY, Plaintiff,
v.
CANDLE CORPORATION OF AMERICA, Sysco Corporation, and Sysco of Minnesota, Inc., Defendants.
**No. Civ.04-2593 RHK/AJB.**

Nov. 24, 2004.

Steven B. Fisher, John R. Schleiter, and David M. Roach, Fisher, Kanaris, P.C., Chicago, IL, and Bradley D. Fisher, Foley & Mansfield, P.L.L.P., Minneapolis, MN, for Plaintiff.

George W. Flynn and Bradley J. Ayers, Flynn, Gaskins & Bennett, L . L.P., Minneapolis, MN, for Defendants.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction

*1 On December 6, 2000, a fire caused significant damage to the Decathlon Hotel and Athletic Club ("Decathlon"). Plaintiff Regent Insurance Company ("Regent"), as subrogee of Decathlon, has now sued Defendants Candle Corporation of America, Sysco Corporation, and Sysco of Minnesota, Inc. (collectively "Defendants") alleging various product liability claims based on the theory that a **Sterno** can manufactured, designed and distributed by Defendants caused the fire. In their Answer, Defendants have asserted an affirmative defense seeking sanctions against Regent for **spoliation** of evidence resulting in Defendants' inability to investigate the fire scene in its original condition. Regent has moved for summary judgment on Defendants' **spoliation** of evidence defense.

Background

On December 7 and 8, 2000, the fire scene at Decathlon was investigated by three fire experts: Russ Smith, a Fire Inspector for the Bloomington Fire Department (Smith actually began investigating the scene on December 6); G. Crawford Wiestling, a professional fire investigator retained by Decathlon to investigate the cause and origin of the fire; and Robert Whitemore, a professional fire investigator retained by General Casualty Insurance Company ("General Casualty"), an affiliate of Regent and insurer of Decathlon, to investigate the cause and origin of the fire. (Smith 7/22/04 Aff. ¶ ¶ 2, 7, 8, 17, 18.) Smith established a protocol for the investigation and instituted a "method of tearing down the scene and removing debris, etc." (*Id.* at ¶ 8.)

The three inspectors concluded that the fire started in the Tabone Room and that a **Sterno** can was the cause of the fire. "[T]his determination was based upon [their] observations of the fire scene, interviews with witnesses and firefighters, evidence gathered at the scene and [their] knowledge, experience and expertise in fire cause and origin investigations." [FN1] (Wiestling Aff. ¶ 23.) After reaching a conclusion about the cause and origin of the fire, the inspectors retained physical artifacts related to and surrounding the **Sterno** can. (Smith 7/22/04 Aff. ¶¶ 23, 24.) "[S]pecifically, the coffee pot, the **Sterno** holder, baskets for utensils, silverware, plates, creamer, ... [a] food riser, coffee cups, glassware, [and] ... [b]oxes of **Sterno** cans" were preserved and removed from the scene; "it was determined" that there were no other artifacts relevant to the cause and origin of the fire. (Wiestling Aff. ¶ ¶ 15, 16.) On December 8, the inspectors considered and rejected numerous alternative ignition sources, none of which was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

located near the **Sterno** can. These alternative ignition sources included an artificial Christmas tree and its lights, electrical outlets, and overhead lighting fixtures. (*Id.* at ¶¶ 17-21, *see also* Dyer Aff. ¶ VII (mentioning a TV and VCR as an additional "known potential ignition source").)

FN1. During the investigation, Decathlon employee Jodi Epstein informed the inspectors that shortly before the fire started, in preparation for a morning meeting, she lit a **Sterno** can to heat coffee in the Tabone Room. (Ayers Aff. Exs. H, I.)

It was not until June 2003, two and one half years after the fire, that General Casualty notified Defendants of the fire and alerted Defendants to the possibility that a defective **Sterno** can was its cause. [FN2] (Ayers Aff. ¶ II.) Defendants first inspected the fire scene in October 2003, accompanied by Richard Dyer, a professional fire investigator retained by Candle Corporation. (*Id* . at ¶ V.) By that time, the fire scene "had been completely gutted, leaving only the bare brick walls on three sides and concrete floor for inspection." [FN3] (Dyer Aff. ¶ III; Ayers Aff. ¶ VI.) In May 2004, Defendants inspected the fire artifacts retained by Regent. (Dyer Aff. ¶ IV.) Dyer was also provided with Smith's "report, file materials, photographs and videotape of the fire scene," and the photographs "from Plaintiff's fire investigators and insurance representatives." (*Id.* at ¶¶ VI, VII.)

FN2. At oral argument, counsel for Regent was unable to give a reason for the two-and-one-half-year delay in notifying Defendants.

FN3. The record does not indicate when or under what circumstances the Decathlon building was "gutted."

*2 According to Dyer, the photographs of the fire scene "are insufficient ... to conduct a comprehensive analysis of [the] fire because they do not allow [him] to fully evaluate heat, burn and smoke patterns, to see critical areas close-up, and to see physical evidence that was not photographed or retained." (*Id.* at ¶ VII.) Dyer has stated that his "ability to determine whether" any of the alternative ignition sources "caused and/or contributed to" the fire has been compromised because he has "not been able to examine the fire scene in its original condition, nor inspect potential alternative sources of ignition." (*Id.* ¶ IX.) Regent disputes that Defendants' investigation has been compromised in any way, and now moves for summary judgment seeking dismissal of Defendants' **spoliation** defense.

Standard of Review

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). It is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 250 (1986). The Court views the evidence, as well as all reasonable inferences, in a light most favorable to the nonmoving party. *See Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996); *see Adkinson v. G.D. Searle & Co.,* 971 F.2d 132, 134 (8th Cir.1992). The moving party carries the burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 224 F.3d 735, 738 (8th Cir.2000). The nonmoving party may not rest upon the allegations or denials of its pleadings. Rather, the nonmovant must establish the existence of specific facts that create a genuine issue for trial. Neither mere allegations nor denials are sufficient. *See Liberty Lobby,* 477 U.S. at 256.

Analysis

Regent moves for dismissal of Defendants' **spoliation** defense on the grounds that: (1) there was no **spoliation** of evidence because all of the relevant evidence from the fire scene was preserved; (2) the agreement among the three fire experts regarding the cause and origin of the fire indicates that there is "only one viable fire cause and origin theory" (Reply Mem. at 10); and (3) the quality and comprehensiveness of the photographs and videotapes taken of the fire scene negate any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prejudice to Defendants. For the reasons that follow, the Court determines that summary judgment is not appropriate.

"**Spoliation** of evidence refers to the destruction of relevant evidence by a party." *Hoffman v. Ford Motor Co.*, 587 N.W.2d 66, 71 (Minn.Ct.App.1998) (internal quotation omitted). Where **spoliation** of evidence occurs prior to the institution of a lawsuit, "[a] district court is vested with discretion to impose sanctions upon a party under its inherent disciplinary power." *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 851 (8th Cir.1998) (citations omitted). Before a court may impose sanctions for the destruction of evidence, however, "[t]here must be a finding of prejudice to the opposing party." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir.2003) (citation omitted). Such a determination is based on the "nature of the evidence destroyed" in a given case, *id.*, and on "the potential for remediation of the prejudice," *Patton v. Newmar Corp.*, 538 N.W.2d 116, 119 (Minn.1995). [FN4]

FN4. In general, whether the destruction of evidence warrants sanctions is based on factual findings made by the court. Courts often hold evidentiary hearings to determine the facts relevant to the imposition of sanctions. *See, e.g., Morris v. Union Pac. R .R.*, 373 F.3d 896, 901, 903 (8th Cir.2004) (noting that the district court conducted four days of "sanctions hearings" concerning the defendant's destruction of evidence); *Stevenson*, 354 F.3d at 743 (noting that the district court granted the plaintiff's motion for sanctions after a three-day evidentiary hearing).

*3 Sanctions for **spoliation** of evidence may be appropriate where a party destroys evidence that it "knew or should have known was relevant to imminent litigation." *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir.1993). Such a standard has been used to justify the exclusion of testimony that is related to the destroyed evidence where that testimony puts the innocent party at a disadvantage. *See, e.g., id.* The destruction of evidence may also warrant the imposition of a presumption in favor of the innocent party or an "adverse inference instruction" given to a jury, although "there must be a finding of intentional destruction indicating a desire to suppress the truth before [that sanction] is justified." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir.2004) (internal quotation omitted); *see also SDI Operating P'ship v. Neuwirth*, 973 F.2d 652, 654-55 (8th Cir.1992) (affirming the imposition of a sanction excluding certain evidence and the denial of a sanction imposing a "presumption favorable to the innocent party" where there was a "lack of bad faith"). [FN5]

FN5. The parties have not addressed whether Minnesota or federal law on **spoliation** sanctions applies to the instant motion, although both parties rely primarily on Minnesota law. The Court will assume that federal law governs the standards applied to the **spoliation** issues in this case. *See, e.g., Fakhro v. Mayo Clinic Rochester*, No. Civ. 02-626, 2004 WL 909740, at *2-3 (D.Minn. March 31, 2004) (applying federal law to a claim for **spoliation** sanctions because such a determination involves procedural matters). But Minnesota cases that address **spoliation** of evidence in the specific context of claims stemming from fire damage are also instructive.

According to Regent, summary judgment is proper because only irrelevant evidence (i.e., evidence unrelated to and not located near the **Sterno** can) was destroyed before Defendants were able to inspect the scene. This argument, however, has been rejected in contexts similar to the instant case. It is well established that "a fire scene itself is the best evidence of the origin and the cause of a fire." *Hoffman*, 587 N.W.2d at 71. (Dyer Aff. ¶ VIII ("[T]he best evidence to determine the origin and cause of a fire is the fire scene itself.").) In the instant case, Defendants were unable to inspect the fire scene firsthand--and although Regent's experts have "concluded that only [the **Sterno** can] could have caused the fire, another investigator examining the fire scene could have reached a different

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conclusion." *Dodd v. Leviton Mfg. Co.*, CX-02-1570, 2003 WL 21147151, at *5 (Minn Ct.App. May 20, 2003); *see Auto-Owners Ins. Co. v. Heggie's Full House Pizza, Inc.*, CX-A03-316, 2003 WL 22293643, at *4 (Minn.Ct.App. Oct. 7, 2003) (affirming dismissal of case where the plaintiffs had "an immense evidentiary advantage because only a small amount of physical evidence ... was preserved" from the fire scene, and any evidence that could have been a "basis for an alternative defense theory of causation was destroyed"). Further, Defendants' expert states that "his ability to determine whether [any alternative ignition sources] caused and/or contributed to [the] fire" has been compromised by his inability to conduct a firsthand investigation of the fire scene. (Dyer Aff. ¶ IX.)

Regent also contends that the agreement among the three experts, all of whom were able to investigate the fire firsthand, indicates that there is only one possible cause and origin theory. This contention is flawed in two respects. First, the consensus among experts is not dispositive here because those investigators are "not now and never [were] aligned with" Defendants, and Defendants' expert "[was] unable to conduct an independent investigation" of the fire scene. *Himes v. Woodings-Verona Tool Works, Inc.*, 565 N.W.2d 469, 471 (Minn.Ct.App.1997). This is the pertinent inquiry even where circumstances indicate that an expert's report is credible. *See id.* Second, the record indicates that the three investigators largely worked together, casting doubt on the independence of their conclusions. (*See* Smith 10/14/04 Aff. at ¶ III (stating that Whitemore and Wiestling "participated in and assisted with my investigation of the Decathlon fire scene" and that the three "jointly agreed on an investigation protocol and conferred throughout the investigation") .)

*4 Finally, Regent asserts that Defendants' **spoliation** defense should be dismissed because the quality and comprehensiveness of the fire scene photographs are such that Defendants' expert should be able to determine the cause and origin of the fire. But there is clearly a genuine issue of material fact regarding the adequacy of the photos, as Defendants' expert states that they "are insufficient for [him] to conduct a comprehensive analysis of [the] fire" (Dyer Aff. at ¶ VII), and Regent's experts contend that the photos are adequate for an investigation (Wiestling Aff. ¶¶ 25, 27; Whitemore Aff. ¶¶ 24, 25). Further, even where an innocent party's "experts have been able to formulate opinions as to the origin and cause of the fire," prejudice may result from the destruction of evidence; a party presenting testimony without the benefit of having conducted a firsthand investigation will "be confronted with the challenge of meeting probative and convincing firsthand evidence with sketchy, relatively speculative secondhand evidence." [FN6] *Hoffman*, 587 N.W.2d at 71.

FN6. The Court notes that the existence of photos in and of itself does not preclude **spoliation** sanctions. *See, e.g., Bass*, 150 F.3d at 850-51 (affirming imposition of sanctions against plaintiffs in the form of preclusion of testimony and an adverse inference instruction where the destroyed car was "photographed and videotaped and a portion of the driver's seatbelt was removed"); *Dillon*, 986 F.2d at 267-68 (affirming sanctions where photos were deemed to be inadequate); *Hoffman*, 587 N.W.2d at 71 (affirming sanctions where defendant's expert was forced to rely in part on unclear and incomplete photographs).

The posture of the instant case--as it is in the preliminary stages of discovery--only bolsters the Court's determination. The parties disagree as to whether Defendants' expert has been furnished with all of the photographs and investigation materials relevant to the fire. (*Compare* Dyer Aff. ¶ IX, *with* Roach Aff. ¶¶ 1, 4.) Further, at oral argument, Regent's counsel revealed that the original reports of Wiestling and Whitemore (both of whom inspected the fire scene firsthand) had not been produced to Defendants. [FN7] Defendants cannot be expected to predict the extent of the prejudice they may have suffered without having the opportunity to conduct a review of such relevant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

materials. Even if the Court were to ultimately determine that no sanctions are warranted here because, as Regent urges, Defendants have suffered no prejudice, the denial of this motion is clearly proper--the consideration of **spoliation** sanctions in this case is for another day. [FN8] Thus, the Court determines that because genuine issues of material fact exist, summary judgment as to Defendants' **spoliation** defense is not appropriate.

FN7. At the Court's request, Regent has since provided the Court and Defendants with these materials.

FN8. The current Pretrial Scheduling Order sets the discovery deadline at August 1, 2005. (Doc. No. 9.)

Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, IT IS ORDERED that Regent's Motion for Summary Judgment on Defendants' Affirmative Defense Asserting the **Spoliation** of Evidence (Doc. No. 21) is DENIED.

2004 WL 2713251 (D.Minn.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3010712 (Trial Pleading) Joint Answer of Defendants Candle Corporation of America, Sysco Corporation, and Sysco of Minnesota, Inc. to Plaintiff's First Amended Complaint and Jury Trial Demand (Sep. 13, 2004)

• 2004 WL 3010678 (Trial Pleading) First Amended Complaint at Law (2004)

• 2004 WL 3010735 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment on Defendant's Affirmative Defense Asserting the Spoliation of Evidence (2004)

• 2004 WL 3010786 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment on Defendant's Affirmative Defense Asserting the Spoliation of Evidence (2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for RUSERT,SCOTT M 876229**

| | |
|---|---|
| Your Search: | STERNO & SPOLIATION |
| Date/Time of Request: | Tuesday, May 10, 2005 10:32:00 Central |
| Client Identifier: | 999.99999 |
| Database: | MN-CS-ALL |
| Citation Text: | Slip Copy |
| Lines: | 276 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# EXHIBIT K

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Flora FAKHRO, a citizen of the Country of Bahrain, as trustee for the heirs and next-of-kin of Yousif Ahmed Fakhro, Plaintiff,
v.
MAYO CLINIC ROCHESTER, Defendant.
**No. Civ.02-626(JNE/JGL).**

March 31, 2004.

Philip A. Pfaffly, Rider Bennett, LLP, for Plaintiff Flora Fakhro.

Thomas S. Fraser, and Ann E. Decker, Fredrikson & Byron, P.A., for Defendant Mayo Clinic Rochester.

ORDER

ERICKSEN, J.

***1** This is a diversity action involving a medical malpractice claim brought by Flora Fakhro, as trustee for the heirs and next-of-kin of Yousif Ahmed Fakhro, against the Mayo Clinic Rochester (Mayo Clinic). Mr. Fakhro died at the Mayo Clinic after doctors there implanted an internal cardioverter/defibrillator (ICD) in him. The case is before the Court on Mrs. Fakhro's motion for sanctions and/or default judgment and the Mayo Clinic's motion to dismiss under Minn.Stat. § 145.682 (2000). For the reasons set forth below, the Court denies Mrs. Fakhro's motion and grants the Mayo Clinic's motion.

I. BACKGROUND

In February 1999, Mr. Fakhro went to the Mayo Clinic to consult with doctors about his heart condition. Mr. Fakhro reported having at least one episode of palpitations and a few episodes of light-headedness. He also had reduced left ventricular function, and a history of rheumatic heart and coronary artery disease. His aortic valve had been replaced in 1974 and again in 1985. Dr. R. Scott Wright, a cardiologist, examined Mr. Fakhro and ordered a Holter monitor study to evaluate his possible arrhythmia and to determine if Mr. Fakhro was at risk for sudden cardiac death. After examining Mr. Fakhro, Dr. Wright concluded that Mr. Fakhro had non-ischemic cardiomyopathy, which is a weakening of the heart muscle not caused by a heart attack, with left ventricular dysfunction secondary to rheumatic aortic valve disease.

Dr. Wright referred Mr. Fakhro to Dr. Jahangir, an electrophysiologist. [FN1] Dr. Jahangir ordered an electrophysiolgy study (EP study). Based on the results of the EP study, Dr. Jahangir determined that Mr. Fakhro suffered from ventricular tachycardia, which is a fast heartbeat initiated within the ventricles, and that Mr. Fakhro was a candidate for an ICD. An ICD can be used to treat ventricular tachycardia because it detects the onset of an abnormal heart rhythm and, if necessary, delivers an internal shock to restore the heart's normal rhythm. Given Mr. Fakhro's medical history, Dr. Jahangir considered him a high-risk patient. Dr. Jahangir advised Mr. Fakhro of the risks associated with an EP study and with the implantation of an ICD. He testified that it was his practice in 1999 to tell patients with diseased hearts that the risk of death associated with an EP study and with the implantation of an ICD was I in 500. Mr. Fakhro decided he wanted to receive an ICD.

FN1. Electrophysiology is a subspecialty of cardiology that focuses on the evaluation and treatment of cardiac rhythms and disturbances in cardiac

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rhythm.

An ICD is a device implanted under the skin that is connected to the heart by wires that send electrical signals to and from the ICD. Immediately after an ICD is surgically placed under the skin and the wires are placed in the correct position in the heart, a patient is placed under general anesthesia, and the ICD is tested to determine if it can detect an abnormal heart beat and deliver a shock to restore the heart to a normal rhythm. To test an ICD, an electrophysiologist uses the ICD to introduce an abnormal rhythm in the patient's heart and waits to make sure that the ICD responds appropriately by delivering one or more internal shocks to restore the heart to a normal rhythm.

*2 On February 23, 1999, Mr. Fakhro underwent surgery to implant an ICD. During the procedure, doctors used an electrocardiogram to monitor his heart activity. The Mayo Clinic did not keep the print out from the electrocardiogram. While the ICD was implanted, Mr. Fakhro was given conscious sedation, and then he was placed under general anesthesia to test the ICD. Dr. Hammill, an electrophysiologist, monitored him. A shock was delivered by the ICD to put Mr. Fakhro's heart into ventricular fibrillation. The ICD sensed the abnormal rhythm and delivered a first shock of 24 joules. Because the first shock did not restore Mr. Fakhro's heart to a normal rhythm, the ICD delivered a second shock of 35 joules. The second shock restored the heart to a normal rhythm. It took 25 seconds for Mr. Fakhro's heart to return to a normal rhythm.

Although his heart rhythm was restored, Mr. Fakhro's blood pressure did not recover. Specifically, he experienced electrical mechanical dissociation (EMD), which means that his heart was not able to pump blood effectively. Therefore, the doctors called a "Code Blue" and began efforts to resuscitate him. Doctors ordered various tests, including drawing arterial blood gases (ABG), to help determine the cause of the EMD. After approximately 45 minutes, Mr. Fakhro's blood pressure returned to a normal level. During that time, however, he sustained irreversible brain damage due to the lack of oxygen to his brain. Mr. Fakhro went into a coma and died on March 25, 1999. He was 43 years old.

On March 22, 2002, Mrs. Fakhro commenced this action, alleging medical malpractice. Pursuant to a Stipulation and Order dated December 30, 2002, the Mayo Clinic filed an amended answer and counterclaim for medical services rendered on January 8, 2003. To date, no affidavit of service has been filed for service of the amended answer and counterclaim, and Mrs. Fakhro has not filed her reply to the counterclaim.

## II. DISCUSSION

### A. Sanctions for Spoliation of Evidence

Mrs. Fakhro asserts that the Mayo Clinic should be sanctioned for destroying the electrocardiogram's "rhythm strips" [FN2] that were printed out during Mr. Fakhro's procedure. [FN3] Mrs. Fakhro asks the Court to strike the Mayo Clinic's responsive pleadings and enter default judgment against it. In the alternative, she asks that the Court shift the burden of proof of negligence from Mrs. Fakhro to the Mayo Clinic and that the Court give an adverse inference instruction to the jury.

FN2. Mrs. Fakhro uses various terms to describe this piece of evidence, including heart monitoring strips, heart tracing strip, ECG rhythm strips, EKG strips, and computer driven heart data records.

FN3. Mrs. Fakhro also asserts that the Mayo Clinic should be sanctioned for not keeping "a flow sheet or log." During and following Mr. Fakhro's procedure, the Mayo Clinic created and maintained a surgical report, anesthesia report, and an ICD implementation report. After reviewing the record and the parties' arguments, the Court concludes that the difference between those records and a flow sheet or log is a matter of semantics. Accordingly, the Court finds Mrs. Fahkro's argument with respect to this issue unavailing.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The first issue to address with respect to spoliation of evidence and the appropriate sanction to apply is whether federal or state law should be used to analyze such a claim. The parties cite to both state and federal law in support of their arguments. Under the *Erie* doctrine, federal courts sitting in diversity apply state law to substantive matters and federal law to procedural matters. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). The sanctions sought by Mrs. Fakhro are procedural matters because they concern evidentiary matters. *See, e.g., Stevenson v. Union Pac. R.,* 354 F.3d 739, 743 (8th Cir.2004) (affirming district court's use of an adverse inference jury instruction because it was within the district court's inherent power to give the instruction); *Lawrence v. Bowersox,* 297 F.3d 727, 735 (8th Cir.2002) (noting that trial court could have used its inherent power to strike responsive pleading and enter default judgment). Accordingly, federal law governs Mrs. Fakhro's motion.

***3** Sanctions for spoliation of evidence may be imposed under a federal court's inherent powers. *Dillon v. Nissan Motor Co.,* 986 F.2d 263, 267 (8th Cir.1993). Before a sanction for destruction of the evidence is appropriate, there must also be a finding that the party knew or shown have known that the destroyed evidence was relevant to pending or potential litigation. *Id.* As this Court has explained, "sanctions are appropriate when a party (1) destroys (2) discoverable material (3) which the party knew or should have known (4) was relevant to pending, imminent, or reasonably foreseeable litigation." *Lexis-Nexis v. Beer,* 41 F.Supp.2d 950, 954 (D.Minn.1999). In addition, before a sanction can be imposed, there must also be a finding that the destruction prejudiced the opposing party. *Dillon,* 986 F.2d at 267. If a district court determines that a sanction is appropriate, it is then within its discretion to determine the extent of such a sanction. *Id.* at 268.

Mrs. Fakhro relies on the testimony of M.J. Rasmussen, an electrophysiology nurse, to support her assertion that the Mayo Clinic should have retained the rhythm strips. A rhythm strip is a piece of paper that shows raw data about a patient's heart rhythm during a particular procedure. The paper used to produce the strips is thermal paper, which can discolor or become illegible over time. A typical ICD implantation produces approximately 20 feet of rhythm paper. Ms. Rasmussen testified that the strips are normally discarded after a procedure but that the Mayo Clinic "might keep" the strips if they did not look "normal." Thus, Mrs. Fakhro contends that the Mayo Clinic should have been on notice of a potential suit because the strips could not have been normal, given that Mr. Fakhro eventually died from a rare adverse result of the ICD implantation. She asserts that she has been prejudiced by the strips' destruction because the strips are "the one piece of evidence that can conclusively determine what went wrong" with Mr. Fakhro. According to her, the strips are the only objective data that can show how the heart was performing at every moment during the procedure.

In response, the Mayo Clinic states that the rhythm strips are not a key piece of evidence. The Mayo Clinic argues that it could not have known that this information was relevant to a pending or potential lawsuit because Mrs. Fakhro did not bring this action until three years after her husband's death. It explains that it destroyed the strips in its normal course of business because it is not practical for the Mayo Clinic to keep approximately 20 feet of paper for each ICD implantation it does and that the machine that produced the strips did not have any electronic storage capacity. Moreover, it notes that it did not keep the strips because they were considered "normal," given that Mr. Fakhro's heart rhythm was restored to a normal rate within 25 seconds. Finally, it argues that Mrs. Fakhro cannot show that she has been prejudiced because the pertinent information contained in those strips can be found in Dr. Hammill's notes taken during Mr. Fakhro's procedure.

***4** Assuming for the purposes of this motion that the Mayo Clinic was on notice of a potential lawsuit, Mrs. Fakhro's motion nonetheless fails because she cannot show that she has been prejudiced. Dr. Hammill's notes taken contemporaneously with Mr. Fakhro's procedure show the pertinent information from the strips, namely that 25 seconds elapsed between the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

induction of the abnormal rhythm and the restoration of the normal rhythm. This information is supported by detailed information about the ICD procedure contained in the surgical report and anesthesia record. Mrs. Fakhro's expert, Dr. Virendra S. Mather, expressed his opinion-based on Dr. Hammill's notes-that the Mayo Clinic was negligent because it did not use alternative methods of counter shock within 15 seconds after Mr. Fakhro's heart was put into ventricular fibrillation. The Mayo Clinic does not dispute that time period. Given that Mrs. Fakhro's expert was able to form an opinion based on the 25 seconds and because the pertinent information about the strips is available in Dr. Hammill's notes, the Court concludes that Mrs. Fakhro has suffered no prejudice. *Cf. Stevenson,* 354 F.3d at 748 (explaining that the plaintiff had been prejudiced because an audio tape was the only contemporaneous recording of the conversation); *Dillon,* 986 F.2d at 267-68 (noting ways in which plaintiff was prejudiced because photographs, which were blurry and not comprehensive, failed to document crucial areas of the vehicle). Accordingly, her motion for sanctions and/or default judgment is denied.

B. Medical Malpractice

The Mayo Clinic moves to dismiss with prejudice Mrs. Fahkro's medical malpractice claim because she has not complied with the statutory requirements of Minn.Stat. § 145.682. Minnesota law requires a plaintiff to file two separate affidavits in medical malpractice cases when expert testimony is needed to establish a prima facie case. Minn.Stat. § 145.682, subds. 2-4. Failure to comply with either affidavit requirement results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is required to establish a prima facie case. *Id.,* subd. 6; [FN4] *see also Lindberg v. Health Partners, Inc.,* 599 N.W.2d 572, 578 (Minn.1999).

FN4. Subdivision 6 was amended on May 22, 2002. *See* Act of May 22, 2002, ch. 403, § 1, 2002 Minn. Laws. Subdivision 6 now allows a plaintiff time to correct deficiencies in an affidavit of expert identification before mandatory dismissal. This amended section applies to causes of action commenced on or after May 22, 2002; therefore, it is not applicable to this case because Mrs. Fakhro filed her Complaint on March 22, 2002.

Pursuant to section 145.682, when a plaintiff serves a defendant with a summons and complaint, the complaint must be accompanied by an affidavit of the plaintiff's attorney stating that the facts of the case have been reviewed by the attorney with an expert who is of the opinion that the defendant "deviated from the applicable standard of care and by that action caused injury to the plaintiff." Minn.Stat. § 145.682, subd. 3. Mrs. Fakhro complied with this requirement because she filed the Complaint accompanied by an affidavit signed by her attorney, Philip Pfaffly. Within 180 days after commencement of the suit, a plaintiff must serve upon the defendant a second affidavit which:

> must be signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

***5** *Id.,* subd. 4. The second affidavit is sometimes called the affidavit of expert identification. Mrs. Fakhro submitted the Affidavit of Dr. Mather as her affidavit of expert identification. Dr. Mather's affidavit is the focus of the Mayo Clinic's motion to dismiss.

In his affidavit, Dr. Mather expresses three main opinions. He opines that the Mayo Clinic was negligent in (1) its record-keeping, (2) its failure to draw ABG within 20 minutes of Mr. Fakhro's hypotensive crisis, and (3) by failing to use alternative methods of counter shock within 15 seconds after Mr. Fakhro's heart was put into ventricular fibrillation. The Mayo Clinic contends that Dr. Mather's affidavit does not meet the statutory requirements of section 145.682 for his opinions about record keeping and the failure to timely draw ABG because those opinions do not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adequately show causation. It also asserts that Dr. Mather's affidavit does not meet the statutory requirements of section 145.682 with respect to his opinion about the use of alternative methods of counter shock within 15 seconds because it does not show causation and because Dr. Mather is not qualified to offer such an opinion.

*1. Causation*

Since 1990, the Minnesota Supreme Court has discussed the requirements of section 145.682 in five cases. *See Teffeteller v. Univ. of Minn.,* 654 N.W.2d 420 (Minn.2002); *Anderson v. Rangachary,* 608 N.W.2d 843 (Minn.2000); *Lindberg,* 599 N.W.2d at 578; *Stroud v. Hennepin County Med. Ctr.,* 556 N.W.2d 552 (Minn.1996); *Sorenson v. St. Paul Ramsey Med. Ctr.,* 457 N.W.2d 188 (Minn.1990). The Minnesota Supreme Court explained that the affidavit of expert identification must (1) disclose specific details concerning the expert's expected testimony, including the applicable standard of care, (2) identify the acts or omissions that the plaintiff alleges violated the standard of care, and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages. *Sorenson,* 457 N.W.2d at 190. With respect to causation, an expert affidavit stating that the defendants "failed to properly evaluate" or "failed to properly diagnose" the patient does not satisfy section 145.682 because such statements contain empty conclusions that do not set out how the expert will use the facts in the hospital record to arrive at opinions of malpractice and causation. *Id.,* 457 N.W .2d at 192-93. In *Stroud,* a case alleging malpractice based on the defendant's failure to timely diagnose and treat an injury, the court concluded that the expert affidavit provided only broad and conclusory statements as to causation because it failed to connect the decedent's cause of death to the defendant's alleged delay in properly diagnosing and treating the decedent. *Stroud,* 556 N.W.2d at 556. The Minnesota Supreme Court noted that the expert affidavit "should set out how the expert will use those facts to arrive at opinions of malpractice and causation." *Id.* at 555 (citations omitted). The expert affidavit in *Stroud* failed to comply with section 145.682 because it contained only conclusory statements based on facts found in the hospital or clinic record. *Id.* at 555-56.

*6 With respect to his opinion that the Mayo Clinic was negligent in its record-keeping efforts, Dr. Mathur explains what he believes are appropriate record-keeping techniques. In doing so, however, he fails to explain how the Mayo Clinic's alleged negligence in record keeping caused any harm to Mr. Fakhro. Without more, Dr. Mathur's opinion with respect to the Mayo Clinic's record keeping does not detail the chain of causation required under section 145.682.

With respect to his opinion that the Mayo Clinic was negligent during its resuscitation efforts because it failed to draw ABG within 20 minutes of Mr. Fakhro's hypotensive crisis, Dr. Mathur describes what information ABG provide, but he does not explain how the alleged delay in drawing the ABG caused harm to Mr. Fahkro. Specifically, Dr. Mathur does not explain how the Mayo Clinic could have used such information, if it had drawn the ABG as Dr. Mathur describes, to change its treatment of Mr. Fakhro. Moreover, he fails to counter the Mayo Clinic's assertion that the ABG were drawn within 20 minutes but that the test results were received and recorded after 20 minutes into Mr. Fakhro's hypotensive crisis. Without more, Dr. Mathur's opinion as to the ABG contains only broad conclusions, and it falls short of detailing the chain of causation required under section 145.682.

With respect to his opinion that the Mayo Clinic was negligent in failing to use alternative methods of counter shock within 15 seconds after Mr. Fakhro's heart was put into ventricular fibrillation, Dr. Mathur explains what steps should have been taken within 15 seconds. He further explains how those steps should have been implemented and how Mr. Fakhro's condition would have been impacted if those alternative methods had been used. Finally, he explains how Mr. Fakhro's condition was impacted by the Mayo Clinic's failure to use the alternative methods within 15 seconds. Given this detailed analysis, the Court concludes that Dr. Mathur's opinion with respect to this issue describes in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adequate detail the chain of causation required under section 145.682.

*2. Qualification*

The Mayo Clinic asserts that Dr. Mathur is not qualified to deliver an opinion that it was negligent in failing to use alternative methods of counter shock within 15 seconds after Mr. Fakhro's heart was put into ventricular fibrillation. According to the Mayo Clinic, although Dr. Mathur is a qualified cardiologist, he has no practical experience in ICD implantation, ICD testing, or electrophysiology. Therefore, it asserts that he is not qualified to render an opinion on the acceptable standard of care required in ICD implantation surgery and ICD testing. In response, Mrs. Fakhro asserts that Dr. Mathur, as a cardiologist for over 25 years, has more than sufficient experience, background, and qualifications to deliver such an opinion. She points out that, although Dr. Mathur does not implant ICDs, he is "intimately involved when one of his patients receives an ICD" because he "consults extensively" with other doctors to determine the appropriate care needed for his patients. Further, she points out that Dr. Mathur has written 24 articles "related to" electrophysiology.

*7 Section 145.682 requires that a plaintiff submit an affidavit by an expert "whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial." Minn.Stat. § 145.682, subd. 3(a); *Teffeteller,* 645 N.W.2d at 427 (concluding that the requirements of subd. 3(a) apply to the affidavit of expert identification). In *Teffeteller,* the Minnesota Supreme Court concluded that the expert was not qualified or competent to give an expert opinion at trial. *Teffeteller,* 645 N.W.2d at 427. In that case, a 14-year-old bone marrow transplant patient suffered morphine toxicity and died. *Id.* at 423-24. The plaintiff's expert had impressive credentials in pediatrics and pediatric care. *Id.* at 426-27. However, he did not have any specific experience with bone marrow transplants or pediatric oncology. *Id.* For this reason, the Minnesota Supreme Court affirmed the district court's dismissal of the case because the expert did not meet the statutory requirements of section 145.682. *Id.* at 428.

In *Walberg v. Department of Veterans Affairs,* 2002 WL 31060378 (D.Minn. Sept. 12, 2002), this Court reached a similar conclusion. In that case, a patient died as a result of complications from conjunctival melanoma, or cancer of the eye. *Walberg,* 2002 WL 31060378, at * 1. This Court dismissed the case because, although the plaintiff's expert was a qualified oncologist, he had no experience with cancers of the eye. *Id.* at * 2. In *Mattke v. Deschamps,* 2003 WL 1883344 (D.Minn. Apr. 14, 2003), this Court determined that the plaintiff's expert was qualified under the requirements of section 145.682. In that case, a patient sued the Mayo Clinic claiming that it was negligent in removing a healthy portion of the patient's lung. *Mattke,* 2003 WL 1883344, at *1. The plaintiff's expert had completed a fellowship in pulmonary and critical care, was board certified, and had extensive practical experience with the subject matter at hand. *Id.* at * 5. Given these factors, this Court concluded that the plaintiff's expert met the statutory qualification requirements under section 145.682. *Id.*

Dr. Mathur has impressive credentials in the field of interventional cardiology. He has been practicing cardiology for over 25 years; he is on staff at St. Luke's Episcopal Hospital, which is affiliated with the renowned Texas Heart Institute; and he is an associate professor of medicine at Baylor College of Medicine. However, he is not experienced with the implantation of ICDs or their testing. He is not board certified in electrophysiology. Moreover, he does not regularly practice in the area of evaluation and treatment of cardiac rhythms. Instead, he refers his patients to an electrophysiologist when they need such evaluation because, as Dr. Mathur explains, electrophysiologists "super specialize" in the field of cardiac rhythms.

Dr. Mathur treated Mr. Fakhro in 1994. However, his treatment of Mr. Fakhro's general heart condition does not necessarily qualify him to testify about matters concerning Mr. Fakhro's ICD implantation. Dr. Mathur does have some general knowledge of the field of electrophysiology, but this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subspecialty of cardiology, which includes the use of ICDs, has changed dramatically in the last 20 years. Dr. Mathur's last article about electrophysiology was published in 1981. Dr. Mathur may be qualified to testify about the procedures needed to resuscitate a patient in other situations, but it does not necessarily follow that he is qualified to testify about the procedures needed to resuscitate a patient during a highly technical ICD testing. Indeed, in this setting, the Mayo Clinic points out that certain testing conditions must be present, including the introduction of an abnormal rhythm and the allowance of sufficient time for the ICD to charge and respond, to make sure that the ICD works properly.

***8** The Court reads Minnesota Supreme Court precedent as requiring that an expert, for the purposes of section 145.682, have experience with the particular procedure or area of care under dispute before that expert can deliver an affidavit of expert identification with respect to an alleged negligent act. While an expert need not be exquisitely qualified in a particular area, he or she must be sufficiently familiar with the same or similar procedure at issue so that he or she can render an opinion as to whether it was negligently performed. *See Teffeteller,* 645 N.W.2d at 426. Dr. Mathur, having never implanted or assisted in the implantation or testing of an ICD, is not qualified to render an opinion concerning the applicable standard of care required during the implantation and testing of an ICD. Indeed, Dr. Mathur's opinion about the 15 seconds is not particularized to an ICD situation, and his opinion does not recognize the situational factors present during an ICD testing. Given this, Dr. Mathur's qualifications are more akin to the expert's qualifications in *Walberg* than to the expert's qualifications in *Mattke.* Therefore, the Court concludes that Dr. Mathur is not qualified, as required by section 145.682, to render an opinion about the Mayo Clinic's failure to use alternative methods of counter shock within 15 seconds after Mr. Fakhro's heart was put into ventricular fibrillation during the ICD testing. Because Dr. Mathur's affidavit does not meet the requirements of the affidavit of expert identification with respect to causation and/or qualification, the Court grants the Mayo Clinic's motion to dismiss. *See* Minn.Stat. § 145.682, subd. 6.

*3. Constitutionality*

Finally, Mrs. Fakhro argues that section 145.682 is unconstitutional. She contends that the statutory method proscribed for screening meritorious medical malpractice claims violates the separation of powers because it is a clear reversal of the notice pleading court rules and procedures. Mrs. Fakhro takes her argument from the dissent in *Anderson. See Anderson,* 608 N.W.2d at 852 (Gilbert, J., dissenting). The Minnesota Supreme Court, the Minnesota Court of Appeals and this Court have previously determined that the application of section 145.682 to medical malpractice claims is constitutional. *See, e.g., Anderson,* 608 N.W.2d at 850; *Henke v. Dunham,* 450 N.W.2d 595, 598 (Minn.Ct.App.1990); *Gall v. Mayo Clinic,* 2001 WL 267490 at *4 (Minn.Ct.App. Mar. 20, 2001); *Medina v. EMSA Correctional Care, Inc.,* 2002 WL 1488773 (D.Minn. July 10, 2002); *Chizmadia v. Smiley's Point Clinic,* 768 F.Supp. 266, 271 (D.Minn.1991). Accordingly, Mrs. Fakhro's constitutional challenge fails.

III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Mrs. Fakhro's motion for sanctions and/or default judgment [Docket No. 16] is DENIED.
2. Mayo Clinic's motion to dismiss under Minn.Stat. § 145.682 [Docket No. 20] is GRANTED.

***9** 3. Mrs. Fakhro's Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

4. The parties shall contact the Court in writing within 30 days from the date of this Order to inform it as to the status of the Mayo Clinic's Counterclaim.

2004 WL 909740 (D.Minn.)

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

- 0:02CV00626 (Docket)
(Mar. 22, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.



**H**
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
Nathanael DODD, et al., Appellants,
v.
LEVITON MANUFACTURING COMPANY, INC., Respondent.
**No. CX-02-1570.**

May 20, 2003.

Olmsted County District Court, File No. C2011381.

Margaret K. Ackerman, Ackerman Law Office, Minneapolis, MN, for appellants.

Paula Duggan Vraa, Stephen P. Watters, Rider, Bennett, Egan & Arundel, Minneapolis, MN, for respondent.

Considered and decided by HARTEN, Presiding Judge, PETERSON, Judge, and WRIGHT, Judge.

**UNPUBLISHED OPINION**

PETERSON, Judge.

***1** After a fire damaged the residence of appellants Nathanael and Michelle Dodd, the Dodds and appellant Farmers Home Group, of which the Dodds' insurer Gopher State Mutual was a member, sued respondent Leviton Manufacturing Company, Inc., alleging that the fire was caused by a defective electrical outlet that had been manufactured by Leviton. Although appellants knew within a few days after the fire that the outlet was a potential cause of the fire and that respondent was the manufacturer, they did not notify respondent of a potential claim until eight months later; by that time, the home had been repaired and the fire scene destroyed, and some appliances that were near the outlet had not been preserved. The district court ruled that appellants were barred from presenting any evidence as to the cause or origin of the fire based on lack of notice to respondent and spoliation of the evidence. The court granted summary judgment to respondent. Appellants contend the district court abused its discretion in dismissing the action because they preserved the relevant evidence or, alternatively, the sanction of giving a negative inference instruction to the jury would have cured any prejudice. We affirm.

FACTS

The fire started in the kitchen of the Dodds' home. No one was home at the time. When Nathanael Dodd came home, he opened the front door, encountered smoke, and went to a neighbor's house to call the fire department. The Stewartville Fire Rescue Department responded to the call and later prepared an incident report listing the fire's source as "undetermined, multiple possibilities in area of origin."

Gopher State Mutual retained Bruce Lillevold, a cause-and-origin investigator, to investigate the fire. Lillevold determined that the fire originated in the kitchen in the small space between the refrigerator and the stove. Lillevold eliminated the refrigerator, stove, and microwave as possible causes of the fire because they sustained only external damage and did not appear to be possible causes of the fire. Lillevold also eliminated an item left on the stove as a possible cause because all controls on the stove were in the off position and the burn patterns did not support an item being left on a stove burner as the cause of the fire. The Dodds informed Lillevold that they did not have any accelerants or candles in the area of the fire and that they did not smoke.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Based on his investigation and the information provided by the Dodds, Lillevold concluded that the only other items in the area of origin that could have possibly caused the fire were a can opener and a small Sony stereo, both of which were plugged into a ground-fault-circuit-interrupter (GFCI) outlet.

Based on that conclusion, Lillevold retained Beth Anderson, an electrical engineer, to investigate the fire. Anderson inspected the fire scene on August 3, 1999, five days after the fire occurred. Anderson also concluded that the fire originated in the small space between the refrigerator and the stove and that the only items that could possibly have caused the fire were the can opener and the stereo that were plugged into the GFCI outlet. Anderson discovered that an internal contact arm of the GFCI outlet was damaged and, based on the type of damage, opined that the most probable cause of the damage was electrical activity in the form of arcing.

*2 Lillevold and Anderson took numerous photographs of the fire scene. They collected and retained fire debris that had fallen through a hole in the kitchen floor into the basement. Appellants discarded the stove, microwave, and refrigerator because they sustained only external damage. Appellants retained the refrigerator cord and the outlet it was plugged into. They also retained the can opener, the Sony stereo, and the GFCI outlet.

Michelle Dodd testified in her deposition that when Anderson conducted her inspection, Anderson indicated that she thought the outlet caused the fire.

On March 29, 2000, appellants provided respondent with notice of their potential claim against it. By then, the Dodds' home had been repaired. Appellants made available to respondent all photographs of the fire scene and all evidence retained from the fire. In December 2000, appellants began this lawsuit against respondent alleging that the GFCI outlet was defective and had caused the fire.

Respondent retained Crawford Wiestling, a professional licensed fire investigator, and David A. Reiter, a professional engineer, to investigate the fire. Wiestling stated in an affidavit:

4. The evidence from the fire that is available for me to examine is insufficient for me to do a comprehensive analysis of the cause and origin of this fire because I am unable to determine the burn patterns, I am unable to see the area close-up, and I am unable to see the areas that were not photographed.

5. I cannot testify in this matter based on the evidence that is available to me for examination because the pictures do not adequately document the fire scene and do not accurately reveal the condition of the scene after the fire.

6. The best evidence for determining the cause and origin of a fire is the fire scene itself because photographs do not adequately replicate the fire scene and do not reveal the details which are necessary to examine to determine the cause and origin of a fire. Without having the opportunity to be at the fire scene, I am unable to determine the cause and origin of this fire.

Reiter stated in an affidavit:

4. In order to do a comprehensive analysis of the electrical components that may relate to a fire, it is necessary to examine all of the electrical items in the house. In this case, this would include, but not be limited to the stove, refrigerator, and microwave. I would also need to examine all the circuitry tracing back from the allegedly defective Ground Fault Circuit Interrupter to the branch circuit breaker in the house. That circuit breaker should then be dynamically tested to insure it operates within its design parameters.

5. I have not examined the stove, refrigerator, microwave, or circuit breaker because these items were not preserved after the fire, or have not been made available for examination.

6. There may be additional items that were present at the fire scene that would be relevant to my comprehensive analysis of this fire, but I am unable to determine what those items might be because I was not given an opportunity to investigate and inspect the fire scene.

*3 7. I have examined the photographs of the fire scene. These photographs are inadequate for determining if there are electrical components other than the ones preserved by Anderson Engineering that caused or contributed to the fire.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> The photographs and preserved evidence are inadequate to determine if there were electrical items in the home which were faulty or not functioning properly.

At the hearing on respondent's motion, counsel for appellants indicated to the court that the circuit breaker had not been destroyed in the fire and was still in the Dodds' home. Counsel stated that it was available for respondent's experts to inspect, but they had never asked to inspect it.

The district court explained its decision to exclude the expert testimony as follows:

> In *Amana* [FN1] [a case that the court allowed to proceed despite spoliation of evidence], the court found there was sufficient evidence pointing to the refrigerator as the sole source of the fire. However, this Court is not convinced the same can be said of the fire scene at issue in this case. Consequently, this Court is not prepared to make such a finding. From the photographs taken by [appellants], it appears there is the typical v-shape of charring on the wall containing the receptacle at issue. However, [appellants] have not adequately explained how the large hole in the floor immediately below the location of the allegedly defective receptacle came to be. In addition, [respondent's] experts are unwilling or unable to testify as to their opinion of the cause or origin of this fire based on the photographs alone. Too many questions remain unexplained despite the existence of photographs.

FN1. *State Farm Ins. Co. v. Amana Refrigeration, Inc.*, 698 N.Y.52d 300 (N.Y.App.Div.1999).

> This Court is also troubled by the lack of notice given to [respondent]. [Appellants] were aware of what they believed was the origin and cause of the fire. They have given no explanation for not having put [respondent] on notice. * * *
> [Appellants] in this case apparently knew within four days what they believed to be the source of this fire based on the opinions of their experts retained by the insurance carrier. Courts have been clear that insurance companies have been held to a higher standard in spoliation cases such as this one.

DECISION

The supreme court has held that the district court has inherent authority to impose sanctions for inadvertent or negligent destruction of evidence. *Patton v. Newmar Corp.*, 538 N.W.2d 116, 119 (Minn.1995). The propriety of a sanction is determined by the prejudice resulting to the opposing party. *Id.* In determining a sanction, the court should

> examine the nature of the item lost in the context of the claims asserted and the potential for remediation of the prejudice. One challenging the [district] court's choice of a sanction has the difficult burden of convincing an appellate court that the [district] court abused its discretion--a burden which is met only when it is clear that no reasonable person would agree [with] the [district] court's assessment of what sanctions are appropriate.

***4** *Id.* (quotation omitted).

Appellants incorrectly cite *N. States Power Co. v. Williams,* 343 N.W.2d 627, 630 (Minn.1984), to argue that this court may review the district court's findings of fact de novo because they were based on affidavit evidence.

> [T]he proposition for which appellant cites *Northern States Power* is no longer the law. That case was decided before the change in Minn. R. Civ. P. 52.01, which now provides, in part, "Findings of fact, *whether based on oral or documentary evidence,* shall not be set aside unless clearly erroneous * * *."

*City of Lake Elmo v. City of Oakdale,* 468 N.W.2d 575, 578 (Minn.App.1991); *see also Rogers v. Moore,* 603 N.W.2d 650, 656 (Minn.1999) (applying Minn. R. Civ. P. 52.01).

This court has recognized that "a fire scene itself is the best evidence of the origin and the cause of a fire," and that a fire scene is of "unquestionable relevancy." *Hoffman v. Ford Motor Co.,* 587 N.W.2d 66, 71 (Minn.App.1998). In *Hoffman,* a fire started shortly after the plaintiff parked a new Ford Taurus in the garage attached to his house. *Id.* at 68. After a deputy state fire marshal and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs' insurer investigated the fire scene, but before Ford had an opportunity to conduct an independent investigation, the Taurus was taken to a salvage yard, and the garage and home were demolished. *Id.*

Based on its findings that important evidence was destroyed, lost, or altered and that Ford was prejudiced by the spoliation, the district court sanctioned the plaintiff by excluding "all testimony and evidence regarding the cause of the fire that derived from an investigation of the car itself, the garage, or any contents of the garage." *Id.* at 70. Without that evidence, the plaintiff could not prove his claim, so the sanction resulted in dismissal of the case. *Id.* This court upheld the sanction. *Id.* at 72.

Here, as in *Hoffman,* respondent was deprived of an opportunity to conduct a firsthand investigation of the fire scene. Both of respondent's experts stated that they were unable to determine the cause and origin of the fire from the photographs and preserved evidence. Wiestling stated that

> [t]he best evidence for determining the cause and origin of a fire is the fire scene itself because photographs do not adequately replicate the fire scene and do not reveal the details which are necessary to examine to determine the cause and origin of a fire.

Appellants argue that Wiestling's and Reiter's review of the preserved evidence was incomplete because Reiter did not review the fire department's photographs or examine the circuit breaker and Wiestling did not review the items retained from the scene. But Wiestling stated that photographs do not adequately represent the fire scene, and Reiter stated that he needed to examine the stove, microwave, and refrigerator, not just the circuit breaker. Thus, according to their affidavits, even if they had reviewed all of the available items, it still would have been insufficient for them to determine a cause.

*5 Appellants argue that they did not destroy relevant evidence because they retained all of the items that could possibly have caused the fire. Although appellants' investigators concluded that only the can opener, the stereo, or the outlet could have caused the fire, another investigator examining the fire scene could have reached a different conclusion. *See Hoffman,* 587 N.W.2d at 71 (noting that Ford "had been deprived of an opportunity to conduct a firsthand investigation of a myriad of possible alternative ignition sources at the scene of the fire and was forced instead to rely on unclear and incomplete photographs and the testimony of other fire investigators to rebut appellants' claims").

The district court's memorandum indicates that it assigned significant weight to the insurer's failure to provide to respondent notice of the potential claim against it until eight months after the fire when appellants knew within a few days after the fire that they believed the fire was caused by the GFCI outlet. [FN2] *See Baliotis v. McNeil,* 870 F.Supp. 1285, 1292-93 (M.D.Pa.1994) (stating "[p]roperty insurers who permit the destruction of a fire scene after identifying subrogation targets should suffer some sanction, where, as here, it is clear that relevant evidence has been lost"); *Allstate Ins. Co. v. Sunbeam Corp.,* 865 F.Supp. 1267, 1278 (N.D.Ill.1994) (in upholding sanction of exclusion of evidence for insurer's failure to preserve second propane tank located near grill that burst into flames, court noted that rule requiring preservation of evidence rests on "basic fairness" and "there is no reason to limit it to the [claimed defective] product itself" and that rule was especially applicable to subrogated insurer who intended to bring a claim all along) *affm'd* 53 F.3d 804 (7th Cir.1995).

> FN2. The district court found that appellants knew within approximately four days that they believed the outlet caused the fire, but evidence in the record shows that it was within five days.

The authority cited by appellants indicates that it would not have been an abuse of discretion for the district court to impose a lesser sanction, such as an adverse-inference instruction. But this court applies an abuse-of-discretion standard of review to the district court's choice of a sanction for spoliation of evidence and will not reverse unless it is clear that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

no reasonable person would agree with the district court's decision. *Patton,* 538 N.W.2d at 119. The affidavits by respondent's experts state that they could not determine a cause based on the preserved evidence; Gopher State Mutual delayed eight months in providing notice to respondent; and the evidence supports the district court's finding that the evidence presented by appellants on causation was not conclusive. Under these circumstances, the district court's decision was not an abuse of discretion.

**Affirmed.**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M

Westlaw.



**C**

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
AUTO-OWNERS INS. CO., et. al., Appellants,
v.
HEGGIES FULL HOUSE PIZZA, INC., Respondent,
NOVA INDUSTRIES, INC., a Wisconsin corporation, Respondent,
BIMET CORPORATION, an Illinois corporation, Respondent,
M.H. RHODES, Respondent.
**No. A03-316.**

Oct. 7, 2003.

Mille Lacs County District Court, File No. C3-01-282.

Thomas E. Emmer, Teresa A. Anderson, Emmer & Lively, P.A., Maple Plain, MN, for appellants.

Paul Wocken, Willenbring, Dahl, Wocken & Zimmermann, PLLC, Cold Spring, MN, for respondent Heggie's Pizza.

Michael R. Peterson, John G. Ness & Associates, St. Louis Park, MN, for respondent Nova Industries.

Patrick D. Reilly, Erstad & Riemer, P.A., Minneapolis, MN, for respondent M.H. Rhodes.

Sandra J. Grove, Joseph Goldberg & Associates, St. Louis Park, MN, for respondent Bimet Corporation.

Considered and decided by HARTEN, Presiding Judge, ANDERSON, Judge, and WRIGHT, Judge.

**UNPUBLISHED OPINION**

WRIGHT, Judge.

*1 Appellants, owners and insurers of a building destroyed by fire, sued respondents, each of whom had a role in the manufacture or supply of a pizza oven alleged to have started the fire. The district court granted summary judgment in favor of respondents. Appellants contend that (1) summary judgment was erroneously granted because there are genuine issues of material fact as to their theories of breach of warranties, strict liability, and negligence; (2) the district court abused its discretion when it dismissed the case due to spoliation of evidence; and (3) the award of costs and disbursements was erroneous. We affirm.

**FACTS**

On July 5, 1998, the restaurant at Malmo Bay Lodge (Malmo) was destroyed by a fire. Appellant Auto-Owners Insurance Company (Auto-Owners) insured the restaurant's owner, a partnership called the "Medinger 4," consisting of appellants Ralph Medinger, Bernice Medinger, Jean Harvey and Kathy Arseneau. Appellants allege that one of two pizza ovens supplied by respondent Heggie's Full House Pizza, Inc. (Heggie's), which sold pizza to Malmo, caused the fire. The oven, which Heggie's furnished to customers as long as they purchased pizza from Heggie's, was manufactured by respondent Nova Industries, Inc. (Nova); the oven's timer was manufactured by respondent M.H. Rhodes; and the thermostat was manufactured by respondent Bimet Corporation (Bimet). Appellants sued respondents under theories of breach of express and implied warranties, strict product liability, and negligence.

Deputy State Fire Marshal Mark Germain examined the fire scene and determined that the fire originated in the area near the two pizza ovens. Auto-Owners retained Paul Hansen, an expert with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Engineering & Fire Investigations, who provided deposition testimony regarding his examination of the pizza ovens.

Appellants were required to bulldoze the fire scene in August 1998 due to health and safety concerns. Appellants preserved the pizza ovens and photographed the fire scene, but other appliances were not saved. Because respondents were not notified prior to the destruction of the fire scene, respondents did not have the opportunity to investigate the fire scene.

After discovery, the district court granted summary judgment in favor of each respondent and subsequently awarded Bimet and M.H. Rhodes costs and disbursements. This appeal followed.

**DECISION**

**I.**

On appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Summary judgment is appropriate when the matter before the district court has no genuine issues of material fact and one party is entitled to judgment as a matter of law. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). A genuine issue for trial must be established by substantial evidence. *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69-70 (Minn.1997). "[S]ummary judgment is inappropriate when reasonable persons might draw different conclusions from the evidence presented ." *Id.* at 69 (citing *Ill. Farmers Ins. Co. v. Tapemark Co.,* 273 N.W.2d 630, 634 (Minn.1978)).

***2** Appellants argue that the district court erred in ruling that there were no genuine issues of material fact regarding the issues of breach of express and implied warranties by Heggie's. The warranties at issue are derived from the Uniform Commercial Code (UCC), which, as adopted in Minnesota, is codified as Chapter 336 of Minnesota Statutes. The alleged warranties at issue here are based on Article 2 of the UCC, which applies to transactions in goods. Minn.Stat. § 336.2-102 (2002). A sale of goods is required to trigger the application of Article 2 and its warranties. A sale is "the passing of title from the seller to the buyer for a price[.]" Minn.Stat. § 336.2- 106(1) (2002). Goods are defined as all things that are movable at the time of identification to the contract for sale. Minn.Stat. § 336.2-105(1) (2002).

The district court ruled that Heggie's did not breach any express or implied warranties regarding the pizza ovens because, although Heggie's sold pizza to Malmo, it did not sell pizza ovens. Appellants argue that Heggie's provision of pizza ovens to Malmo constituted a sale of goods sufficient to invoke the UCC. Appellants characterize this relationship as "purchasing the right to possess the Nova pizza ovens" because the pizza ovens were loaned to customers as long as they purchased pizza from Heggie's. But the record establishes that the pizza ovens were always owned by Heggie's. Appellant Harvey conceded at deposition that she did not pay for the ovens and, if Heggie's had asked for their return, she would have returned them.

The evidence fails to create a factual dispute regarding whether the provision of the pizza ovens constituted a sale of goods. Appellants' allegation that providing the ovens created "the right to possess" them falls far short of the passing of title required for a sale. Minn.Stat. § 336.2-106(1). The evidence establishes that the ovens were loaned; no sale occurred. Without a sale of goods, Article 2 of the UCC does not apply to the provision of the ovens, and expressed or implied warranties were not created. Accordingly, there are no questions of fact regarding appellants' claims of breach of express or implied warranties, [FN1] and summary judgment as to these claims was properly granted.

FN1. Even if Article 2 of the UCC applied, we agree with the district court's conclusion that there is no evidence in the record that Heggie's made any express or implied warranties. An express warranty is created upon "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Minn.Stat.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

§ 336.2-313(1)(a) (2002). The only express warranty alleged to have been given--replacement of a malfunctioning oven--was not a warranty of the future performance of the goods. *See Anderson v. Crestliner, Inc.,* 564 N.W.2d 218, 222 (Minn.App.1997) (stating that for purposes of UCC provision addressing when cause of action accrues "[a] warranty of future performance is different from a repair or replacement warranty"). Likewise, Heggie's did not breach implied warranties of merchantability or fitness for a particular purpose. "[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Minn.Stat. § 336.2-314(1) (2002). A merchant is "a person who deals in goods of the kind." Minn.Stat. § 336.2-104(1) (2002). There is no evidence establishing that Heggie's was a merchant with respect to pizza ovens. An implied warranty of fitness for a particular purpose exists when a plaintiff shows (1) the seller had reason to know of the buyer's particular purpose, (2) the seller had reason to know that the buyer was relying on the seller's "skill or judgment to furnish appropriate goods," and (3) actual reliance by the buyer. *Willmar Cookie Co. v. Pippin Pecan Co.,* 357 N.W.2d 111, 115 (Minn.App.1984). A particular purpose is distinguishable from an ordinary purpose. *See* Minn.Stat. § 336.2-315, Minnesota Code Cmt. (describing "[t]he implied warranty of fitness for a truly particular purpose, as distinguished from the ordinary purpose for which goods are used"). There was no evidence that Malmo intended to use the pizza ovens for any particular purpose other than baking pizzas. Thus, even if appellants established the requisite sale of goods, their claims of breach of express or implied warranties are unavailing.

Appellants also challenge the district court's determination that there are no genuine issues of material fact as to whether appellants can recover damages from respondents Bimet and M.H. Rhodes under a theory of strict liability. To establish a product-liability claim based on strict liability, "an injured party must show (1) the product was in a defective condition, unreasonably dangerous to the user, (2) the defect existed when the product left the manufacturer's control, and (3) causation." *Westbrock v. Marshalltown Mfg. Co.,* 473 N.W.2d 352, 356 (Minn.App.1991), *review denied* (Minn. Sept. 13, 1991). But a plaintiff must not be aware of the defect to recover in a strict-liability case. *Magnuson v. Rupp Mfg., Inc.,* 285 Minn. 32, 40, 171 N.W.2d 201, 207 (1969); *McCormick v. Custom Pools, Inc .,* 376 N.W.2d 471, 476 (Minn.App.1985), *review denied* (Minn. Dec. 30, 1985).

*3 Appellants argue that fact issues remain regarding whether the timer and thermostat were defective. The district court ruled that appellants' expert could not determine if the failure of the timer and thermostat were caused by a defect or by the natural end of the useful life of the product. The district court also found that, even if a defect existed, it was undisputed that appellant Arseneau had knowledge of it. Appellants contend that, because the timer and thermostat did not operate properly for the minimum number of cycles it should have operated before failing, the timer was defective. Appellants proffer no evidentiary support, however, for the proposition that a failure to operate for the minimum number of cycles establishes that the timer was defective. Paul Hansen, an expert retained by Auto-Owners, testified that he had no opinion on whether there was a defect in the timer. He concluded that contacts in the thermostat welded together, which eventually caused the fire. With regard to both the thermostat and the timer, Hanson did not know whether the cause of the fire was the end of the life of the product or a product defect. Without evidence that the pizza oven's timer was defective, we conclude that there is not a genuine issue of material fact with regard to this issue.

But even if a factual dispute exists regarding

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether the timer and thermostat were defective, the evidence establishes that Arseneau knew of the defect. In deposition, Arseneau testified that, on one of the ovens, the timer would stick and the heat would not dissipate. Appellants do not dispute this issue with regard to the strict-liability claim. Thus, we conclude that the district court did not err when it ruled that there were no genuine issues of material fact with regard to appellants' strict-liability claims.

Appellants also contend that genuine issues of material fact exist regarding negligence claims against respondents Bimet and M.H. Rhodes. "The essential elements of a negligence claim are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury." *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn.1995). A manufacturer has a duty to warn of dangers where it knew or should have known of the risk or hazard involved. *Germann v. F.L. Smithe Mach. Co.,* 395 N.W.2d 922, 924-25 (Minn.1986). Whether a legal duty to warn exists is a question of law for a district court. *Id.* at 924. Generally, there is no duty to warn of dangers if the user knows or should know of the potential danger. *Wiseman v. N. Pac. Ry. Co.,* 214 Minn. 101, 107, 7 N.W.2d 672, 675 (1943); *see also Lawrence v. Hollerich,* 394 N.W.2d 853, 855 (Minn.App.1986), *review denied* (Minn. Dec. 17, 1986).

The district court ruled that there is no evidence that respondents' products were defective; and, in any event, appellant Malmo's continued use of the oven, even after discovering that it was dangerous, shields respondents from liability. Appellants argue that a question of fact exists as to whether it was reasonably foreseeable that the thermostat and timer could malfunction or wear out. We agree with the district court's conclusion that the record fails to present any evidence that any of the respondents were responsible for a defective product or were notified that the pizza oven was malfunctioning. Further, it is undisputed that appellant Arseneau knew of the danger presented by the pizza oven. We, therefore, conclude that the district court did not err when it ruled that there are no genuine issues of material fact as to appellants' negligence claims against respondents.

**II.**

*4 Appellants next argue that the district court's sanction for spoliation of evidence--dismissal of the case--was an abuse of discretion. Spoliation is the destruction of evidence or the failure to preserve property for another's use in pending or future litigation. *Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.,* 456 N.W.2d 434, 436 (Minn.1990); *see also Hoffman v. Ford Motor Co.,* 587 N.W.2d 66, 71 (Minn.App.1998) (stating that "[s]poliation of evidence refers to the destruction of relevant evidence by a party"). A finding of spoliation is a factual finding that we will not set aside unless clearly erroneous. *Hoffman,* 587 N.W.2d at 70.

Courts are authorized to sanction a party for the spoliation of evidence when one party gains an evidentiary advantage due to its failure to preserve evidence after having the opportunity to examine it. *Himes v. Woodings-Verona Tool Works, Inc.,* 565 N.W.2d 469, 470-71 (Minn.App.1997), *review denied* (Minn. Aug. 26, 1997). Spoliation encompasses both intentional and negligent destruction of evidence. *Patton v. Newmar Corp.,* 538 N.W.2d 116, 118-19 (Minn.1995); *Himes,* 565 N.W.2d at 471 (noting that spoliation sanction does not imply any wrongdoing on spoliator's behalf). Regardless of intent, disposal of evidence is spoliation when a party knows or should know that the evidence should be preserved for pending or future litigation. *Patton,* 538 N.W.2d at 118. "The propriety of a sanction for the spoliation of evidence is determined by the prejudice resulting to the opposing party." *Hoffman,* 587 N.W.2d at 71.

Less than a month after the fire, due to safety and health concerns, the fire scene was bulldozed. Photographs of the fire scene were taken before its destruction. The two pizza ovens were salvaged, but all other electrical appliances were destroyed. Respondents were not notified prior to the destruction of the fire scene. The district court ruled that the destruction of the evidence would result in prejudice to the respondents and granted respondents' motions to dismiss based on spoliation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appellants assert that the district court made a clearly erroneous interpretation of the facts in characterizing the destruction of the fire scene.

"[A] fire scene itself is the best evidence of the origin and the cause of a fire." *Id.* Here, although the reason for destroying the fire scene demonstrates no wrongdoing, such destruction without prior notice to respondents foreclosed their opportunity to conduct an independent investigation of the fire scene. As a result, appellants have an immense evidentiary advantage because only a small amount of physical evidence--the pizza ovens--was preserved. Because any evidentiary basis for an alternative defense theory of causation was destroyed without prior notice to respondents, the district court's dismissal of the case due to spoliation was not an abuse of discretion. *See id.* at 71 (concluding that the district court did not abuse its discretion when it imposed a spoliation sanction after determining that relevant evidence of the origin and cause of the fire had been destroyed, altered, or lost where the fire scene was destroyed, but a vehicle alleged to be the cause of the fire was not).

### III.

***5** "In every action in a district court, the prevailing party ... shall be allowed reasonable disbursements paid or incurred." Minn.Stat. § 549.04 (2002). "[D]isbursements shall be stated in detail and verified by affidavit." Minn. R. Civ. P. 54.04. The district court is mandated to award reasonable costs to a prevailing party and has discretion to determine which party, if any, qualifies as a prevailing party. *Benigni v. County of St. Louis,* 585 N.W.2d 51, 54-55 (Minn.1998). "When reviewing a request for costs and disbursements, the district court must make sufficient findings of reasonable and necessary costs and disbursements." *Beniek v. Textron, Inc.,* 479 N.W.2d 719, 724 (Minn.App.1992), *review denied* (Minn. Feb. 19, 27, 1992). "To make these findings, the district court must take oral testimony of all costs and disbursements with full opportunity for both direct and cross-examination so a full record is available for review." *Id.* (quotation omitted). We may overturn a district court's award for costs and disbursements when the award is an abuse of discretion. *Kellar v. Von Holtum,* 605 N.W.2d 696, 703 (Minn.2000).

Appellants argue that the district court abused its discretion when it ordered costs and disbursements for Bimet in the amount of $10,785.05 and M.H. Rhodes in the amount of $17,333.75. The record contains documentation of litigation costs and affidavits presented by Bimet and M.H. Rhodes, who both prevailed by summary judgment. In its memorandum, the district court states that, following a hearing, it "carefully reviewed the defendants' requested costs as well as Plaintiff's objections and [found] the costs and disbursements to be reasonable and necessary." As the evidence supports the district court's findings, appellants' argument for finding an abuse of discretion is unavailing. We, therefore, conclude that the district court's findings are sufficient to support its award of costs and disbursements.

**Affirmed.**

2003 WL 22293643 (Minn.App.), 51 UCC Rep.Serv.2d 946

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.